Query     Reports     Utilities     Help   What's New   Log Out

# United States District Court
## District of Massachusetts (Boston)
## CIVIL DOCKET FOR CASE #: 1:23-cv-11552-NMG

Gilson v. Progress Software Corporation
Assigned to: Judge Nathaniel M. Gorton
Demand: $5,000,000
related Case: 1:23-cv-11370-NMG
Cause: 28:1332 Diversity-Property Damage

Date Filed: 07/11/2023
Jury Demand: None
Nature of Suit: 380 Personal Property: Other
Jurisdiction: Diversity

**Plaintiff**

**Cody Gilson**

represented by **Patrick J. Sheehan**
Whatley Kallas, LLP
101 Federal Street
19th Floor
Boston, MA 02110
617-203-8459
Fax: 800-922-4851
Email: psheehan@whatleykallas.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Progress Software Corporation**

Email All Attorneys

Email All Attorneys and Additional Recipients

| Date Filed | # | Docket Text |
|---|---|---|
| 07/11/2023 | 1 | COMPLAINT against Progress Software Corporation Filing fee: $ 402, receipt number AMADC-9940298 (Fee Status: Filing Fee paid), filed by Cody Gilson. (Attachments: # 1 Civil Cover Sheet, # 2 Category Form)(Sheehan, Patrick) Modified on 7/11/2023: Updated docket text. (Dore, Samantha). (Entered: 07/11/2023) |
| 07/11/2023 | 2 | ELECTRONIC NOTICE of Case Assignment. Judge Nathaniel M. Gorton assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge M. Page Kelley. (Danieli, Chris) (Entered: 07/11/2023) |
| 07/11/2023 | 3 | Summons Issued as to Progress Software Corporation. **Counsel receiving this notice electronically should download this summons, complete one for each defendant and serve it in accordance with Fed.R.Civ.P. 4 and LR 4.1. Summons will be mailed to plaintiff(s) not receiving notice electronically for completion of service.** (Dore, Samantha) (Entered: 07/11/2023) |

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| CODY GILSON, individually, and on behalf of all others similarly situated,<br><br>       Plaintiff,<br><br>   v.<br><br>PROGRESS SOFTWARE CORPORATION,<br><br>     Defendant. | Case No.<br><br>CLASS ACTION COMPLAINT<br><br><br><br><br><br>JURY TRIAL DEMANDED |

**CLASS ACTION COMPLAINT**

Plaintiff Cody Gilson ("Plaintiff"), individually and on behalf of all others similarly situated ("Class Members"), brings this action against Progress Software Corporation ("PSC" or "Defendant"), by and through his attorneys, and alleges, based upon personal knowledge as to his own actions, and based upon information and belief as to all other matters, as follows.

## I.  INTRODUCTION

1.  PSC is a Massachusetts-based software company that markets, sells, and supports a wide variety of software products to private corporate and government entities throughout the United States, including healthcare service providers and state DMV agencies.

2.  One of PSC's most popular and successful products is "MOVEit" a cloud hosting and secure file transfer program/service.

3.  As PSC's healthcare industry clients and customers utilized the MOVEit program/service, PSC collected, maintained, stored highly sensitive personal and medical information pertaining to its customers' patients, including, but not limited to: Social Security numbers, dates of birth, full names, addresses, telephone numbers, and driver's license numbers ("personally identifying information" or "PII"); and information regarding medical treatment,

1

diagnosis, and prescriptions, medical record numbers, health insurance information, and other protected health information ("private health information" or "PHI"); and financial account/payment card information ("financial account information") (collectively "Private Information").

4.      On May 31, 2023, PSC posted a notice on its website informing the public that it had discovered a SQL injection vulnerability in the MOVEit program and that this vulnerability had allowed unauthorized third-parties (*i.e.,* cybercriminals) to access and obtain the vast stores of highly sensitive Private Information stored within the MOVEit servers (the "Data Breach").[1]

5.      PSC has *still* declined to send a notice of this Breach to affected individuals (the "Class Members"). Instead, PSC's affected customers have begun to notify their own customers, patients, and other users of the Breach.

6.      One of PSC's healthcare industry customers is Vitality Group International, Inc. ("Vitality"), a Chicago-based software company which offers a mobile platform that provides health and wellness updates in real-time, encouraging users to prioritize their health through incentives, data and behavioral science. Vitality's program is used by over 30 million individuals around the world.[2] Upon learning about the breach at PSC and MOVEit, Vitality conducted its own internal investigation and determined that its own users Private Information was compromised as a result and thereafter dispatched a data breach notice to its users on June 22, 2023.

7.      Plaintiff Cody Gilson was a user of Vitality's healthcare app whose Private Information was compromised by the Breach.

---

[1] MOVEit Transfer Critical Vulnerability (May 2023) (CVE-2023-34362), Progress Community, available at https://community.progress.com/s/article/MOVEit-Transfer-Critical-Vulnerability-31May2023 (last accessed July 4, 2023).

[2] Vitality Group Confirms MOVEit Vulnerability Resulted in Data Breach Affecting Consumers' Health Information. JD Supra (June 28, 2023), available at https://www.jdsupra.com/legalnews/vitality-group-confirms-moveit-1611521/ (last accessed July 4, 2023).

8. PSC, despite being a sophisticated software company, failed to invest in adequate data security, and as a direct, proximate, and foreseeable result of its inexcusable failure to implement reasonable security protections sufficient to prevent an eminently avoidable cyberattack, unauthorized actors compromised its company networks and accessed its customers' files containing highly-sensitive Private Information.

9. PSC's failure to promptly notify Plaintiff and Class members that their Private Information was exfiltrated, PSC has *still* declined to do so as of the date of this complaint, due to PSC's apparent security failures virtually ensured that the unauthorized third parties who exploited those security lapses could monetize, misuse and/or disseminate that Private Information before Plaintiff and Class members could take affirmative steps to protect their sensitive information. As a result, Plaintiff and Class members will suffer indefinitely from the substantial and concrete risk that their identities will be (or already have been) stolen and misappropriated.

10. It is clear that PSC failed to take sufficient and reasonable measures to safeguard its data security systems and protect highly sensitive data in order to prevent the Data Breach from occurring; to disclose to its patients, and the public at large, that it lacked appropriate data systems and security practices to secure Private Information; and to timely detect and provide adequate notice of the Data Breach to affected individuals. Due to PSC's failures, Plaintiff and *millions* of other individuals had their Private Information compromised.

11. As a result of PSC's negligent, reckless, intentional, and/or unconscionable failure to adequately satisfy its contractual, statutory, and common-law obligations, Plaintiff's and Class members' Private Information was accessed and acquired by unauthorized third-parties for the express purpose of misusing the data and causing further irreparable harm to their personal, financial, reputational, and future well-being. Plaintiff and Class members face the real,

immediate, and likely danger of identity theft and misuse of their Private Information, especially because their Private Information was specifically targeted by malevolent actors.

12.     Plaintiff and Class members suffered injuries as a result of PSC's conduct including, but not limited to: lost or diminished value of their Private Information; out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Private Information; lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to the loss of time needed to take appropriate measures to avoid unauthorized and fraudulent charges; time needed to change usernames and passwords on their accounts; time needed to investigate, correct and resolve unauthorized access to their accounts; time needed to deal with spam messages and e-mails received subsequent to the Data Breach; charges and fees associated with fraudulent charges on their accounts; and the continued and increased risk of compromise to their Private Information, which remains in PSC's possession and is subject to further unauthorized disclosures so long as PSC fails to undertake appropriate and adequate measures to protect their Private Information. These risks will remain for the lifetimes of Plaintiff and the Class.

13.     Accordingly, Plaintiff brings this action on behalf of all those similarly situated to seek relief from Defendant's failure to reasonably safeguard Plaintiff's and Class members' Private Information; its failure to reasonably provide timely notification that Plaintiff's and Class members' Private Information had been compromised by an unauthorized third party; and for intentionally and unconscionably deceiving Plaintiff and Class members concerning the status, safety, location, access, and protection of their Private Information.

## II.    PARTIES

14.    Plaintiff Cody Gilson is a resident of Illinois. His Private Information came into PSC's possession through his use of Vitality's health app. Vitality was one of PSC's customers and used the MOVEit program to "securely" store and transfer its users' sensitive information. Plaintiff Gilson's Private Information was among those compromised by the Data Breach.

15.    Defendant PSC is a sophisticated software company that sells, markets, and supports a wide variety of software products to private corporate and government entities throughout the United States, including healthcare service providers. PSC is the current seller and maintainer of the MOVEit cloud hosting and "secure" file transfer program. PSC is a Massachusetts corporation with its principal place of business at 15 Wayside Road, Suite 400, Burlington, Massachusetts 01803.

## III.    JURISDICTION AND VENUE

16.    This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2), because this is a class action in which the matter in controversy exceeds the sum of $5,000,000, the number of class members exceeds 100, and at least one Class member is a citizen of a state different from Defendant. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

17.    This Court has personal jurisdiction over Defendant because Defendant is headquartered in Massachusetts.

18.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's and Class members' claims occurred in this District.

## IV.    FACTUAL ALLEGATIONS

### A.    Progress Software Corporation – Background

19.    MOVEit was originally developed by Ipswitch, Inc. ("Ipswitch").[3] In 2019, PSC wholly purchased and absorbed Ipswitch and its intellectual property, including the MOVEit program, for $225 million. Thereafter, PSC took over the marketing, sale, and continued development of the MOVEit cloud storage and "secure" file transfer program and its attendant services.

20.    PSC markets itself as "the experienced, trusted provider of products designed with you, our customers, in mind" and proclaims that one of its values is to "uphold trust" of its clients and consumers.

21.    The MOVEit program was utilized by numerous government agencies and private, corporate parties. And through the program, PSC acquired vast amounts of PII, PHI, and financial account information from the Class Members. PSC was entrusted with keeping this Private Information safe.

### B.    The Data Breach

22.    On May 31, 2023, PSC discovered "a vulnerability in MOVEit Transfer and MOVEit Cloud (CVE-2023-34362) that could lead to escalated privileges and potential unauthorized access to the environment.".[4]

---

[3] *MOVEit*, IPSWITCH, available at https://www.ipswitch.com/moveit (last accessed July 3, 2023).

[4] *MOVEit Transfer and MOVEit Cloud Vulnerability, Progress Security Center*, available at https://www.progress.com/security/moveit-transfer-and-moveit-cloud-vulnerability (last accessed July 3, 2023).

23.     Cybercriminals took full advantage of the CVE-2023-34362 vulnerability to access the MOVEit database, steal Private Information,[5] and launch a massive spree of ransomware attacks on MOVEit's customers using the Clop ransomware program.[6]

24.     CVE-2023-34362 presented an unacceptably simply and easy avenue of attack for malicious actors: SQL injection.[7] SQL injection occurs when a database requests an input from a user, such as a username/userid. A malicious actor can use this to inject a SQL statement into the input command which will unknowingly run on the database if the database is not properly programed to reject such a command.

25.     After further investigation, PSC discovered additional severe vulnerabilities, which were labeled CVE-2023-36932, CVE-2023-36933, and CVE-2023-36934.[8] CVE-2023-36932 and CVE-2023-36934 were additional SQL injection vulnerabilities while CVE-2023-36933 would have allowed malicious actors to completely shut down the MOVEit program.[9]

26.     The CVE-2023-34362 vulnerability had existed for at least two years. The corporate investigation and risk consulting firm Kroll discovered evidence that the cybercrime gang had been experimenting with ways to exploit CVE-2023-34362 as far back as July 2021.[10]

---

[5] Khandelwal Swati, *Another Critical Unauthenticated SQLi Flaw Discovered in MOVEit Transfer Software*, The Hacker News (July 7, 2023), available at https://thehackernews.com/2023/07/another-critical-unauthenticated-sqli.html (last accessed July 7, 2023).

[6] Carly Page, *Hackers launch another wave of mass-hacks targeting company file transfer tools*, TechCrunch (June 2, 2023), available at https://techcrunch.com/2023/06/02/hackers-launch-another-wave-of-mass-hacks-targeting-company-file-transfer-tools/ (last accessed July 3, 2023).

[7] Khandelwal Swati, *Another Critical Unauthenticated SQLi Flaw Discovered in MOVEit Transfer Software*, The Hacker News (July 7, 2023), available at https://thehackernews.com/2023/07/another-critical-unauthenticated-sqli.html (last accessed July 7, 2023).

[8] *Id*.

[9] *Id.*

[10] Ravie Lakshmanan, *New Critical MOVEit Transfer SQL Injection Vulnerabilities Discovered - Patch Now!* The Hacker News (June 10, 2023), available at https://thehackernews.com/2023/06/new-critical-moveit-transfer-sql.html#:~:text=%22An%20attacker%20could%20submit%20a,7)%2C%202021.1 (last accessed July 4, 2023).

27.     Kroll also discovered that the notorious Cl0p ransomware gang had successfully infiltrated MOVEit's database using this method and began extracting data as early as April 2023.[11]

28.     Despite being in possession of truly astonishing quantities of Private Information, MOVEit's database security was full of glaring vulnerabilities that went undiscovered and unpatched for at least two years. And a simple SQL injection allowed a notorious gang of cyber criminals unfettered access to plunder MOVEit's data vaults for *at least* two months before PSC discovered what had been done.

**C.     PSC's Many Failures Both Prior to and Following the Breach**

29.     First, PSC could have prevented this Data Breach by properly hardening the MOVEit databases against SQL injection attacks or by timely discovering such vulnerabilities and quickly patching them before they were exploited. Indeed, PSC had *two* years to discover not only the vulnerability but also the fact that cybercriminals had attempted to exploit the same breach before.

30.     Second, after the vulnerability *was* finally successfully exploited, PSC did not discover that the MOVEit databases had been compromised until almost two whole months had passed. Two whole months that allowed an infamous cyber gang to access and empty the proverbial vault.

31.     Third, when PSC finally acknowledged that it had experienced a breach, it failed to inform Plaintiff's and Class Members that their information had been compromised. It simply released a notice on its website and pushed an update to its programs.

---

[11] *Id.*

32.     Fourth, PSC has, to this day, made no effort to protect Plaintiff and the Class Members from the long-term consequences of PSC's previously mentioned failures. It has not even offered any kind of complimentary credit monitoring services to Plaintiff or other Class Members, which would still be insufficient to mitigate the heightened risk of identity theft that Plaintiff and the Class Members would suffer for the remainder of their lives.

33.     In short, PSC's myriad failures, including the failure to timely detect the Data Breach and total failure to properly notify Plaintiff and Class Members that their personal and medical information had been exfiltrated, allowed cyber criminals to access, misappropriate and misuse Plaintiff's and Class members' Private Information for months before PSC finally afforded victims the opportunity to take proactive steps to defend themselves and mitigate the near- and long-term consequences of the Data Breach.

## D.     Data Breaches Pose Significant Threats

34.     Data breaches have become a constant threat that, and PII, including Social Security numbers in particular, are a particularly valuable commodity and a frequent target of hackers.

35.     In 2022, the Identity Theft Resource Center's Annual End-of-Year Data Breach Report listed 1,802 total compromises involving 422,143,312 victims for 2022, which was just 50 compromises short of the current record set in 2021.[12] The HIPAA Journal's 2022 Healthcare Data Breach Report reported 707 compromises involving healthcare data, which is just 8 shy of the

---

[12] *2022 End of Year Data Breach Report*, Identity Theft Resource Center (January 25, 2023), available at: https://www.idtheftcenter.org/publication/2022-data-breach-report/?utm_source=press+release&utm_medium=web&utm_campaign=2022+Data+Breach+Report+ (last accessed March 23, 2023).

record of 715 set in 2021 and still double that of the number of similar such compromises in 2017 and triple the number of compromises in 2012.[13]

36.     Statista, a German entity that collects and markets data relating to, among other things, data breach incidents and the consequences thereof, confirms that the number of data breaches has been steadily increasing since it began a survey of data compromises in 2005 with 157 compromises reported that year, to a peak of 1,862 in 2021, to 2022's total of 1,802.[14] The number of impacted individuals has also risen precipitously from approximately 318 million in 2015 to 422 million in 2022, which is an increase of nearly 50%. [15]

37.     Data breaches are a constant threat because PII is routinely traded on the dark web as s simple commodity, with social security numbers being so ubiquitous to be sold at as little as $2.99 apiece and passports retailing for as little as $15 apiece.[16]

38.     In addition, the severity of the consequences of a compromised social security number belies the ubiquity of stolen numbers on the dark web. Criminals and other unsavory elements can fraudulently take out loans under the victims' name, open new lines of credit, and cause other serious financial difficulties for victims:

> [a] dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone

---

[13] *2022 Healthcare Data Breach Report*, The HIPAA Journal (January 24, 2023), available at: https://www.hipaajournal.com/2022-healthcare-data-breach-report/ (last accessed March 23, 2023).

[14] *Annual Number of Data Breaches and Exposed Records in the United States from 2005 to 2022*, Statista, available at: https://www.statista.com/statistics/273550/data-breaches-recorded-in-the-united-states-by-number-of-breaches-and-records-exposed/ (last accessed last accessed March 23, 2023).

[15] *Id.*

[16] *What is your identity worth on the dark web?* Cybernews (September 28, 2021), available at: https://cybernews.com/security/whats-your-identity-worth-on-dark-web/ (last accessed March 23, 2023).

illegally using your Social Security number and assuming your identity can cause
a lot of problems.[17]

This is exacerbated by the fact that he problems arising from a compromised social security

number are exceedingly difficult to resolve. A victim is forbidden from proactively changing his

or her number unless and until it is actually misused and harm has already occurred. And even this

delayed remedial action is unlikely to undo the damage already done to the victims:

> Keep in mind that a new number probably won't solve all your problems. This is
> because other governmental agencies (such as the IRS and state motor vehicle
> agencies) and private businesses (such as banks and credit reporting companies)
> will have records under your old number. Along with other personal information,
> credit reporting companies use the number to identify your credit record. So using
> a new number won't guarantee you a fresh start. This is especially true if your other
> personal information, such as your name and address, remains the same.[18]

39.     Beyond social security numbers, the most sought after and expensive PII on the

dark web are stolen medical records which command prices from $250 to $1,000 each.[19] Medical

records are considered the most valuable because unlike credit cards, which can easily be canceled,

and social security numbers, which can be changed, medical records contain "a treasure trove of

unalterable data points, such as a patient's medical and behavioral health history and

demographics, as well as their health insurance and contact information".[20] With this bounty of ill-

gotten information, cybercriminals can wreak havoc and perpetuate far serious crimes such as drug

---

[17] United States Social Security Administration, *Identity Theft and Your Social Security Number*, United
States Social Security Administration (July 2021), available at: https://www.ssa.gov/pubs/EN-05-
10064.pdf  (last accessed March 23, 2023).

[18] *Id.*

[19] Paul Nadrag, Capsule Technologies*, Industry Voices—Forget credit card numbers. Medical records
are the hottest items on the dark web*, Fierce Healthcare (January 26, 2021), available at:
https://www.fiercehealthcare.com/hospitals/industry-voices-forget-credit-card-numbers-medical-records-
are-hottest-items-dark-web (last accessed March 23, 2023).

[20] *Id.*

dealing (by obtaining prescriptions under the victims' names) and major fraud (by filing large-scale and bogus insurance claims).[21]

40.     The wrongful use of compromised medical information is known as medical identity theft and the damage resulting from medical identity theft is routinely far more serious than the harm resulting from the theft of simple PII. Victims of medical identity theft spend an average of $13,500 to resolve problems arising from medical identity theft and there are currently no laws limiting a consumer's liability for fraudulent medical debt (by contrast, a consumer's liability for fraudulent credit card charges is capped at $50).[22] It is also "considerably harder" to reverse the damage from medical identity theft with victims routinely suffering long term harassment from aggressive medical debt collection practices, irreversible damage to credit, and even prosecution after thieves used their stolen data to stockpile prescription drugs for sale in the drug trade.[23]

41.     Instances of Medical identity theft have grown exponentially over the years from approximately 6,800 cases in 2017 to just shy of 43,000 in 2021, which represents a seven-fold increase in the crime.[24]

42.     As explained by Kunal Rupani, director of product management at Accellion, a private cloud solutions company, in the context of a different medical data breach:

> Unlike credit card numbers and other financial data, healthcare information doesn't have an expiration date. As a result, a patient's records can sell on the black market for upwards of fifty times the amount of their credit card number, making hospitals and other healthcare organizations extremely lucrative targets for cybercriminals.[25]

---

[21] *Id.*

[22] Medical Identity Theft, AARP (March 25, 2022), available at: https://www.aarp.org/money/scams-fraud/info-2019/medical-identity-theft.html (last accessed March 23, 2023).

[23] *Id.*

[24] *Id.*

[25] Jeff Goldman, 21st Century Oncology Notifies 2.2 Million Patients of Data Breach (Mar. 11, 2016),

43.    In light of the dozens of high-profile health and medical information data breaches that have been reported in recent years, entities like Defendant charged with maintaining and securing patient PII know the importance of protecting that information from unauthorized disclosure. Indeed, on information and belief, Defendant was aware of highly publicized security breaches where PII and protected health information was accessed by unauthorized cybercriminals, including breaches of computer systems involving: UnityPoint Health, Lifetime Healthcare, Inc., Community Health Systems, Kalispell Regional Healthcare, Anthem, Premera Blue Cross, and many others.[26]

44.    In addition, the Federal Trade Commission ("FTC") has brought dozens of cases against companies that have engaged in unfair or deceptive practices involving inadequate protection of consumers' personal data, including recent cases concerning health-related information against LabMD, Inc., SkyMed International, Inc., and others. The FTC publicized these enforcement actions to place companies like Defendant on notice of their obligation to safeguard customer and patient information.

45.    Indeed, cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets so they are aware of and take appropriate measures to prepare for and are able to thwart such an attack.

46.    Given the nature of PSC's Data Breach, as well as the length of the time PSC's networks were breached and the long delay in notification to the Class, it is foreseeable that the compromised Private Information has been or will be used by hackers and cybercriminals in a

---

http://www.esecurityplanet.com/network-security/21st-century-oncology-notifies-2.2-million-patients-of-data-breach.html (last accessed March 11, 2023).

[26] *See e.g.*, *Healthcare Data Breach Statistics*, HIPAA Journal, available at:
https://www.hipaajournal.com/healthcare-data-breach-statistics (last accessed March 11, 2023).

variety of devastating ways. Indeed, the cybercriminals who possess Plaintiff's and Class members' Private Information can easily obtain Plaintiff's and Class members' tax returns or open fraudulent credit card accounts in Class members' names.

47. Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, because credit card victims can cancel or close credit and debit card accounts.[27] The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

48. Despite the prevalence of public announcements of data breach and data security compromises, its own acknowledgment of the risks posed by data breaches, and its own acknowledgment of its duties to keep Private Information private and secure, PSC failed to take appropriate steps to protect the Private Information of Plaintiff and the Class from misappropriation. As a result, the injuries to Plaintiff and the Class were directly and proximately caused by PSC's failure to implement or maintain adequate data security measures for customers' customers.

**E.     PSC Had a Duty and Obligation to Protect Private Information**

49. PSC has an obligation, both statutory and self-imposed, to keep confidential and protect from unauthorized access and/or disclosure Plaintiff's and Class members' Private Information. PSC's obligations are derived from: 1) government regulations and state laws, including HIPAA and FTC rules and regulations; 2) industry standards; and 3) promises and

---

[27] *See* Jesse Damiani, *Your Social Security Number Costs $4 On The Dark Web, New Report Finds*, Forbes, Mar 25, 2020, available at https://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-security-number-costs-4-on-the-dark-web-new-report-finds/?sh=6a44b6d513f1 (last accessed March 11, 2023).

representations regarding the handling of sensitive PII and medical records. Plaintiff and Class members provided, and PSC obtained, their information on the understanding that it would be protected and safeguarded from unauthorized access or disclosure.

50.     HIPAA requires, *inter alia*, that Covered Entities and Business Associates implement and maintain policies, procedures, systems and safeguards that ensure the confidentiality and integrity of consumer and patient PII and PHI, protect against any reasonably anticipated threats or hazards to the security or integrity of consumer and patient PII and PHI, regularly review access to data bases containing protected information, and procedures and systems to detect, contain, and correct any unauthorized access to protected information. *See* 45 CFR § 164.302, *et seq.*

51.     Additionally, HIPAA requires Covered Entities and Business Associates to provide notification to every affected individual following the impermissible use or disclosures of any protected health information. The individual notice must be provided to affected individuals without unreasonable delay and no later than 60 days following discovery of the breach. Further, for a breach involving more than 500 individuals, entities are required to provide notice in prominent media outlets. *See* 45 CFR § 164.400, *et seq.*

52.     Defendant has an obligation to comply with HIPAA requirements concerning the protection of PII and protected health information and prompt and adequate notification of data breaches.

53.     Additionally, FTC Health Breach Notification Rule obligates companies that suffered a data breach to provide notice to every individual affected by the data breach, as well as notifying the media and the FTC. *See* 16 CFR 318.1, *et seq.*

54.     The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[28] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[29]

55.     The FTC has issued numerous guides for businesses highlighting the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-marking.[30]

56.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[31] The guidelines note businesses should protect the personal information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems.[32] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts

---

[28] 17 C.F.R. § 248.201 (2013).

[29] *Id.*

[30] *Start With Security*, Federal Trade Commission (June 2015), available at https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

[31] *Protecting Personal Information: A Guide for Business*, Federal Trade Comm'n (October 2016), available at https://www.ftc.gov/tips-advice/business-center/guidance/protecting-personal-information-guide-business.

[32] *Id.*

of data being transmitted from the system; and have a response plan ready in the event of a breach.[33] PSC clearly failed to do any of the foregoing, as evidenced by the length of the Data Breach, the fact that the Breach went undetected, and the amount of data exfiltrated.

57.     Here, at all relevant times, PSC was fully aware of its obligation to protect the PII Private Information of its customers' customers, including Plaintiff and the Class, and on information and belief, PSC is a sophisticated and technologically savvy hospital that relies extensively on technology systems and networks to maintain its practice, including storing its customers' customers PII, protected health information, and medical information in order to operate its business.

58.     PSC had and continues to have a duty to exercise reasonable care in collecting, storing, and protecting the Private Information from the foreseeable risk of a data breach. The duty arises out of the special relationship that exists between PSC and Plaintiff and Class members. PSC alone had the exclusive ability to implement adequate security measures to its cyber security network to secure and protect Plaintiff's and Class members' Private Information.

59.     PSC's failure to follow the FTC guidelines and its subsequent failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential data constitutes unfair acts or practices prohibited by Section 5 of the Federal Trade Commission Act , 14 U.S.C. § 45.

60.     Further, PSC had a duty to promptly notify Plaintiff and the Class that their Private Information was accessed by unauthorized persons.

---

[33] *Id.*

**F.     PSC Violated HIPAA, FTC and Industry Standard Data Protection Protocols**

61.     HIPAA obligates Covered Entities and Business Associates to adopt administrative, physical, and technology safeguards to ensure the confidentially, integrity, and security of consumer and patient PII and PHI.

62.     The FTC rules, regulations, and guidelines obligate businesses to protect PII and PHI, from unauthorized access or disclosure by unauthorized persons.

63.     At all relevant times, PSC was fully aware of its obligation to protect the patient PII and PHI entrusted to it by both Class members, because it is a sophisticated business entity that is in the business of maintaining and transmitting PII and PHI.

64.     PSC was also aware of the significant consequences of its failure to protect Private Information for the thousands of individuals who provided their PII and medical information and knew that this data, if hacked, would gravely injure consumers, including Plaintiff and Class members.

65.     Unfortunately, PSC failed to comply with HIPAA, FTC rules, regulations and guidelines, and industry standards concerning the protection and security of Private Information. As evidenced by the duration, scope, and nature of the Data Breach, among its many deficient practices, PSC failed in, *inter alia*, the following respects:

        a.     Developing and employing adequate intrusion detection systems;

        b.     Engaging in regular reviews of audit logs and authentication records;

        c.     Developing and maintaining adequate data security systems to reduce the risk of data breaches and cyberattacks;

        d.     Ensuring the confidentiality and integrity of its customers' customers' PII and protected health and information and records that Defendant receives and maintains;

        e.     Protecting against any reasonably anticipated threats or hazards to the security or integrity of its customers' customers' Private Information;

f.  Implementing policies and procedures to prevent, detect, contain, and correct security violations;

g.  Developing adequate policies and procedures to regularly review records of system activity, such as audit logs, access reports, and security incident tracking reports;

h.  Implementing technical policies, procedures and safeguards for electronically stored information concerning Private Information that permit access for only those persons or programs that have specifically been granted access; and

i.  Other similar measures to protect the security and confidentiality of its customers' customers' Private Information.

66.  Had PSC implemented the above-described data security protocols, policies, and/or procedures, the consequences of the Data Breach could have been avoided or greatly reduced. PSC could have prevented or detected the Data Breach prior to the hackers accessing PSC's systems and extracting sensitive and personal information; the amount and/or types of Private Information accessed by the hackers could have been avoided or greatly reduced; and current and Class Members would have been notified sooner, allowing them to promptly take protective and mitigating actions.

**G.  PSC's Data Security Practices are Inadequate and Inconsistent with its Self-Imposed Data Security Obligations**

67.  PSC represented that it "guarantees the security of sensitive files," and promises, among other things, to: keep customers' files private; comply with industry standards related to data security and maintenance of its customers' files and the Private Information contained therein; only disclose the sensitive information for business purposes and reasons related to the services it provides; and provide adequate notice to individuals if their Private Information is disclosed without authorization.[34]

---

[34] *Progress Brochure*, available at https://d117h1jjiq768j.cloudfront.net/docs/default-source/default-document-

19

68. Plaintiff and Class members provided their Private Information to PSC in reliance on its promises and self-imposed obligations to keep PII and medical information confidential, and to secure the Private Information from unauthorized access by malevolent actors. It failed to do so.

69. Had PSC undertaken the actions that federal and state law require, the Data Breach could have been prevented or the consequences of the Data Breach significantly reduced, as PSC would have detected the Data Breach prior to the hackers extracting data from PSC's networks, and PSC's customers' customers would have been notified of the Data Breach sooner, allowing them to take necessary protective or mitigating measures much earlier.

**H.    Plaintiff and the Class Suffered Harm Resulting from the Data Breach**

70. Like any data hack, the Data Breach presents major problems for all affected.[35]

71. The FTC warns the public to pay particular attention to how they keep personally identifying information including Social Security numbers and other sensitive data. As the FTC notes, "once identity thieves have your personal information, they can drain your bank account, run up charges on your credit cards, open new utility accounts, or get medical treatment on your health insurance."[36]

72. The ramifications of PSC's failure to properly secure Plaintiff's and Class members' Private Information are severe. Identity theft occurs when someone uses another

---

library/progress-corporate-brochure-2023-rgb.pdf?sfvrsn=a0b1f671_3 (last accessed July 4, 2023).

[35] Paige Schaffer, *Data Breaches' Impact on Consumers*, Insurance Thought Leadership (July 29, 2021), available at https://www.insurancethoughtleadership.com/cyber/data-breaches-impact-consumers (last accessed March 23, 2023).

[36] *Warning Signs of Identity Theft*, Federal Trade Comm'n, available at https://www.identitytheft.gov/#/Warning-Signs-of-Identity-Theft (last accessed March 11, 2023).

person's financial, and personal information, such as that person's name, address, Social Security number, and other information, without permission in order to commit fraud or other crimes.

73.     According to data security experts, one out of every four data breach notification recipients becomes a victim of identity fraud.

74.     Furthermore, PII has a long shelf-life because it contains different forms of personal information, it can be used in more ways than one, and it typically takes time for an information breach to be detected.

75.     Accordingly, PSC's wrongful actions and/or inaction and the resulting Data Breach have also placed Plaintiff and the Class at an imminent, immediate, and continuing increased risk of identity theft and identity fraud.[37]   Indeed, "[t]he level of risk is growing for anyone whose information is stolen in a data breach."[38]   Javelin Strategy & Research, a leading provider of quantitative and qualitative research, notes that "[t]he theft of SSNs places consumers at a substantial risk of fraud."[39]   Moreover, there is a high likelihood that significant identity fraud and/or identity theft has not yet been discovered or reported.   Even data that has not yet been exploited by cybercriminals presents a concrete risk that the cybercriminals who now possess Class members' Private Information will do so at a later date or re-sell it.

---

[37] *Data Breach Victims More Likely To Suffer Identity Fraud*, INSURANCE INFORMATION INSTITUTE BLOG (February 23, 2012), available at http://www.iii.org/insuranceindustryblog/?p=267 (last accessed March 11, 2023).

[38] Susan Ladika, *Study: Data Breaches Pose A Greater Risk*, CREDITCARDS.COM (July 23, 2014), available at http://www.creditcards.com/credit-card-news/data-breach-id-theft-risk-increase-study-1282.php (last accessed March 11, 2023).

[39] THE CONSUMER DATA INSECURITY REPORT: EXAMINING THE DATA BREACH- IDENTITY FRAUD PARADIGM IN FOUR MAJOR METROPOLITAN AREAS, available at https://www.it.northwestern.edu/bin/docs/TheConsumerDataInsecurityReport_byNCL.pdf) (last accessed March 11, 2023).

76.     The theft of medical information, beyond the theft of more traditional forms off PII, is especially harmful for victims. Medical identity theft, the misuse of stolen medical records and information, has seen a seven-fold increase over the last five years and this explosive growth far outstrips the increase in incidence of traditional identity theft.[40] Medical Identity Theft is especially nasty for victims because of the lack of laws that limit a victim's liabilities and damages from this type of identity theft (e.g., a victim's liability for fraudulent credit card charges is capped at $50), the unalterable nature of medical information, the sheer costs involved in resolving the fallout from a medical identity theft (victims spend, on average, $13,500 to resolve problems arising from this crime), and the risk of criminal prosecution under anti-drug laws.[41]

77.     Here, due to the Breach, Plaintiff and Class members have been exposed to injuries that include, but are not limited to:

a.      Theft of Private Information;

b.      Costs associated with the detection and prevention of identity theft and unauthorized use of financial accounts as a direct and proximate result of the Private Information stolen during the Data Breach;

c.      Damages arising from the inability to use accounts that may have been compromised during the Data Breach;

d.      Costs associated with spending time to address and mitigate the actual and future consequences of the Data Breach, such as finding fraudulent charges, cancelling and reissuing payment cards, purchasing credit monitoring and identity theft protection services, placing freezes and alerts on their credit reports, contacting their financial institutions to notify them that their personal information was exposed and to dispute fraudulent charges, imposition of withdrawal and purchase limits on compromised accounts, including but not limited to lost productivity and opportunities, time taken from the enjoyment of one's life, and the inconvenience, nuisance, and annoyance of dealing with all issues resulting from the Data Breach, if they

---

[40] Medical Identity Theft, AARP (March 25, 2022), available at: https://www.aarp.org/money/scams-fraud/info-2019/medical-identity-theft.html (last accessed March 23, 2023).

[41] *Id.*

were fortunate enough to learn of the Data Breach despite PSC's total failure in disseminating notice in accordance with state law;

e.  The imminent and impending injury resulting from potential fraud and identity theft posed because their Private Information is exposed for theft and sale on the dark web; and

f.  The loss of Plaintiff's and Class members' privacy.

78.  Plaintiff and Class members have suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from their Private Information being accessed by cybercriminals, risks that will not abate within a mere one to two years: the unauthorized access of Plaintiff's and Class members' Private Information, especially their Social Security numbers, puts Plaintiff and the Class at risk of identity theft indefinitely.

79.  As a direct and proximate result of PSC's acts and omissions in failing to protect and secure Private Information, Plaintiff and Class members have been placed at a substantial risk of harm in the form of identity theft, and have incurred and will incur actual damages in an attempt to prevent identity theft.

80.  Plaintiff retains an interest in ensuring there are no future breaches, in addition to seeking a remedy for the harms suffered as a result of the Data Breach on behalf of both herself and similarly situated individuals whose Private Information was accessed in the Data Breach.

I.  **Plaintiff Cody Gilson's Experience**

81.  Plaintiff Cody Gilson was an avid user of Vitality's health application. As part of using the app, Plaintiff Gilson shared highly sensitive PII, PHI, and financial account information with Vitality.

82.  Vitality was a customer of PSC and utilized the MOVEit program to "securely" transfer and store the sensitive Private Information of its customers.

83. Upon information and belief, Plaintiff Gilson's Private Information was transmitted to PSC and stored on its databases via the MOVEit program. Thereafter, cybercriminals including the Cl0p ransomware gang, accessed and exfiltrated Plaintiff Gilson's Private Information.

84. In May 2023, Plaintiff Gilson observed that his bank account had been compromised and that funds had been removed from his account.

85. Upon information and belief, Plaintiff Gilson's bank account was compromised using information stolen as a result of the MOVEit data breach.

86. As a result of the Data Breach, Plaintiff Gilson has made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to, researching the Data Breach and reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud. Plaintiff Gilson has spent several hours dealing with the Data Breach, valuable time Plaintiff Gilson otherwise would have spent on other activities, including, but not limited to, work and recreation.

87. As a result of the Data Breach, Plaintiff Gilson has suffered anxiety due to the public dissemination of his PII, which he believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and using his Private Information for purposes of identity theft and fraud. Plaintiff Gilson is concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

88. Plaintiff Gilson suffered actual injury from having his Private Information compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of his Private Information, a form of property that Defendant obtained

from Plaintiff; (b) violation of his privacy rights; and (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

89.     As a result of the Data Breach, Plaintiff Gilson anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. As a result of the Data Breach, Plaintiff Gilson is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

## V.     CLASS ALLEGATIONS

90.     Plaintiff brings this action on behalf of himself and, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), a Class of:

> All persons in the United States whose Private Information was accessed in the Data Breach.

Excluded from the Class are Defendant, its executives and officers, and the Judge(s) assigned to this case. Plaintiff reserves the right to modify, change or expand the Class definition after conducting discovery.

91.     Numerosity: Upon information and belief, the Class is so numerous that joinder of all members is impracticable with the number of affected individuals estimated to be in the millions.[42] The exact number and identities of individual members of the Class are unknown at this time, such information being in the sole possession of PSC and obtainable by Plaintiff only through the discovery process. The members of the Class will be identifiable through information and records in PSC's possession, custody, and control.

92.     Existence and Predominance of Common Questions of Fact and Law: Common questions of law and fact exist as to all members of the Class. These questions predominate over

---

[42] Vitality, just one of PSC's customers, had over 30 million users.

the questions affecting individual Class members. These common legal and factual questions include, but are not limited to:

a.     Whether PSC's data security and retention policies were unreasonable;

b.     Whether PSC failed to protect the confidential and highly sensitive information with which it was entrusted;

c.     Whether PSC owed a duty to Plaintiff and Class members to safeguard their Private Information;

d.     Whether PSC breached any legal duties in connection with the Data Breach;

e.     Whether PSC's conduct was intentional, reckless, willful or negligent;

f.     Whether an implied contract was created concerning the security of Plaintiff's and Class members' Private Information;

g.     Whether PSC breached that implied contract by failing to protect and keep secure Plaintiff's and Class members' Private Information and/or failing to timely and adequately notify Plaintiff and Class members of the Data Breach;

h.     Whether Plaintiff and Class members suffered damages as a result of PSC's conduct; and

i.     Whether Plaintiff and the Class are entitled to monetary damages, injunctive relief and/or other remedies and, if so, the nature of any such relief.

93.     Typicality: All of Plaintiff's claims are typical of the claims of the Class since Plaintiff and all members of the Class had their Private Information compromised in the Data Breach. Plaintiff and the members of the Class sustained damages as a result of PSC's uniform wrongful conduct.

94.     Adequacy: Plaintiff is an adequate representative because his interests do not materially or irreconcilably conflict with the interests of the Class they seek to represent, he has retained counsel competent and highly experienced in complex class action litigation, and intend to prosecute this action vigorously. Plaintiff and his counsel will fairly and adequately protect the

interests of the Class. Neither Plaintiff nor his counsel have any interests that are antagonistic to the interests of other members of the Class.

95.     Superiority: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiff and the Class. The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by PSC's conduct. It would be virtually impossible for members of the Class individually to effectively redress the wrongs done to them. Even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and to the court system presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Members of the Class can be readily identified and notified based on, *inter alia*, PSC's records and databases.

96.     PSC has acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final relief with respect to the Class as a whole.

## VI.     CAUSES OF ACTION

### COUNT I – Negligence

97.     Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

98.     This count is brought on behalf of all Class members.

99.     PSC owed a duty to Plaintiff and the Class to use and exercise reasonable and due care in obtaining, retaining, and securing the Private Information that PSC collected.

100. PSC owed a duty to Plaintiff and the Class to provide security, consistent with industry standards and requirements, and to ensure that its cyber networks and systems, and the personnel responsible for them, adequately protected the Private Information that PSC collected.

101. PSC owed a duty to Plaintiff and the Class to implement processes to quickly detect a data breach, to timely act on warnings about data breaches, and to inform the victims of a data breach as soon as possible after it is discovered.

102. PSC owed a duty of care to Plaintiff and the Class because they were a foreseeable and probable victim of any inadequate data security practices.

103. PSC gathered and stored the Private Information belonging to Plaintiff and the Class.

104. PSC knew or should have known it inadequately safeguarded this information.

105. PSC knew that a breach of its systems would inflict millions of dollars of damages upon Plaintiff and Class members, and PSC was therefore charged with a duty to adequately protect this critically sensitive information.

106. PSC had a special relationship with Plaintiff and Class members. Plaintiff's and Class members' highly sensitive Private Information was entrusted to PSC on the understanding that adequate security precautions would be taken to protect the PII and medical information. Moreover, only PSC had the ability to protect its systems and the Private Information stored on them from attack.

107. PSC's own conduct also created a foreseeable risk of harm to Plaintiff, Class members, and their PII. PSC's misconduct included failing to: (1) secure its systems, servers and networks, despite knowing their vulnerabilities, (2) comply with industry standard security

practices, (3) implement adequate system and event monitoring, and (4) implement the safeguards, policies, and procedures necessary to prevent this type of data breach.

108.    PSC breached its duties to Plaintiff and Class members by failing to provide fair, reasonable, or adequate cyber networks and data security practices to safeguard the Private Information belonging to Plaintiff and the Class.

109.    PSC breached its duties to Plaintiff and the Class by creating a foreseeable risk of harm through the misconduct previously described.

110.    PSC breached the duties it owed to Plaintiff and Class members by failing to implement proper technical systems or security practices that could have prevented the unauthorized access of Private Information.

111.    The law further imposes an affirmative duty on PSC to timely disclose the unauthorized access and theft of the Private Information belonging to Plaintiff and the Class so that Plaintiff and the Class can take appropriate measures to mitigate damages, protect against adverse consequences, and thwart future misuse of their Private Information.

112.    PSC breached the duties it owed to Plaintiff and the Class by failing to timely and accurately disclose to Plaintiff and Class members that their Private Information had been improperly acquired or accessed.

113.    PSC breached its duty to timely notify Plaintiff and Class members of the Data Breach by failing to provide direct notice to Plaintiff and the Class concerning the Data Breach.

114.    As a direct and proximate result of PSC's conduct, Plaintiff and the Class have suffered a drastically increased risk of identity theft, relative to both the time period before the breach, as well as to the risk born by the general public, as well as other damages, including but not limited to time and expenses incurred in mitigating the effects of the Data Breach.

115.    As a direct and proximate result of PSC's negligent conduct, Plaintiff and the Class have suffered injury and are entitled to damages in an amount to be proven at trial.

### COUNT II – Negligence Per Se

116.    Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

117.    This count is brought on behalf of all Class members.

118.    HIPAA obligates Covered Entities and Business Associates to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information" and "must reasonably safeguard protected health information." 45 CFR § 164.530(c).

119.    In the event of a data breach, HIPAA obligates Covered Entities and Business Associates to notify affected individuals, prominent media outlets, and the Secretary of the Department of Health and Human Services of the data breach without unreasonable delay and in no event later than 60 days after discovery of the data breach. 45 CFR § 164.400, *et seq.*

120.    Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by companies, such as PSC, of failing to use reasonable measures to protect PII. Various FTC publications and orders also form the basis of PSC's duty.

121.    PSC violated HIPAA and FTC rules and regulations obligating companies to use reasonable measures to protect Private Information by failing to comply with applicable industry standards; and by failing to provide reasonable notice of the actual breach. PSC's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored, the foreseeable consequences of a Data Breach and the exposure of Plaintiff's and Class members' sensitive Private Information.

30

122. PSC's violations of HIPAA and Section 5 of the FTC Act and other applicable statutes, rules, and regulations constitutes negligence *per se*.

123. Plaintiff and the Class are within the category of persons HIPAA and the FTC Act were intended to protect.

124. The harm that occurred as a result of the Data Breach described herein is the type of harm HIPAA and FTC Act were intended to guard against.

125. As a direct and proximate result of PSC's negligence *per se*, Plaintiff and the Class have been damaged as described herein, continue to suffer injuries as detailed above, are subject to the continued risk of exposure of their Private Information in PSC's possession, and are entitled to damages in an amount to be proven at trial.

### COUNT III – Breach of Third-Party Beneficiary Contract

126. Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

127. This count is brought on behalf of all Class Members.

128. Upon information and belief, Defendant entered into virtually identical contracts with its customers to provide secure file transfer services to them. The terms of these contracts included material descriptions of PSC's data security practices, procedures, and protocols sufficient to safeguard Private Information that its customers would entrust to PSC.

129. Such contracts were made expressly for the benefit of Plaintiffs and the Class Members, as it was their Private Information that PSC agreed to receive and protect through its services. Thus, the benefit of collection and protection of the Private Information belonging to Plaintiffs and the Class Members was the direct and primary objective of the contracting parties and Plaintiffs and Class Members were direct and express beneficiaries of such contracts.

130. PSC knew that Plaintiffs and the Class Members would suffer substantial harm in the event it breached these contracts with its customers.

131. Through various actions and inactions including its failure to secure its MOVEit program and databases, failure to timely detect and patch security vulnerabilities, and failure to timely detect a security breach, PSC breached its contracts with its customers.

132. As foreseen at the formation of these contracts, PSC's breach caused Plaintiffs and the Class Members to be harmed through, *inter alia*, the continuous and substantially increased risk of identity theft, the loss in value of their Private Information, and lost time in attempting to mitigate the consequences of the breach.

133. Accordingly, Plaintiff and the Class are entitled to damages in an amount to be determined at trial, along with costs and attorneys' fees incurred in this action.

## COUNT IV – Unjust Enrichment

134. Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

135. This count is brought on behalf of all Class Members.

136. Plaintiff and the Class have an interest, both equitable and legal, in their Private Information that was collected and maintained by PSC.

137. PSC was benefitted by the conferral upon it of Plaintiff's and Class members' Private Information and by its ability to retain and use that information. PSC understood that it was in fact so benefitted.

138. PSC also understood and appreciated that Plaintiff's and Class members' Private Information was private and confidential and its value depended upon PSC maintaining the privacy and confidentiality of that information.

139. But for PSC's willingness and commitment to maintain its privacy and confidentiality, Plaintiff and Class members would not have provided or authorized their Private Information to be provided to PSC.

140. As a result of PSC's wrongful conduct as alleged herein (including, among other things, its deception of Plaintiff, the Class, and the public relating to the nature and scope of the data breach; its failure to employ adequate data security measures; its continued maintenance and use of the Private Information belonging to Plaintiff and Class members without having adequate data security measures; and its other conduct facilitating the theft of that Private Information PSC has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and the Class.

141. PSC's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein, including the compiling and use of Plaintiff's and Class members' sensitive Private Information, while at the same time failing to maintain that information secure from intrusion.

142. Under the common law doctrine of unjust enrichment, it is inequitable for PSC to be permitted to retain the benefits it received, and is still receiving, without justification, from Plaintiff and the Class in an unfair and unconscionable manner. PSC's retention of such benefits under circumstances making it inequitable to do so constitutes unjust enrichment.

143. The benefit conferred upon, received, and enjoyed by PSC was not conferred officiously or gratuitously, and it would be inequitable and unjust for PSC to retain the benefit.

144. Furthermore, Plaintiff has no adequate remedy at law.

145. PSC is therefore liable to Plaintiff and the Class for restitution in the amount of the benefit conferred on PSC as a result of its wrongful conduct, including specifically the value to

PSC of the PII and medical information that was accessed and exfiltrated in the Data Breach and the profits PSC receives from the use and sale of that information.

146. Accordingly, Plaintiff and the Class are entitled to damages in an amount to be determined at trial, along with costs and attorneys' fees incurred in this action.

## COUNT V – Invasion of Privacy

147. Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

148. This count is brought on behalf of all Class members.

149. Plaintiff and Class members had a reasonable expectation of privacy in the Private Information that PSC possessed and/or continues to possess.

150. By failing to keep Plaintiff's and Class members' Private Information safe, and by misusing and/or disclosing their Private Information to unauthorized parties for unauthorized use, PSC invaded Plaintiff's and Class members' privacy by:

   a. Intruding into their private affairs in a manner that would be highly offensive to a reasonable person; and

   b. Publicizing private facts about Plaintiff and Class members, which is highly offensive to a reasonable person.

151. PSC knew, or acted with reckless disregard of the fact that, a reasonable person in Plaintiff's position would consider PSC's actions highly offensive.

152. PSC invaded Plaintiff's and Class members' right to privacy and intruded into Plaintiff's and Class members' private affairs by misusing and/or disclosing their private information without their informed, voluntary, affirmative, and clear consent.

153. As a proximate result of such misuse and disclosures, Plaintiff's and Class members' reasonable expectation of privacy in their Private Information was unduly frustrated and thwarted. PSC's conduct amounted to a serious invasion of Plaintiff's and Class members' protected privacy interests.

154.    In failing to protect Plaintiff's and Class members' Private Information, and in misusing and/or disclosing their Private Information, PSC has acted with malice and oppression and in conscious disregard of Plaintiff's and the Class members rights to have such information kept confidential and private, in failing to provide adequate notice, and in placing its own economic, corporate, and legal interests above the privacy interests of its millions of individuals. Plaintiff, therefore, seek an award of damages, including punitive damages, on behalf of Plaintiff and the Class.

### COUNT VI – Declaratory Judgment and Injunctive Relief

155.    Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

156.    This count is brought on behalf of all Class members.

157.    Under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described herein.

158.    An actual controversy has arisen in the wake of the Data Breach regarding PSC's present and prospective common law and other duties to reasonably safeguard Plaintiff's and Class members' Private Information, and whether PSC is currently maintaining data security measures adequate to protect Plaintiff and Class members from further data breaches that compromise their Private Information. Plaintiff alleges that PSC's data security measures remain inadequate.

159.    Plaintiff and the Class continue to suffer injury as a result of the compromise of their Private Information and remain at imminent risk that further compromises of their Private Information will occur in the future.

160. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring that PSC continues to owe a legal duty to secure Plaintiff's and Class members' Private Information, to timely notify them of any data breach, and to establish and implement data security measures that are adequate to secure Private Information.

161. The Court also should issue corresponding prospective injunctive relief requiring PSC to employ adequate security protocols consistent with law and industry standards to protect Plaintiff's and Class members' Private Information.

162. If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy. The threat of another breach of the Private Information in PSC's possession, custody, and control is real, immediate, and substantial. If another breach of PSC's network, systems, servers, or workstations occurs, Plaintiff and the Class will not have an adequate remedy at law, because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

163. The hardship to Plaintiff and the Class if an injunction does not issue exceeds the hardship to PSC if an injunction is issued. Among other things, if another massive data breach occurs at PSC, Plaintiff and the Class will likely be subjected to substantial identify theft and other damage. On the other hand, the cost to PSC of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and PSC has a pre-existing legal obligation to employ such measures.

164. Issuance of the requested injunction will serve the public interest by preventing another data breach at PSC, thus eliminating additional injuries to Plaintiff and the thousands of Class members whose confidential information would be further compromised.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually, and on behalf of all members of the Class, respectfully requests that the Court enter judgment in his favor and against PSC, as follows:

A.     That the Court certify this action as a class action, proper and maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure; declare that Plaintiff is a proper class representative; and appoint Plaintiff's Counsel as Class Counsel;

B.     That Plaintiff be granted the declaratory relief sought herein;

C.     That the Court grant permanent injunctive relief to prohibit PSC from continuing to engage in the unlawful acts, omissions, and practices described herein;

D.     That the Court award Plaintiff and the Class members compensatory, consequential, and general damages in an amount to be determined at trial;

E.     That the Court award Plaintiff and the Class members statutory damages, and punitive or exemplary damages, to the extent permitted by law;

F.     That the Court award to Plaintiff the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

G.     That the Court award pre- and post-judgment interest at the maximum legal rate;

H.     That the Court award grant all such equitable relief as it deems proper and just, including, but not limited to, disgorgement and restitution; and

I.     That the Court grant all other relief as it deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of herself and the putative Class, demands a trial by jury on all issues so triable.

Date: July 11, 2023

Respectfully Submitted,

*/s/ Patrick J. Sheehan*
Patrick J. Sheehan (BBO# 639320)
**WHATLEY KALLAS, LLP**
101 Federal Street, 19th Floor
Boston, Massachusetts 02110
Telephone: (617) 203-8459
Facsimile: (800) 922-4851
psheehan@whatleykallas.com

Daniel O. Herrera
Nickolas J. Hagman
**CAFFERTY CLOBES MERIWETHER
& SPRENGEL LLP**
135 S. LaSalle, Suite 3210
Chicago, Illinois 60603
Telephone: (312) 782-4880
Facsimile: (312) 782-4485
dherrera@caffertyclobes.com
nhagman@caffertyclobes.com

*Attorneys for Plaintiff and the Proposed Class*

TO ORDER COPIES OF ANY DOCUMENTS LISTED
BELOW, CALL WESTLAW COURTEXPRESS
1-877-DOC-RETR (1-877-362-7387) (Additional Charges Apply)

**This docket is current through 07/11/2023**

Today's Date: 7/11/2023
Source: U.S. District Court, District of Massachusetts (Boston)

| | |
|---|---|
| **Court:** | U.S. District Court, District of Massachusetts (Boston) |
| **Case Title:** | Gilson v. Progress Software Corporation |
| **Case:** | 1:23-CV-11552 |
| **Date Filed:** | 07/11/2023 |

**SYNOPSIS INFORMATION**

| | |
|---|---|
| **Allegations:** | Class action. Defendant failed to promptly notify plaintiff and class members that their personal and medical information had been compromised by an unauthorized third party. |
| **Damages:** | Class certification, compensatory damages, statutory damages, punitive damages, exemplary damages, general damages, consequential damages, declaratory and injunctive relief, interest, disbursements, expenses, fees and costs. |

**COMPLAINT**                         Original Image of this Document (PDF)

**CASE INFORMATION**

| | |
|---|---|
| **Case Number:** | 1:23CV11552 |
| **Jury Demand:** | None |
| **Demand:** | $5,000,000 |
| **Nature of Suit:** | Torts: Other Personal Property Damage (380) |
| **Key Nature of Suit:** | Torts/Negligence; Personal Property; Other Personal Property Damage (430.77.10) |
| **Jurisdiction:** | Diversity |
| **Cause:** | 28 USC 1332 Diversity-Property Damage |
| **Lead Docket:** | 1:23-CV-11370 |

**PARTICIPANT INFORMATION**

## Cody Gilson

| | |
|---|---|
| **Type:** | Plaintiff |
| **Attorney:** | Patrick J. Sheehan |
| **Status:** | LEAD ATTORNEY; ATTORNEY TO BE NOTICED |
| **Firm Name:** | Whatley Kallas, LLP |
| **Attorney Address:** | 101 Federal Street |
| | 19th Floor |
| | Boston, MA 02110 |
| **Attorney Phone:** | 617-203-8459 |
| **Attorney Fax:** | 800-922-4851 |
| **Email Address:** | psheehan@whatleykallas.com |

## Progress Software Corporation

| | |
|---|---|
| **Type:** | Defendant |

**CALENDAR INFORMATION**
View Calendar Information

**DOCKET PROCEEDINGS (1)**

| Entry #: | Date: | Description: | | |
|----------|-------|-------------|---|---|
| 1 | 07/11/2023 | COMPLAINT against Progress Software Corporation Filing fee: $ 402, receipt number AMADC-9940298 (Fee Status: Filing Fee paid), filed by Cody Gilson. (Attachments: # 1 Civil Cover Sheet, # 2 Category Form) (Sheehan, Patrick) Modified on 7/11/2023: Updated docket text. (Dore, Samantha). (Entered: 07/11/2023) | View | Add to request |

TO ORDER COPIES OF ANY DOCUMENTS LISTED
ABOVE, CALL WESTLAW COURTEXPRESS
1-877-DOC-RETR (1-877-362-7387) (Additional Charges Apply)

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.