# Exhibit 1

## *0:23cv2254, White Et Al V. Pension Benefit Information, Llc Et Al*

US District Court Docket

United States District Court, Minnesota

(DMN)

**This case was retrieved on 07/28/2023**

## Header

**Case Number:** 0:23cv2254
**Date Filed:** 07/28/2023
**Nature of Suit:** Personal Property (380)
**Cause:** Diversity
**Lead Docket:** None
**Other Docket:** None
**Jurisdiction:** Diversity

**Class Code:** Open
**Statute:** 28:1332
**Jury Demand:** Plaintiff
**Demand Amount:** $5,000,000
**NOS Description:** Personal Property

## Participants

### Litigants

Diane White
**Plaintiff**

Sabela Portillo
**Plaintiff**

Rebecca Iddings
**Plaintiff**

Pension Benefit Information, LLC
d/b/a PBI Research Services |
**Defendant**

Progress Software Corporation
**Defendant**

### Attorneys

Brian C Gudmundson
ATTORNEY TO BE NOTICED
Zimmerman Reed, PLLP
1100 Ids Center 80 South Eighth Street
Minneapolis, MN  55402
USA
612-341-0400 Fax: 612-341-0844
Email:Brian.Gudmundson@zimmreed.Com

Brian C Gudmundson
ATTORNEY TO BE NOTICED
Zimmerman Reed, PLLP
1100 Ids Center 80 South Eighth Street
Minneapolis, MN  55402
USA
612-341-0400 Fax: 612-341-0844
Email:Brian.Gudmundson@zimmreed.Com

Brian C Gudmundson
ATTORNEY TO BE NOTICED
Zimmerman Reed, PLLP
1100 Ids Center 80 South Eighth Street
Minneapolis, MN  55402
USA
612-341-0400 Fax: 612-341-0844
Email:Brian.Gudmundson@zimmreed.Com

0:23cv2254, White Et Al V. Pension Benefit Information, Llc Et Al

## Proceedings

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 1 | 07/28/2023 | COMPLAINT  against Pension Benefit Information, LLC, Progress Software Corporation (filing fee $ 402, receipt number AMNDC-10437877) filed by Diane White, Rebecca Iddings, Sabela Portillo. Filer requests summons issued. (Attachments: # 1 Civil Cover Sheet) (Gudmundson, Brian) (Entered: 07/28/2023) | |

Copyright © LexisNexis CourtLink, Inc. All Rights Reserved.

*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***

**End of Document**

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| DIANE WHITE, SABELA PORTILLO, and REBECCA IDDINGS, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiffs, | JURY TRIAL DEMANDED |
| v. | |
| PENSION BENEFIT INFORMATION, LLC d/b/a PBI RESEARCH SERVICES and PROGRESS SOFTWARE CORPORATION, | |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiffs Diane White, Sabela Portillo, and Rebecca Iddings, individually and on behalf of all others similarly situated (hereinafter "Plaintiffs"), bring this Class Action Complaint against Defendants Pension Benefit Information, LLC d/b/a PBI Research Services ("PBI") and Progress Software Corporation ("PSC") (collectively, "Defendants"), and allege, upon personal knowledge as to their own actions, and upon information and belief as to all other matters, as follows:

## INTRODUCTION

1. Plaintiffs bring this class action on behalf of themselves and all other individuals ("Class Members") who had their sensitive personal identifiable information—i.e., information that is or could be used, whether on its own or in combination with other information, to identify, locate, or contact a person, including, without limitation: full names; driver's license and/or identification card numbers; physical addresses; dates of birth; Social Security numbers ("SSN"); insurance policy number; height; eye color; vehicle registration information; handicap placard

information; names of former or current employers, spouses or domestic partners, and children;[1] and other personally identifying information ("PII" or "Personal Information")—disclosed to unauthorized third parties during a massive data breach compromising Defendants' MOVEit Transfer and MOVEit Cloud ("MOVEit") software that occurred on or about May 27, 2023 (the "Data Breach").

2. MOVEit is an industry-leading third-party data transfer service used to send large files. It is widely used across the country and around the world. Reports are rapidly emerging of newly discovered exposures of sensitive data in this major international cyber-attack. The full scope of the Data Breach is not yet known, as entities continue to disclose breaches of their data.

3. Defendant PBI is a company that provides services to pension funds and insurers, such as the California Public Employees' Retirement System ("CalPERS") and the California State Teachers' Retirement System ("CalSTRS"). PBI's services include locating individuals for those funds and insurers and satisfying regulatory obligations to search databases to identify deaths of insured persons and fund members in order to determine benefit eligibility. As part of its business operations, PBI uses the MOVEit managed file transfer software.

---

[1] *See MOVEit Data Breach*, OREGON.GOV, https://www.oregon.gov/odot/dmv/pages/data_breach.aspx (last visited July 27, 2023); *MOVEit Data Breach Impacts OMV*, LA. OFF. MOTOR VEHICLES (June 15, 2023), https://www.expresslane.org/alerts/; *PBI Data Breach – Frequently Asked Questions*, CALPERS (July 14, 2023), https://www.calpers.ca.gov/page/home/pbi; *MOVEit Security Event*, GENWORTH (July 14, 2023), https://www.genworth.com/moveit.html.

4.      Defendant PSC is a technology company that acquired the developer of MOVEit in May 2019 for $225 million in order to "bolster [PSC]'s core offerings." Since that time, PSC's core offerings have included selling and/or licensing MOVEit to its enterprise customers.[2]

5.      During the Data Breach, and due to Defendants' data security and privacy shortcomings, unauthorized persons were able to gain access to Defendants' clients' files by exploiting a vulnerability in the MOVEit platform. Specifically, the attacks, which appear to be ongoing, reportedly have been conducted by a ransomware gang—CL0P Ransomware Gang, also known as TA505—which began hacks of MOVEit transfer servers on May 27, 2023, using a vulnerability tracked as CVE-2023-34362. The United States Cybersecurity & Infrastructure Security Agency ("CISA") reports that TA505 has been known to both publish exfiltrated data and to ransom exfiltrated data for profit.[3]

6.      The MOVEit attacks have resulted in widespread disclosures of data breaches domestically and worldwide, impacting various companies, federal government agencies, and local state agencies. Numerous impacted companies have announced being impacted by the MOVEit Data Breach, while others will continue to disclose breaches in the near term.

7.      Defendants tout that they are technology professionals capable of and committed to safeguarding their clients' data and the individuals' information contained in that data.

8.      In reality, Defendants' pronouncements as being capable data custodians proved false. Contrary to their many representations and promises, Defendants utilized inadequate data

---

[2] Press Announcement, Progress Software Corporation, Progress Completes Acquisition of Ipswitch, Inc. (May 1, 2019), *available at* https://www.sec.gov/Archives/edgar/data/876167/000087616719000073/ipswitchclose_finalxpressx.htm.

[3] *See #StopRansomware: CL0P Ransomware Gang Exploits CVE-2023-34362 MOVEit Vulnerability*, CYBERSECURITY & INFRASTRUCTURE SECURITY AGENCY (June 7, 2023), https://www.cisa.gov/news-events/cybersecurity-advisories/aa23-158a.

security measures they knew, or should have known, put the highly sensitive data they oversaw at significant risk of theft by or exposure to nefarious parties.

9.     Plaintiffs are victims of Defendants' conduct and the MOVEit Data Breach.

10.    Plaintiff Diane White is a victim of Defendants' conduct and the MOVEit Data Breach. She is a resident of California and a member of CalPERS whose Personal Information was compromised by the breach of CalPERS data. She received a Notice of Data Breach from CalPERS dated June 22, 2023, informing her of the breach of Defendants' systems and that her Personal Information, including her full name, date of birth, SSN, and potentially the names of any dependents, was compromised as part of the Data Breach.

11.    Plaintiff Sabela Portillo is a victim of Defendants' conduct and the MOVEit Data Breach. She is a resident of California and a member of both CalSTRS and CalPERS whose Personal Information was compromised by the breach of CalSTRS and CalPERS data. She received Notices of Data Breach from both CalSTRS and CalPERS, informing her of the breach of Defendants' systems and that her Personal Information was compromised as part of the Data Breach.

12.    Plaintiff Rebecca Iddings is a victim of Defendants' conduct and the MOVEit Data Breach. She is a resident of California and a member of CalPERS whose Personal Information was compromised by the breach of CalPERS data. She received a Notice of Data Breach from CalPERS, informing her of the breach of Defendants' systems and that her Personal Information was compromised as part of the Data Breach.

13.    Defendants are and at all relevant times were well aware of the data security shortcomings in the MOVEit file transfer software. Indeed, software vulnerabilities have become ubiquitous in large data breaches. Nevertheless, Defendants failed to take steps to undertake the

necessary testing for and eliminate the vulnerabilities in the MOVEit software, putting its file transfer service clients and their clients' customers, employees, and other affiliated persons at risk of being impacted by a breach.

14. Defendants' failure to ensure that its MOVEit file transfer software and services were adequately secure fell far short of its obligations and Plaintiffs' and Class Members' reasonable expectations for data privacy, has jeopardized the security of their Personal Information, and has put them at a serious and continuing risk of fraud and identity theft.

15. As a result of Defendants' conduct and the Data Breach, Plaintiffs' and Class Members' privacy has been invaded. Their Personal Information is now in the hands of criminals, and they face a substantially increased risk of identity theft and fraud. Accordingly, these individuals now must take immediate and time-consuming action to protect themselves from such identity theft and fraud.

16. Plaintiffs seek to remedy these harms, on behalf of themselves and all similarly situated individuals whose Personal Information was accessed and/or compromised during the Data Breach, and bring causes of action for: (I) Negligence; (II) Negligence Per Se; (III) Breach of Contract; (IV) Unjust Enrichment; (V) Invasion of Privacy; and (VI) Breach of Fiduciary Duty.

## THE PARTIES

17. Plaintiff Diane White is a citizen of California and a member of CalPERS. Plaintiff White received a Notice of Data Breach via mail informing her that her Personal Information was stolen during the Data Breach. Plaintiff White has spent time and resources since the Data Breach to mitigate the effects of any nefarious use of her Personal Information, including monitoring and changing the passwords for her various accounts. Plaintiff White anticipates spending additional

time monitoring her financial and other accounts and taking other actions to mitigate the consequences of the Data Breach.

18.     Plaintiff Sabella Portillo is a citizen of California and a member of CalSTRS and CalPERS. Plaintiff Portillo received a notice of data breach letters from both CalSTRS and CalPERS via mail informing her that her Personal Information was stolen during the Data Breach. After the Data Breach, Plaintiff Portillo experienced effects of her information being compromised and used nefariously, including receiving spam inquiries and being forced to close two checking accounts after notification that an unknown individual attempted to withdraw from them. Plaintiff Portillo anticipates spending additional time monitoring her financial and other accounts and taking other actions to mitigate the consequences of the Data Breach.

19.     Plaintiff Rebecca Iddings is a citizen of California and a member of CalPERS. Plaintiff Iddings received a notice of data breach letter from CalPERS via mail informing her that her Personal Information was stolen during the Data Breach. Plaintiff Iddings has spent time and resources since the Data Breach to mitigate the effects of any nefarious use of her Personal Information, including monitoring and changing the passwords for her various accounts. Plaintiff Iddings anticipates spending additional time monitoring her financial and other accounts and taking other actions to mitigate the consequences of the Data Breach.

20.     Defendant Pension Benefit Information, LLC d/b/a PBI Research Services is a Delaware for-profit corporation with its principal place of business at 333 S 7th Street, Suite 2400, Minneapolis, Minnesota 55402.

21.     Defendant Progress Software Corporation is a Delaware for-profit corporation with its principal place of business located at 15 Wayside Road, Suite 4, Burlington, Massachusetts 01803.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(a) and (d), because the matter in controversy, exclusive of interest and costs, exceeds the sum or value of five million dollars ($5,000,000.00) and is a class action in which Plaintiffs are citizens of states different from Defendants. Further, greater than two-thirds of the Class Members reside in states other than the state in which Defendants are citizens.

23.     The Court has personal jurisdiction over Defendant PBI because PBI is headquartered in Minneapolis, Minnesota, is registered to conduct business in Minnesota, and has a registered office address in Roseville, Minnesota. This Court has personal jurisdiction over Defendant PSC because PSC is registered to conduct business in Minnesota and has a registered office address in Roseville, Minnesota. Defendants have minimum contacts with Minnesota because they conduct substantial business in the state.

24.     Venue properly lies in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in Minnesota and because Defendants conduct a substantial part of their business within this District.

## COMMON FACTUAL ALLEGATIONS

### A.  PBI, PSC, and the Unsecure MOVEit Software

25.     Defendant PBI is a company located in Minneapolis, Minnesota that provides services to entities across the nation, including identification of decedents, plan participants, and policyholders.

26.     To provide these services, PBI handles the sensitive Personal Information of millions of individuals, including SSNs, names, dates of birth, zip codes, states, policy numbers, and names of individuals' employers, spouses or partners, and children.

27.     PBI acknowledges how critical it is to safeguard this information—and, therefore, how devastating it is to individuals whose information has been stolen. PBI states, "[p]rotecting and securing the information of our clients . . . is of critical importance to PBI";[4] that PBI "is committed to the responsible use of information and protection of individual privacy rights"; that PBI "strives to provide products and services . . . that help reduce and prevent fraud . . . in ways that protect individuals' privacy"; that PBI "aspire[s] to protect individuals' privacy through the design of our products and services"; that "[d]ata security is a company imperative"; that "PBI strives to provide additional safeguards for sensitive personally identifiable information"; that "PBI believes in the important of notifying individuals who may have had their sensitive personally identifiable information acquired by an unauthorized individual";[5] and that "PBI recognizes the importance of protecting personal information."[6]

28.     PBI utilizes MOVEit software and on-premises hardware to conduct its business operations.[7] By using on-premises MOVEit hardware, PBI had physical control over the server that was breached at the time of the breach.

_____

[4] *Data Security*, PBI RESEARCH SERVICES, https://www.pbinfo.com/data-security/ (last visited July 27, 2023).

[5] *Privacy Principles*, PBI RESEARCH SERVICES, https://www.pbinfo.com/privacy-principles/ (last visited July 27, 2023).

[6] *Privacy Policy*, PBI RESEARCH SERVICES, https://www.pbinfo.com/privacy-policy/ (last visited July 27, 2023).

[7] *See Global MOVEit Transfer Cyberattack*, PBI RESEARCH SERVICES, https://www.pbinfo.com/faq-communication/ (last visited July 27, 2023) ("PBI systems were not impacted, outside of the isolated MOVEit Transfer server."); *MOVEit*, IPSWITCH,

29.     Defendant PSC also provides services to entities across the nation. PSC licenses its MOVEit software and associated hardware to enable companies, including PBI, to transfer large volumes of information—and, purportedly, to do so securely. The information handled by MOVEit software and hardware is often highly sensitive, including Personal Information such as an individual's full name; driver's license and/or identification card number; physical address; date of birth; Social Security number; insurance policy number; height; eye color; vehicle registration information; handicap placard information; and names of former or current employers, spouses or domestic partners, and children.

30.     Like PBI, PSC acknowledges the critical nature of safeguarding such SPI. PSC boasts that MOVEit can "easily ensure the reliability of core business processes, and secure the transfer for sensitive data"; "provides full security, reliability and compliance"; provides "security, centralized access controls, file encryption and activity tracking needed to ensure operational reliability and compliance"; permits users to "[r]eliabl[y] and easily comply with SLAs, internal governance requirements and regulations"; "reduces errors while mitigating the risk of data loss";[8] and can "transfer sensitive information securely" and "assure regulatory compliance."[9] These features, according to PSC, will "keep sensitive information out of harm's way."[10]

31.     PSC has further held itself out as a data security expert by publishing and advertising a "whitepaper" on its website titled "Ransomware vulnerabilities in file transfer,"

---

https://www.ipswitch.com/moveit (last visited July 27, 2023) ("MOVEit Transfer provides . . . an on-premises solution.").

    [8] *MOVEit*, *supra* note 9.

    [9] *Secure File Transfer and Automation Software for the Enterprise*, PROGRESS, https://www.progress.com/moveit (last visited July 27, 2023).

    [10] *Id.*

which purports to teach "how to assure your file transfer servers aren't the launching pad for a ransomware attack."[11]

      32.     PSC makes a host of claims about data security and its MOVEit product. Its website claims "MOVEit provides secure collaboration and automated file transfers of sensitive data" and "[e]ncryption and activity tracking enable compliance with regulations such as PCI, HIPAA and GDPR."[12]

      33.     PSC also touts all of the following on its website regarding MOVEit[13]:

# Securely Share Files Across the Enterprise and Globally

Reduce the risk of data loss and non-compliance with a fully-auditable and managed file transfer solution. Extend file transfer capabilities to all users to eliminate insecure use of email and quickly onboard partners and third-parties. Easily create automated file transfer tasks and workflows to accelerate your business and eliminate the risk of user error. Track and report on every single transfer.

✓ **Transfer Sensitive Information Securely**

Encryption in-transit and at-rest and advanced security features keep sensitive information out of harm's way.

✓ **Assure Regulatory Compliance**

Easily implement security controls and establish an audit trail.

✓ **Let End Users Collaborate Securely**

Easily ensure secure and compliant sharing of sensitive data for all users.

✓ **Accelerate Task and Workflow Creation**

Enable your team with programming-free automation of multi-step, logic-based workflows.

---

[11] *Whitepaper: Ransomware Vulnerabilities in File Transfer*, IPSWITCH, https://www.ipswitch.com/resources/whitepapers-ebooks/ransomware-vulnerabilities-in-file-transfer (last visited July 27, 2023).

[12] *MOVEit: Managed File Transfer Software*, PROGRESS, https://www.progress.com/moveit (last visited July 10, 2023).

[13] *Id.*

34.   Despite Defendants' promises to protect sensitive data and efforts to portray themselves as capable data custodians, Defendants' own data security decisions created substantial gaps that Defendants knew or should have known created a risk of a data breach. That risk materialized in May 2023, when hackers broke into Defendants' systems and stole Plaintiffs' and Class Members' Personal Information.

35.   Despite knowing or having reason to know that MOVEit leaves Defendants' customers and the third parties interacting and transacting with their file transfer customers (like Plaintiffs and other Class Members) exposed to security threats, they continued to offer and transact business with their customers using the MOVEit file transfer products without adequately testing and identifying the vulnerabilities in the products, and patching or otherwise eliminating those threats.

36.   Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their Personal Information.

37.   Plaintiffs and Class Members directly or indirectly entrusted Defendants with their sensitive and confidential information, including Personal Information, some of which is static, meaning that it does not change and can be used to commit myriad financial crimes against Plaintiffs and Class Members.

38.   Plaintiffs and Class Members relied on Defendants to keep their Personal Information confidential and securely maintained, to use the information for business purposes only, and to make only authorized disclosures of this information.

39.   Defendants had a duty to adopt reasonable measures to protect and safeguard the Personal Information of Plaintiffs and Class Members from unauthorized disclosure to third parties.

40.     Defendants failed to use reasonable security procedures and practices appropriate to the nature of the sensitive, unencrypted Personal Information they were entrusted to maintain for Plaintiffs and Class Members, causing the exposure of the Personal Information.

41.     The unencrypted Personal Information of Plaintiffs and Class Members will likely end up for sale on the dark web, subjecting Plaintiffs and Class Members to the continued threat of identity theft and other fraudulent activity by unknown actors. Additionally, the Personal Information may fall into the hands of companies that will use the information for targeted marketing without the approval of Plaintiffs and Class Members.

**B.  The MOVEit Data Breach**

42.     According to CISA, beginning on May 27, 2023, hackers exploited a vulnerability in the MOVEit technology and accessed, copied, and stole Plaintiffs' and Class Members' Personal Information.[14]

43.     According to reports, the CL0P ransomware gang is responsible for the attack on the MOVEit platform, which has led to compromised networks around the globe, including across the United States. CISA explained, "Internet-facing MOVEit Transfer web applications were infected with a specific malware used by CL0P, which was then used to steal data from underlying MOVEit Transfer databases."[15]

---

[14] *#StopRansomware*, *supra* note 3.

[15] Bruce Sussman, *Clop Ransomware and the MOVEit Cyberattack: What to Know*, BLACKBERRY BLOG (June 19, 2023), https://blogs.blackberry.com/en/2023/06/clop-ransomware-and-moveit-cyberattack.

44.     A senior CISA officer informed reporters that "several hundred" businesses and organizations in the United States may be impacted by the hacking campaign in addition to government entities.[16]

45.     The list of impacted entities and organizations that are MOVEit customers continues to grow, but reports indicate that the following domestic entities have indicated potential impact or confirmed impact by the MOVEit breach, among others ("Impacted MOVEit Clients"):

- Louisiana Office of Motor Vehicles;
- Oregon Department of Motor Vehicles;
- Oak Ridge Associated Universities (U.S. Department of Energy);
- Waste Isolation Pilot Plant (U.S. Department of Energy);
- Umpqua Bank;
- UnitedHealthcare Student Resources;
- Leggett & Platt;
- University System of Georgia;
- 1st Source;
- First National Bankers Bank;
- Putnam Investments;
- Datasite;
- National Student Clearinghouse;
- Gen Digital.

46.     PSC was aware of the vulnerability in its MOVEit technology by no later than May 31, 2023, and published a software update purportedly addressing the vulnerability.[17] Specifically, Defendants identified that MOVEit's web-based front end is affected by a critical structured query language (SQL) injection vulnerability/attack vector that can be exploited by an unauthenticated attacker to access databases associated with the product.

---

[16] Onur Demirkol, *US government under siege: MOVEit breach exposes critical data to ruthless Clop ransomware attack*, DATACONOMY (June 19, 2023), https://dataconomy.com/2023/06/19/moveit-breach-data-clop-ransomware/.

[17] *MOVEit Transfer and MOVEit Cloud Vulnerability*, PROGRESS (July 5, 2023), https://www.progress.com/security/moveit-transfer-and-moveit-cloud-vulnerability.

47.     "PBI became aware of the MOVEit compromise on June 2, 2023," and only then applied the software patch provided by PSC.[18] This means that PBI delayed at least two days before applying the patch to address the vulnerability in its systems that was allowing unauthorized access to Plaintiffs' and Class Members Personal Information to third parties.

48.     Further delay ensued before Plaintiffs or Class Members were informed of the Data Breach. PBI initially communicated the breach to CalPERS on June 6, 2023, and to CalSTRS on June 4, 2023. However, that communication by PBI was so deficient as to detail and scope that it did not give CalSTRS or CalPERS sufficient information to notify its members of the breach until further information was gathered.[19] As a result of Defendants' needless delay, Plaintiffs and Class Members did not receive notice of the Data Breach—and therefore could not take remedial steps to protect their credit and accounts from malicious actors—until mid-June, weeks after the Data Breach occurred.

49.     Defendants had obligations created by contract, industry standards, common law, federal and state law, and representations made to Plaintiffs and Class Members to use reasonable data security procedures and practices to keep Plaintiffs' and Class Members' Personal Information confidential and to protect it from unauthorized access and disclosure. They failed to comply with these obligations.

50.     Plaintiffs and Class Members provided, directly or indirectly, their Personal Information to Defendants with the reasonable expectation and mutual understanding that

---

[18] *Global MOVEit Transfer Cyberattack*, *supra* note 9.

[19] *PBI Data Breach – Frequently Asked Questions*, *supra* note 1; Cathie Anderson, *What CalSTRS, CalPERS did in days after learning hackers had stolen retirees' personal info*, THE SACRAMENTO BEE (June 30, 2023), https://www.sacbee.com/news/politics-government/the-state-worker/article276875708.html; *Information about PBI data security incident*, CALSTRS, https://www.calstrs.com/information-about-pbi-data-security-incident (last visited July 27, 2023).

Defendants would comply with their obligations to keep such information confidential and secure from unauthorized access and to provide timely notice of any security breaches.

51.     Defendants' data security obligations were particularly important given the substantial increase in cyberattacks in recent years.

52.     Defendants knew or should have known that their electronic records and systems would be targeted by cybercriminals.

**C.  Impact of the Data Breach**

53.     As a result of the MOVEit Data Breach, Plaintiffs and many millions of individuals have had their sensitive Personal Information exposed as a result of the unsecure MOVEit file transfer product being exploited by cyber criminals during the Data Breach.

54.     The harm caused to Plaintiffs and Class Members by the Data Breach is already apparent. Criminal hacker groups have made ransomware payment demands upon Impacted MOVEit Clients and have already publicly disseminated information about the Data Breach[20] and, potentially, lists containing sensitive Personal Information, presumably for those MOVEit customers who decline to pay the ransom demand.

55.     Even if Impacted MOVEit Clients pay the ransom, there is no guarantee that the criminals making the ransom demands will suddenly act honorably and destroy the sensitive information. In fact, there is no motivation for them to do so, given the burgeoning market for sensitive Personal Information on the dark web.

---

[20] Carly Page, *Ransomware gang lists first victims of MOVEit mass-hacks, including US banks and universities*, TECHCRUNCH (June 15, 2023), https://techcrunch.com/2023/06/15/moveit-clop-mass-hacks-banks-universities/.

56. The breach creates a heightened security concern for Plaintiffs and Class Members because SSNs and other sensitive information was or may be among the data exposed during the Data Breach.

57. Theft of SSNs creates a particularly alarming situation for victims because those numbers cannot easily be replaced. To obtain a new SSN, a breach victim has to demonstrate ongoing harm from misuse of her SSN, and a new SSN will not be provided until after the harm has already been suffered by the victim.

58. Given the highly sensitive nature of SSNs, theft of SSNs in combination with other personally identifying information (e.g., name, address, date of birth) is akin to having a master key to the gates of fraudulent activity. Per the United States Attorney General, Social Security numbers "can be an identity thief's most valuable piece of consumer information."[21]

59. Defendants had a duty to keep sensitive information confidential and to protect it from unauthorized disclosures. Plaintiffs and Class Members provided their Personal Information to CalSTRS, CalPERS, and other impacted MOVEit clients with the common sense understanding any business partners to which these entities disclosed Personal Information (i.e., Defendants) would comply with their obligations to keep such information confidential and secure from unauthorized disclosures.

60. Defendants' data security obligations were particularly important given the substantial increase in data breaches—particularly those involving SSNs—in recent years, which are widely known to the public and to anyone in Defendants' industry of data collection and transfer.

---

[21] *Fact Sheet: the Work of the President's Identity Theft Task Force*, Dep't of Justice (Sept. 19, 2006), https://www.justice.gov/archive/opa/pr/2006/September/06_ag_636.html.

61. Data breaches are by no means new, and they should not be unexpected. These types of attacks should be anticipated by companies that collect and store sensitive and personally identifying information, and these companies must ensure that data privacy and security is adequate to protect against and prevent known attacks. Defendants cannot feign ignorance. Their representations about MOVEit acknowledge the need for and importance of "compliance with regulations such as PCI, HIPAA and GDPR" in collecting, storing, and transferring sensitive data.[22]

62. As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[23]

63. Defendants could have prevented this Data Breach by properly securing and encrypting the systems containing the Personal Information of Plaintiffs and Class Members.

64. The occurrence of the Data Breach indicates that Defendants failed to adequately implement reasonable measures to prevent ransomware attacks, resulting in the Data Breach and the exposure of the Personal Information of Plaintiffs and Class Members.

65. Defendants' negligence in safeguarding the Personal Information of Plaintiffs and Class Members is exacerbated by the repeated warnings and alerts directed to companies like Defendants to protect and secure sensitive data they possess.

---

[22] John Iwuozor, *7 Ways to Keep Your Business Files Safe and Protect Your Data*, IPSWITCH (Apr. 24, 2023), https://www.ipswitch.com/blog/7-ways-keep-your-business-files-safe-protect-your-data.

[23] Fed. Bureau of Investigation, *How to Protect Your Networks from Ransomware* 3, *available at* https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited May 11, 2023).

66.     Despite the prevalence of public announcements of data breach and data security compromises, Defendants failed to take appropriate steps to protect the Personal Information of Plaintiffs and Class Members from being compromised.

67.     The Federal Trade Commission ("FTC") defines "identity theft" as "a fraud committed or attempted using the identifying information of another person without authority."[24] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[25]

68.     The ramifications of Defendants' failure to keep secure the Personal Information of Plaintiffs and Class Members are long lasting and severe. Once Personal Information is stolen, particularly Social Security numbers, fraudulent use of that information and damage to victims may continue for years.

69.     Identity theft victims are frequently required to spend many hours and large amounts of money repairing the impact to their credit. Identity thieves use stolen personal information for a variety of crimes, including credit card fraud, tax fraud, phone or utilities fraud, and bank/finance fraud.

70.     There may be a time lag between when sensitive Personal Information is stolen and when it is used. For example, on average it takes approximately three months for consumers to

---

[24] 17 C.F.R. § 248.201(b)(9).

[25] *Id.* § 248.201(b)(8).

discover their identity has been stolen and used, but it takes some individuals up to three years to learn that information.[26]

71.     With access to an individual's sensitive Personal Information, criminals can do more than just empty a victim's bank account—they can also commit all manner of fraud, including: opening utility accounts using the victim's identity; file a fraudulent tax return using the victim's information; or even give the victim's personal information to police during an arrest.[27]

### D. Defendants Failed to Comply with FTC Guidelines

72.     The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45.[28]

73.     The FTC has issued numerous guidelines for businesses highlighting the importance of reasonable data security practices. The FTC notes the need to factor data security into all business decision-making.[29] According to the FTC, data security requires: (1) encrypting

---

[26] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. SYSTEMICS, CYBERNETICS & INFORMATICS 9 (2019), *available at* https://www.iiisci.org/journal/pdv/sci/pdfs/ IP069LL19.pdf.

[27] *See* Fed. Trade Comm'n, *Warning Signs of Identity Theft*, IDENTITYTHEFT.GOV, https://www.identitytheft.gov/#/Warning-Signs-of-Identity-Theft (last visited July 10, 2023).

[28] *See, e.g.*, *Fed. Trade Comm'n v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

[29] Fed. Trade Comm'n, *Start with Security: A Guide for Business, Lessons Learned from FTC Cases* (2015), *available at* https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

information stored on computer networks; (2) retaining payment card information only as long as necessary; (3) properly disposing of personal information that is no longer needed; (4) limiting administrative access to business systems; using industry tested and accepted security methods; (5) monitoring activity on networks to uncover unapproved activity; (6) verifying that privacy and security features function properly; (7) testing for common vulnerabilities; and (8) updating and patching third-party software.[30]

74.     In October 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses.[31] The guidelines note that businesses should protect the personal customer information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

75.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

---

[30] *Id.*; Fed. Trade Comm'n, *Protecting Personal Information: A Guide for Business* (2016), *available at* https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

[31] *Protecting Personal Information*, *supra* note 32.

76. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by the FTCA. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

77. As evidenced by the Data Breach, Defendants failed to properly implement basic data security practices. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiffs' and Class Members' Personal Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

78. Defendants were at all times fully aware of their obligation to protect the Personal Information of their customers yet failed to comply with such obligations. Defendants were also aware of the significant repercussions that would result from their failure to do so.

**E. Defendants Failed to Comply with Industry Standards**

79. Experts studying cybersecurity routinely identify businesses as being particularly vulnerable to cyberattacks because of the value of the Personal Information which they collect and maintain.

80. Some general industry best practices that should be implemented by businesses like Defendants include but are not limited to: educating all employees, using only strong password requirements, implementing multilayer security including firewalls, anti-virus and anti-malware software, using encryption, requiring multi-factor authentication, backing up data, and limiting which employees can access sensitive data. As evidenced by the Data Breach, Defendants failed to follow some or all of these industry best practices.

81.     Other best cybersecurity practices that are standard in the industry include: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; and training staff regarding these points. As evidenced by the Data Breach, Defendants failed to follow these cybersecurity best practices.

82.     Defendants failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1[32] (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls[33] (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

83.     Defendants failed to comply with these accepted standards, thereby permitting the Data Breach to occur.

**F. Defendants Breached their Duties to Safeguard Plaintiffs' and Class Members' Personal Information**

84.     In addition to its obligations under federal and state laws, Defendants owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Personal Information in their possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendants owed a

---

[32] Nat'l Inst. of Standards & Tech., *Framework for Improving Critical Infrastructure Cybersecurity* (2018), *available at* https://nvlpubs.nist.gov/nistpubs/CSWP/NIST.CSWP.04 162018.pdf.

[33] *See The 18 CIS Critical Security Controls*, CTR. FOR INTERNET SEC., https://www.cisecurity.org/controls/cis-controls-list (last visited May 11, 2023).

duty to Plaintiffs and Class Members to provide reasonable security, including complying with industry standards and requirements, training for its staff, and ensuring that its computer systems, networks, and protocols adequately protected the Personal Information of Class Members.

85. Defendants breached their obligations to Plaintiffs and Class Members and/or were otherwise negligent and reckless because they failed to properly maintain and safeguard their computer systems and data. Defendants' unlawful conduct includes, but is not limited to, the following acts and/or omissions:

    a. Failing to maintain an adequate data security system that would reduce the risk of data breaches and cyberattacks;

    b. Failing to adequately protect customers' Personal Information;

    c. Failing to properly monitor their own data security systems for existing intrusions;

    d. Failing to sufficiently train their employees regarding the proper handling of its customers' files containing the Personal Information;

    e. Failing to fully comply with FTC guidelines for cybersecurity in violation of the FTCA;

    f. Failing to adhere to industry standards for cybersecurity as discussed above; and

    g. Otherwise breaching their duties and obligations to protect Plaintiffs' and Class Members' Personal Information.

86. Defendants negligently and unlawfully failed to safeguard Plaintiffs' and Class Members' Personal Information by allowing cyberthieves to access their computer network, systems, and servers which contained unsecured and unencrypted Personal Information.

87. Defendants had the resources necessary to prevent the Data Breach but neglected to adequately invest in security measures, despite their obligations to protect such information.

Accordingly, Defendants breached their common law, statutory, and other duties owed to Plaintiffs and Class Members.

88.     Had Defendants remedied the deficiencies in their information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, they could have prevented intrusion into their information storage and security systems and, ultimately, the theft of Plaintiffs' and Class Members' confidential Personal Information.

89.     Accordingly, Plaintiffs' and Class Members' lives were severely disrupted. What's more, they have been harmed as a result of the Data Breach and now face an increased risk of future harm that includes, but is not limited to, fraud and identity theft. Plaintiffs and Class Members also lost the benefit of the bargain they made with Defendants.

## G. Defendants Knew of Should Have Known of the Risk to Clients' and Individuals' Personal Information

90.     Defendants' data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches targeting entities that collect and store PII and other sensitive information, like Defendants, preceding the date of the Data Breach.

91.     In light of recent high profile data breaches at other industry leading companies, including Microsoft (250 million records, December 2019). Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Defendants knew or should have known that the Personal Information that they collect and maintain would be targeted by cybercriminals.

92.     Data thieves regularly target companies like Defendants due to the highly sensitive information that they record and maintain. Defendants knew and understood that unprotected PII

is valuable and highly sought after by criminal parties who seek to illegally monetize that PII through unauthorized access.

93. Indeed, cyber-attacks, such as the one experienced by Defendants, have become so notorious that the Federal Bureau of Investigation and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack. As one report explained, smaller entities that store PII are "attractive to ransomware criminals . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[34]

94. In 2021, a record of 1,862 data breaches occurred, resulting in approximately 293,927,708 sensitive records being exposed, a 68% increase from 2020.[35] The trend continued through 2022, as 1,802 data breaches occurred, resulting in approximately 422,143,312 sensitive records being exposed.[36]

95. Despite the prevalence of public announcements of data breaches and data security compromises, Defendants failed to take appropriate steps to protect the Personal Information of Plaintiffs and Class Members from being compromised.

96. At all relevant times, Defendants, as a custodian of PII, knew or reasonably should have known of the importance of safeguarding the Personal Information of Plaintiffs and Class Members and of the foreseeable consequences that would occur if Defendants' data security

---

[34] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, Law360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

[35] *See* Identity Theft Res. Ctr., *2021 Annual Data Breach Report* (2021), *available at* https://www.idtheftcenter.org/publication/2021-annual-data-breach-report-2/.

[36] *See* Identity Theft Res. Ctr., *2022 Data Breach Report* (2022), *available at* https://www.idtheftcenter.org/publication/2022-data-breach-report/.

system was breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

97. Defendants were, or should have been, fully aware of the unique type and the significant volume of data on Defendants' systems, amounting to potentially millions of individuals' detailed Personal Information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

98. Despite the known risk of data breaches and the widespread publicity and industry alerts regarding other notable (similar) data breaches, Defendants failed to take reasonable steps to adequately protect MOVEit, which it should have known was unsecure, from being breached, leaving its clients (including CalSTRS, CalPERS, and other Impacted MOVEit Clients) and all persons who provide sensitive Personal Information to those clients (i.e., Plaintiffs and the Class Members) exposed to risk of fraud and identity theft.

99. Defendants are, and at all relevant times have been, aware that the sensitive Personal Information they handle and store in connection with providing their file transfer services is highly sensitive. As companies that provide file transfer services involving highly sensitive information, Defendants are aware of the importance of safeguarding that information and protecting their systems and products from security vulnerabilities, and Defendants repeatedly acknowledge the importance of data security and compliance with data privacy requirements and regulations on their websites for MOVEit.

100. Defendants were aware, or should have been aware, of regulatory and industry guidance regarding data security, and were alerted to the risks associated with failing to ensure that their use of the file transfer product MOVEit was adequately secured.

101.     Despite the well-known risks of hackers, cybercriminals, data breaches, and cybersecurity intrusions, Defendants failed to employ adequate data security measures in connection with their use and offering of the MOVEit file sharing software products and related services in a meaningful way in order prevent breaches, including the Data Breach.

102.     The security flaws inherent to MOVEit run afoul of industry best practices and standards. Had Defendants adequately tested MOVEit for security flaws and vulnerabilities, and undertaken industry best practices and steps to protect and secure MOVEit, they could have prevented the Data Breach.

103.     Despite the fact that Defendants were on notice of the very real possibility of data theft and data breaches associated with the MOVEit products, they failed to make necessary changes to the product and/or their use of the product or to stop offering and/or using it while working these issues out and permitted a massive intrusion to occur that resulted in disclosure of Plaintiffs' and Class Members' Personal Information to criminals.

104.     The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the Personal Information of Plaintiffs and Class Members.

**H. The Value of Personal Information – Data Breaches Lead to Identity Theft and Cognizable Injuries**

105.     The PII of consumers, such as Plaintiffs and Class Members, is valuable and has been commoditized in recent years.

106.     It is well known among companies that store sensitive PII that such information— such as the Social Security numbers and financial information stolen in the Data Breach—is valuable and frequently targeted by criminals. In a recent article, Business Insider noted that

"[d]ata breaches are on the rise for all kinds of businesses, including retailers . . . . Many of them were caused by flaws in . . . systems either online or in stores."[37]

107.    Sensitive Personal Information is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the dark web for years. As a result of recent large-scale data breaches, identity thieves and cyber criminals have openly posted stolen SSNs and other sensitive Personal Information directly on various illegal websites making the information publicly available, often for a price.

108.    PII is a valuable property right.[38] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[39] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[40] It is so valuable to identity thieves that once PII has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

---

[37] Dennis Green et al., *If you bought anything from these 19 companies recently, your data may have been stolen*, BUSINESS INSIDER (Nov. 19, 2019), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1.

[38] *See* Marc van Lieshout, *The Value of Personal Data*, 457 INT'L FED'N FOR INFO. PROCESSING 26, 29 (2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible . . . ."), *available at* https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data.

[39] Org. for Econ. Cooperation & Dev., *Exploring the Economics of Personal Data: A Survey or Methodologies for Measuring Monetary Value* 4 (2013), *available at* https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[40] Interactive Advertising Bureau, *U.S. Firms to Spend Nearly 19.2 Billion on Third-Party Audience Data & Data-Use Solution in 2018, Up 17.5% From 2017*, IAB (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

109.    As a result of the real and significant value of this data, identity thieves and other cyber criminals have openly posted credit card numbers, Social Security numbers, PII, and other sensitive information directly on various Internet websites, making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be readily aggregated with other such data and become more valuable to thieves and more damaging to victims.

110.    Consumers place a high value on the privacy of their data, as they should. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "[w]hen [privacy policy] information is made available, consumers tend to purchase from online retailers who better protect their privacy."[41]

111.    Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII has deprived that consumer of the full monetary value of the consumer's transaction with the company.

112.    The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, PII can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[42] Experian reports that a stolen credit or debit card number can

---

[41] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior: An Experimental Study*, 22(2) INFO. SYSTEMS RES. 254, 254 (2011), *available at* https://www.jstor.org/stable/23015560?seq=1.

[42] Anita George, *Your personal data is for sale on the dark web. Here's how much it costs*, DIGITAL TRENDS (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

sell for \$5 to \$110 on the dark web.[43] Criminals can also purchase access to entire company data breaches from \$900 to \$4,500.[44]

113. Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[45]

114. What is more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

---

[43] Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/.

[44] *In the Dark*, VPNOVERVIEW, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited May 15, 2023).

[45] Soc. Sec. Admin., Pub. No. 05-10064, *Identity Theft and Your Social Security Number* 1 (2021), *available at* https://www.ssa.gov/pubs/EN-05-10064.pdf.

115.    Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "The credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[46]

116.    This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[47]

117.    Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police. The fraudulent activity resulting from the Data Breach may not come to light for years.

118.    At all relevant times, Defendants knew, or reasonably should have known, of the importance of safeguarding the Personal Information of Plaintiffs and Class Members, including Social Security numbers, and of the foreseeable consequences that would occur if Defendants' data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

119.    Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will

---

[46] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), https://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.

[47] Tim Greene, *Anthem hack: Personal data stolen sells for 10x price of stolen credit card numbers*, NETWORKWORLD (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

continue to incur such damages, in addition to suffering any fraudulent use of their Personal Information.

120.    As a direct and proximate result of Defendants' failures to prevent—and to timely detect—the Data Breach, Plaintiffs and the Class Members have suffered and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. They have suffered or are at an increased risk of suffering:

    a.  The loss of the opportunity to control how their Personal Information is used;

    b.  The diminution in value of their Personal Information;

    c.  The compromise and continuing publication of their Personal Information;

    d.  Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

    e.  Lost opportunity costs and lost wages associated with the time and effort expended addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

    f.  Unauthorized use of stolen Personal Information; and

    g.  The continued risk to their Personal Information, which remains in the possession of Defendants and is subject to further breaches so long as Defendants fail to undertake the appropriate measures to protect the Personal Information in their possession.

121.    Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen PII. To protect themselves, Plaintiffs and Class

Members will need to remain vigilant against unauthorized data use for years or even decades to come.

122. According to the FTC, unauthorized PII disclosures are extremely damaging to consumers' finances, credit history and reputation, and can take time, money and patience to resolve the fallout.[48] As such, the FTC treats the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5(a) of the FTC Act.

123. Defendants allowed Plaintiffs' and Class Members' Personal Information to be compromised and disclosed to criminals by failing to take reasonable steps against an obvious threat.

124. Industry experts are clear that a data breach is indicative of data security failures. Indeed, industry-leading research and advisory firm Aite Group has commented that "[i]f your data was stolen through a data breach that means you were somewhere out of compliance . . . ."[49]

125. As a result of the events detailed herein, Plaintiffs and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their Personal Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their Personal Information; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their

---

[48] Fed. Trade Comm'n, NCJ No. 238946, *Taking Charge: What to Do if Your Identity Is Stolen* 3 (2012), *available at* https://www.ojp.gov/ncjrs/virtual-library/abstracts/taking-charge-what-do-if-your-identity-stolen.

[49] Lisa Baertlein, *Chipotle says hackers hit most restaurants in data breach*, REUTERS (May 26, 2017), https://www.reuters.com/article/us-chipotle-cyber-idUSKBN18M2BY.

Personal Information which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the Personal Information compromised as a result of the Data Breach; (vii) loss of value of the Personal Information that was compromised in the Data Breach; (viii) overpayment for the services that were received without adequate data security; and (ix) loss of privacy.

126.    Victims of the Data Breach have likely already experienced harms, which is made clear by news of attempts to exploit this information for money by the hackers responsible for the breach, i.e., through ransom demands and as evidenced by news that Impacted MOVEit Client information is being posted on CL0P's website.

127.    Moreover, Defendants have offered little to no remedial measures to Plaintiffs or Class Members to protect their Personal Information and credit going forward. PBI puts the onus on Class Members to seek out credit reports, or place fraud alerts or credit freezes;[50] PSC tells its customers that it is "important that you take immediate action."[51] Instead, Defendants have left it entirely to their clients to offer any assistance to Plaintiffs or the Class Members. CalSTRS and CalPERS, for example, have taken the initiative of offering time-limited credit monitoring services through Experian.[52] Even this time-limited monitoring is inadequate, however, given that Defendants' victims are likely to face many years of identity theft.

---

[50] *Global MOVEit Transfer Cyberattack*, *supra* note 9, at "What can I do to protect my personal information?"

[51] *MOVEit Transfer Critical Vulnerability (May 2023) (CVE-2023-34362)*, PROGRESS (June 16, 2023), https://community.progress.com/s/article/MOVEit-Transfer-Critical-Vulnerability-31May2023.

[52] *PBI Data Breach – Frequently Asked Questions*, *supra* note 1; *Information about PBI data security incident*, *supra* note 21.

128.     Defendants' "remedial" advice to Plaintiffs and Class Members squarely places the burden on Plaintiffs and Class Members, rather than on Defendants, to monitor and report suspicious activities to law enforcement. In other words, Defendants and their Customers expect Plaintiffs and Class Members to protect themselves from Defendants' tortious acts resulting in the Data Breach. Rather than automatically enrolling Plaintiffs and Class Members in credit monitoring services upon discovery of the breach, Defendants merely sent instructions to Plaintiffs and Class Members about actions they can affirmatively take to protect themselves.

129.     These extremely limited remedial measures—or advice for Plaintiffs to themselves take remedial measure—are wholly inadequate as they fail to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft and financial fraud, and they entirely fail to provide any compensation for the unauthorized release and disclosure of Plaintiffs' and Class Members' SPI.

130.     As a result of the Data Breach, Plaintiffs' and Class Members' privacy has been invaded, their Personal Information is now in the hands of criminals, they have experienced fraud and/or face a substantially increased risk of identity theft and fraud, and they must take immediate and time-consuming action to protect themselves from such identity theft and fraud.

**I.   Plaintiffs' Experiences**

*i.     Plaintiff Diane White's Experience*

131.     Plaintiff Diane White is a California resident who both pays into and collects from California's public employee pension and health benefit system, CalPERS. In order to pay into and receive benefits from CalPERS, Plaintiff White was required to provide CalPERS with her Personal Information.

132. CalPERS used Defendant PBI's services to determine member benefit eligibility and provided PBI with individuals Personal Information—including Plaintiff White's Personal Information—to do so. PBI used MOVEit technology to handle individuals' Personal Information, including Plaintiff White's Personal Information.

133. Plaintiff White reasonably expected that her highly sensitive Personal Information would remain safeguarded and would not be accessible by unauthorized third parties.

134. Plaintiff White is very careful about sharing her sensitive Personal Information. Plaintiff has never knowingly transmitted unencrypted sensitive Personal Information over the internet or any other unsecured source.

135. Plaintiff White stores any documents containing her sensitive Personal Information in a safe and secure location or destroys the documents. Moreover, Plaintiff White diligently chooses unique usernames and passwords for her various online accounts in an effort to safeguard and protect her Personal Information.

136. On or about June 23, 2023, Plaintiff White received a Notice of Data Breach via mail informing her of the Data Breach, that her information was at risk, and that she faced a substantial and significant risk of her Personal Information being misused. The Notice Letter informed her that the Personal Information impacted in the Data Breach included her full name, date of birth, SSN, and possibly the names of any dependents.

137. Defendants have not provided Plaintiff White with any remedial measures. While CalPERS has taken its own initiative to offer credit monitoring, this offer is time-limited and will expire long before the threat to Plaintiff White's Personal Information is exhausted.

138.    Subsequent to and as a direct and proximate result of the Data Breach, Plaintiff White has spent time and resources to mitigate the effects of the Data Breach, including monitoring and changing the passwords for her various financial and other accounts.

139.    Even with the best response, the harm caused to Plaintiff cannot be undone.

140.    Plaintiff White suffered actual injury from having her Personal Information exposed and/or stolen as a result of the Data Breach, including: (a) required mitigation efforts, including needing to monitor banking and other accounts to ensure her information is not being used for identity theft and fraud; (b) damages to and diminution of the value of the Personal Information, a form of intangible property that loses value when it falls into the hands of criminals who are using that information for fraud or publishing the information for sale on the dark web; (c) loss of privacy; (d) continuous imminent and impending injury arising from the increased risk of financial, medical, and identity fraud and theft; and (e) time and expense of mitigation efforts required as a result of the Data Breach.

141.    In addition, knowing that hackers accessed and exfiltrated her Personal Information and that this likely has been and will be used in the future for identity theft, fraud, and related purposes has caused Plaintiff White to experience significant frustration, anxiety, worry, stress, and fear. As both a payor into and recipient of benefits from CalPERS, Plaintiff White is especially concerned and interested on a continuing basis in her Personal Information remaining protected and safeguarded.

142.    Plaintiff White has a continuing interest in ensuring that her Personal Information, which, upon information and belief, remains in Defendants' control, is protected, and safeguarded from future breaches.

ii.     *Plaintiff Sabela Portillo's Experience*

143.    Plaintiff Sabela Portillo is a California resident who both pays into and collects from California's State Teachers' Retirement System, CalSTRS, and California's public employee pension and health benefit system, CalPERS. In order to pay into and receive benefits from CalSTRS and CalPERS, Plaintiff Portillo was required to provide CalSTRS and CalPERS with her Personal Information.

144.    Both CalSTRS and CalPERS used Defendant PBI's services to determine member benefit eligibility and provided PBI with individuals Personal Information—including Plaintiff Portillo's Personal Information—to do so. PBI used MOVEit technology to handle individuals' Personal Information, including Plaintiff Portillo's Personal Information.

145.    Plaintiff Portillo reasonably expected that her highly sensitive Personal Information would remain safeguarded and would not be accessible by unauthorized third parties.

146.    Plaintiff Portillo is very careful about sharing her sensitive Personal Information. Plaintiff has never knowingly transmitted unencrypted sensitive Personal Information over the internet or any other unsecured source.

147.    Plaintiff Portillo stores any documents containing her sensitive Personal Information in a safe and secure location or destroys the documents. Moreover, Plaintiff Portillo diligently chooses unique usernames and passwords for her various online accounts in an effort to safeguard and protect her Personal Information.

148.    On or about June of 2023, Plaintiff Portillo received a Notice of Data Breach via mail informing her of the Data Breach, that her information was at risk, and that she faced a substantial and significant risk of her Personal Information being misused.

149.     Defendants have not provided Plaintiff Portillo with any remedial measures. While CalSTRS and CalPERS have taken their own initiatives to offer credit monitoring, these offers are time-limited and will expire long before the threat to Plaintiff Portillo's Personal Information is exhausted.

150.     Subsequent to and as a direct and proximate result of the Data Breach, Plaintiff Portillo has experienced nefarious uses of her Personal Information. Plaintiff Portillo has received many spam inquiries and has been forced to close two checking accounts after notification that an unknown individual had attempted to withdraw from the accounts.

151.     Even with the best response, the harm caused to Plaintiff cannot be undone.

152.     Plaintiff Portillo suffered actual injury from having her Personal Information exposed and/or stolen as a result of the Data Breach, including: (a) required mitigation efforts, including needing to monitor banking and other accounts to ensure her information is not being used for identity theft and fraud; (b) damages to and diminution of the value of the Personal Information, a form of intangible property that loses value when it falls into the hands of criminals who are using that information for fraud or publishing the information for sale on the dark web; (c) loss of privacy; (d) continuous imminent and impending injury arising from the increased risk of financial, medical, and identity fraud and theft; and (e) time and expense of mitigation efforts required as a result of the Data Breach.

153.     In addition, knowing that hackers accessed and exfiltrated her Personal Information and that this likely has been and will be used in the future for identity theft, fraud, and related purposes has caused Plaintiff Portillo to experience significant frustration, anxiety, worry, stress, and fear. As both a payor into and recipient of benefits from CalSTRS and CalPERS, Plaintiff

Portillo is especially concerned and interested on a continuing basis in her Personal Information remaining protected and safeguarded.

154.    Plaintiff Portillo has a continuing interest in ensuring that her Personal Information, which, upon information and belief, remains in Defendants' control, is protected, and safeguarded from future breaches.

### iii.    Plaintiff Rebecca Iddings' Experience

155.    Plaintiff Rebecca Iddings is a California resident who both pays into and collects from California's public employee pension and health benefit system, CalPERS. In order to pay into and receive benefits from CalPERS, Plaintiff Iddings was required to provide CalPERS with her Personal Information.

156.    CalPERS used Defendant PBI's services to determine member benefit eligibility and provided PBI with individuals Personal Information—including Plaintiff Iddings' Personal Information—to do so. PBI used MOVEit technology to handle individuals' Personal Information, including Plaintiff Iddings' Personal Information.

157.    Plaintiff Iddings reasonably expected that her highly sensitive Personal Information would remain safeguarded and would not be accessible by unauthorized third parties.

158.    Plaintiff Iddings is very careful about sharing her sensitive Personal Information. Plaintiff has never knowingly transmitted unencrypted sensitive Personal Information over the internet or any other unsecured source.

159.    Plaintiff Iddings stores any documents containing her sensitive Personal Information in a safe and secure location or destroys the documents. Moreover, Plaintiff Iddings diligently chooses unique usernames and passwords for her various online accounts in an effort to safeguard and protect her Personal Information.

160.     On or about June of 2023, Plaintiff Iddings received a Notice of Data Breach via mail informing her of the Data Breach, that her information was at risk, and that she faced a substantial and significant risk of her Personal Information being misused.

161.     Defendants have not provided Plaintiff Iddings with any remedial measures. While CalPERS has taken its own initiative to offer credit monitoring, this offer is time-limited and will expire long before the threat to Plaintiff Iddings' Personal Information is exhausted.

162.     Subsequent to and as a direct and proximate result of the Data Breach, Plaintiff Iddings has spent time and resources to mitigate the effects of the Data Breach, including monitoring and changing the passwords for her various financial and other accounts.

163.     Even with the best response, the harm caused to Plaintiff cannot be undone.

164.     Plaintiff Iddings suffered actual injury from having her Personal Information exposed and/or stolen as a result of the Data Breach, including: (a) required mitigation efforts, including needing to monitor banking and other accounts to ensure her information is not being used for identity theft and fraud; (b) damages to and diminution of the value of the Personal Information, a form of intangible property that loses value when it falls into the hands of criminals who are using that information for fraud or publishing the information for sale on the dark web; (c) loss of privacy; (d) continuous imminent and impending injury arising from the increased risk of financial, medical, and identity fraud and theft; and (e) time and expense of mitigation efforts required as a result of the Data Breach.

165.     In addition, knowing that hackers accessed and exfiltrated her Personal Information and that this likely has been and will be used in the future for identity theft, fraud, and related purposes has caused Plaintiff Iddings to experience significant frustration, anxiety, worry, stress, and fear. As both a payor into and recipient of benefits from CalPERS, Plaintiff Iddings is

especially concerned and interested on a continuing basis in her Personal Information remaining protected and safeguarded.

166.     Plaintiff Iddings has a continuing interest in ensuring that her Personal Information, which, upon information and belief, remains in Defendants' control, is protected, and safeguarded from future breaches.

## CLASS ACTION ALLEGATIONS

167.     Plaintiffs bring this action on behalf of themselves and the following Class:

All natural persons who are residents of the United States whose Personal Information was compromised in the MOVEit Data Breach, including all natural persons who were sent a notice indicating that their Personal Information may have been compromised in the MOVEit Data Breach (the "Nationwide Class").

168.     Excluded from the Class are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, affiliates, officers, directors, and any entity in which Defendants have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, was well as their immediate family members.

169.     Plaintiffs reserve the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

170.     **Numerosity:** The Members of the Class are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiffs at this time, based on information and belief, there are hundreds or thousands of individuals whose Personal Information may have been improperly accessed in the Data Breach, and each Class Member is apparently identifiable within Defendants' records.

171. **Commonality:** Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include, without limitation:

a. Whether and to what extent Defendants had a duty to protect Plaintiffs' and Class Members' Personal Information;

b. Whether Defendants had duties not to disclose the Plaintiffs' and Class Members' Personal Information to unauthorized third parties;

c. Whether Defendants had duties not to use Plaintiffs' and Class Members' Personal Information for unauthorized purposes;

d. Whether Defendants failed to adequately safeguard Plaintiffs' and Class Members' Personal Information;

e. Whether and when Defendants actually learned of the Data Breach;

f. Whether Defendants adequately, promptly, and accurately informed Plaintiffs and Class Members that their Personal Information had been compromised;

g. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

h. Whether Defendants violated the law by failing to promptly notify Plaintiffs and Class Members that their Personal Information had been compromised;

i. Whether Defendants adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j. Whether Defendants engaged in unfair, unlawful, or deceptive practices by misrepresenting that they would safeguard Plaintiffs' and Class Members' Personal Information;

k. Whether Plaintiffs and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendants' wrongful conduct;

l. Whether Plaintiffs and Class Members are entitled to restitution as a result of Defendants' wrongful conduct; and

m. Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

172. **Typicality:** Plaintiffs' claims are typical of those of other Class Members because all had their Personal Information compromised as a result of the Data Breach, due to Defendants' misfeasance.

173. **Adequacy:** Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the Members of the Class, and the infringement of the rights and the damages Plaintiffs have suffered are typical of other Class Members. Plaintiffs have also retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

174. **Policies Generally Applicable to the Class:** This class action is also appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with

respect to the Class as a whole. Defendants' policies challenged herein apply to and affect Class Members uniformly, and Plaintiffs' challenge of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

175.    **Predominance:** Defendants have engaged in a common course of conduct toward Plaintiffs and Class Members, in that all the Plaintiffs' and Class Members' data was stored on the same system and unlawfully accessed in the same way. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

176.    **Superiority and Manageability:** Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication or relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendants. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

177.    The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm

the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonable consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

178.     The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

179.     Adequate notice can be given to Class Members directly using information maintained in Defendants' records.

180.     Unless a Class-wide injunction is issued, Defendants may continue in their unlawful disclosure and failure to properly secure the Personal Information of Class Members, Defendants may continue to refuse to provide proper notification to Class Members regarding the Disclosure, and Defendants may continue to act unlawfully as set forth in this Complaint.

181.     Furthermore, Defendants have acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate.

182.     Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendants owed a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Personal Information;

b. Whether Defendants breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Personal Information;

c. Whether Defendants failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security;

d. Whether an implied contract existed between Defendants on the one hand, and Plaintiffs and Class Members on the other, and the terms of that implied contract;

e. Whether Defendants breached the implied contract;

f. Whether Defendants adequately and accurately informed Plaintiffs and Class Members that their Personal Information had been compromised;

g. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

h. Whether Defendants engaged in unfair, unlawful, or deceptive practices by failing to safeguard Plaintiffs' and Class Members' Personal Information; and

i. Whether Plaintiffs and Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendants' wrongful conduct.

## **CAUSES OF ACTION**

### **COUNT I**
**Negligence**
**(On Behalf of Plaintiffs and the Class)**

183. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

184. Plaintiffs and members of the Class entrusted their Personal Information to Defendants. Defendants owed to Plaintiffs and the Class a duty to exercise reasonable care in handling and using the Personal Information in their care and custody, including implementing industry-standard security procedures sufficient to reasonably protect the information from the Data Breach, theft, and unauthorized use that came to pass, and to promptly detect attempts at unauthorized access.

185. Defendants owed a duty of care to Plaintiffs and members of the Class because it was foreseeable that Defendants' failure to adequately safeguard their Personal Information in accordance with industry standards concerning data security would result in the compromise of that Personal Information—just like the Data Breach that ultimately came to pass. Defendants acted with wanton and reckless disregard for the security and confidentiality of Plaintiffs' and the Class's Personal Information by disclosing and providing access to this information to unauthorized third parties and by failing to properly supervise both the way the Personal Information was stored, used, and exchanged, and those in their employ who were responsible for making that happen.

186. Defendants owed to Plaintiffs and members of the Class a duty to notify them within a reasonable timeframe of any breach to the security of their Personal Information. Defendants also owed a duty to timely and accurately disclose to Plaintiffs and members of the Class the scope, nature, and occurrence of the Data Breach. This duty is required and necessary for Plaintiffs and the Class to take appropriate measures to protect their Personal Information, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

187.     Defendants owed these duties to Plaintiffs and members of the Class because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendants knew or should have known would suffer injury-in-fact from Defendants' inadequate security protocols. Defendants actively sought and obtained Plaintiffs' and the Class's Personal Information.

188.     The risk that unauthorized persons would attempt to gain access to the Personal Information and misuse it was foreseeable. Given that Defendants hold vast amounts of Personal Information, it was inevitable that unauthorized individuals would attempt to access Defendants' databases containing the Personal Information—whether by malware or otherwise.

189.     Personal Information is highly valuable, and Defendants knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the Personal Information of Plaintiffs and the Class and the importance of exercising reasonable care in handling it.

190.     Defendants breached their duties by failing to exercise reasonable care in supervising their employees, agents, contractors, vendors, and suppliers, and in handling and securing the Personal Information of Plaintiffs and the Class which actually and proximately caused the Data Breach and Plaintiffs' and the Class's injury. Defendants further breached their duties by failing to provide reasonably timely notice of the Data Breach to Plaintiffs and members of the Class, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiffs' and members of the Class's injuries-in-fact. As a direct and traceable result of Defendants' negligence and/or negligent supervision, Plaintiffs and the Class have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

191.    Defendants' breach of their common-law duties to exercise reasonable care and their failures and negligence actually and proximately caused Plaintiffs and members of the Class actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their Personal Information by criminals, improper disclosure of their Personal Information, lost benefit of their bargain, lost value of their Personal Information, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendants' negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which Plaintiffs and Class Members continue to face.

192.    In failing to secure Plaintiffs' and Class Members' Personal Information, Defendants are guilty of oppression, fraud, or malice. Defendants acted or failed to act with a reckless, willful, or conscious disregard of Plaintiffs' and Class Members' rights.

**COUNT II**
**Negligence *Per Se***
**(On Behalf of Plaintiffs and the Class)**

193.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

194.    Pursuant to the FTC Act, 15 U.S.C. § 45, Defendants had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiffs' and the Class's PII.

195.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to use reasonable measures to protect customers or, in this case, consumers' PII. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendants' duty to protect Plaintiffs' and the members of the Class's PII.

196.    Defendants breached their duties to Plaintiffs and Class Members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard PII.

197.    Defendants' duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendants are bound by industry standards to protect confidential PII.

198.    Defendants violated their duty under Section 5 of the FTC Act by failing to use reasonable measures to protect Plaintiffs' and the Class's PII and not complying with applicable industry standards as described in detail herein. Defendants' conduct was particularly unreasonable given the nature and amount of PII Defendants collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

199.    The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and the Class.

200.    But for Defendants' wrongful and negligent breach of the duties owed to Plaintiffs and members of the Class, Plaintiffs and members of the Class would not have been injured.

201.    The injury and harm suffered by Plaintiffs and members of the Class were the reasonably foreseeable result of Defendants' breach of their duties. Defendants knew or should have known that they were failing to meet their duties and that their breach would cause Plaintiffs and members of the Class to suffer the foreseeable harms associated with the exposure of their PII.

202.    Had Plaintiffs and the Class known that Defendants did not adequately protect their PII, Plaintiffs and members of the Class would not have entrusted Defendants with their PII.

203.    Defendants' various violations and their failure to comply with applicable laws and regulations constitutes negligence *per se*.

204.    As a direct and proximate result of Defendants' negligence *per se*, Plaintiffs and the Class have suffered harm, including loss of time and money resolving fraudulent charges; loss of time and money obtaining protections against future identity theft; lost control over the value of PII; harm resulting from damaged credit scores and information; and other harm resulting from the unauthorized use or threat of unauthorized use of stolen PII, entitling them to damages in an amount to be proven at trial.

205.    Additionally, as a direct and proximate result of Defendants' negligence *per se*, Plaintiffs and Class members have suffered and will suffer the continued risks of exposure of their PII, which remain in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect their PII in their continued possession.

### COUNT III
### Breach of Contract
### (On Behalf of Plaintiffs and the Class)

206.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

207.    Upon information and belief, PSC entered into contracts with its government and corporate customers to provide secure file transfer services to them; services that included data security practices, procedures, and protocols sufficient to safeguard the Personal Information that was entrusted to it.

208.    Upon information and belief, PBI entered into contracts with its government and corporate customers to provide beneficiary search services; services that included data security practices, procedures, and protocols sufficient to safeguard the Personal Information that was entrusted to it.

209.    Such contracts were made expressly for the benefit of Plaintiffs and the Class, as it was their Personal Information that Defendants agreed to receive, store, utilize, transfer, and protect through its services. Thus, the benefit of collection and protection of the Personal Information belonging to Plaintiffs and the Class was the direct and primary objective of the contracting parties and Plaintiffs and Class Members were direct and express beneficiaries of such contracts.

210.    Defendants knew that if they were to breach these contracts with their clients, the clients' consumers, including Plaintiffs and the Class, would be harmed by, among other things, fraudulent misuse of their PII.

211.    Defendants breached their contracts with their clients when they failed to use reasonable data security measures that could have prevented the Data Breach and resulting compromise of Plaintiffs' and Class Members' PII.

212.    As a direct and proximate result of Defendants' breach, Plaintiffs and Class Members are at a current and ongoing risk of identity theft, and Plaintiffs and Class Members sustained incidental and consequential damages including: (i) financial "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (ii) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (iii) financial "out of pocket" costs incurred due to actual identity theft; (iv) loss of time incurred due to actual identity theft; (v) loss of time due to increased spam and targeted marketing

emails; (vi) diminution of value of their PII; (vii) future costs of identity theft monitoring; (viii) and the continued risk to their PII, which remains in Defendants' control, and which is subject to further breaches, so long as Defendants fails to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' PII.

213.    Accordingly, Plaintiffs and the Class are entitled to damages in an amount to be determined at trial, along with their costs and attorney fees incurred in this action.

214.    Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendants to, e.g., (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

**COUNT IV**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Class)**

215.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

216.    This claim is pleaded solely in the alternative to Plaintiffs' breach of contract claims.

217.    Plaintiffs and Class members conferred a benefit upon Defendants.

218.    Defendants appreciated or had knowledge of the benefits they received from Plaintiffs and Class members. Defendants benefited from receiving Plaintiffs' and Class members' PII, as this was used to provide file transferring software and beneficiary search services.

219.    Plaintiffs and Class members reasonably understood that Defendants would use adequate cybersecurity measures to protect the PII that they were required to provide based on Defendants' duties under state and federal law and their internal policies.

220. Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiffs' and Class members' PII.

221. Instead of providing a reasonable level of security, or retention policies, that would have prevented the Data Breach, Defendants instead calculated to avoid their data security obligations at the expense of Plaintiffs and Class members by utilizing cheaper, ineffective security measures. Plaintiffs and Class members, on the other hand, suffered as a direct and proximate result of Defendants' failure to provide the requisite security.

222. Defendants have retained the benefits of their unlawful conduct, including the amounts of payment received from Plaintiffs and Class Members that should have been used for adequate cybersecurity practices that they failed to provide.

223. Defendants were supposed to use some of the monetary benefit provided to them by Plaintiffs and Class Members to secure the PII belonging to Plaintiffs and Class Members by paying for costs of adequate data management and security.

224. Defendants should not be permitted to retain any monetary benefit belonging to Plaintiffs and Class Members because Defendants failed to implement necessary security measures to protect the PII of Plaintiffs and Class Members.

225. Defendants gained access to Plaintiffs' and Class Members' PII through inequitable means because Defendants failed to disclose that they used inadequate security measures.

226. Plaintiffs and Class Members were unaware of the inadequate security measures and would not have entrusted their PII to Defendants had they known of the inadequate security measures.

227. Plaintiffs and Class members have no adequate remedy at law.

228.    Defendants should be compelled to disgorge into a common fund for the benefit of Plaintiffs and members of the Class all unlawful or inequitable proceeds received by them because of their misconduct and Data Breach.

### COUNT V
### Invasion of Privacy
### (On Behalf of Plaintiffs and the Class)

229.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

230.    Plaintiffs and Class Members maintain a privacy interest in their Personal Information, which is private, confidential information that is also protected from disclosure by applicable laws set forth above.

231.    Plaintiffs' and Class Members' Personal Information was contained, stored, and managed electronically in Defendants' records, computers, and databases and was intended to be secured from unauthorized access to third-parties because highly sensitive, confidential matters regarding Plaintiffs' and Class Members' identities were only shared with Defendants for the limited purpose of obtaining and paying for Defendants' services.

232.    Additionally, Plaintiffs' and Class Members' Personal Information is highly attractive to criminals who can nefariously use such Personal Information for fraud, identity theft, and other crimes without the victims' knowledge or consent.

233.    Plaintiffs and Class Members communicated sensitive Personal Information that they understood Defendants would keep private.

234.    Plaintiffs and Class Members have a reasonable expectation that Defendants would safeguard the confidentiality of their Personal Information and not disclose their Personal

Information to third parties without Plaintiffs' or Class Members' authorization, consent, or knowledge.

235.    Plaintiffs and Class Members had a reasonable expectation of privacy given Defendants' representations and the FTCA. Moreover, Plaintiffs and Class Members have a general expectation that their Personal Information provided to a secure file transfer software service provider would be kept confidential.

236.    Defendants owed a duty to Plaintiffs and Class Members to keep their Personal Information confidential. Defendants failed to protect and, instead, released to unknown and unauthorized third parties the non-redacted and non-encrypted Personal Information of Plaintiffs and Class Members.

237.    Defendants' actions gave publicity to the Personal Information of Plaintiffs and Class Members.

238.    Defendants' failure to protect and maintain the confidentiality of Plaintiffs' and Class Members' Personal Information and resulting disclosure of this Personal Information to unauthorized third parties is highly offensive to the reasonable person. Defendants' disclosure of Plaintiffs' and Class Members' Personal Information to unauthorized third parties permitted the physical and electronic intrusion into private quarters where Plaintiffs' and Class Members' Personal Information was stored.

239.    Plaintiffs and Class Members did not authorize, consent, know about, or take any action to indicate consent to Defendants' conduct alleged herein.

240.    There is no legitimate public concern with respect to the Personal Information of Plaintiffs and Class Members.

241. The intrusion was into a place or thing which was private and is entitled to be private. Plaintiffs and Class Members were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

242. Defendants acted with a knowing state of mind when they permitted the Data Breach to occur because they had actual knowledge that their information security practices were inadequate and insufficient.

243. As a result of Defendants' public disclosure of Plaintiffs' and Class Members' Personal Information, Plaintiffs and Class Members have been needlessly harmed by having their Personal Information disseminated for profit by unknown and unauthorized actors on the dark web.

244. Plaintiffs and Class Members have been damaged as a direct and proximate result of Defendants' invasion of their privacy and are entitled to just compensation, including monetary damages.

245. Plaintiffs and Class Members seek all monetary and non-monetary relief allowed by law, restitution, injunctive relief, reasonable attorneys' fees and costs, and any other relief that is just and proper.

## COUNT VI
### Breach of Fiduciary Duty
### (On Behalf of Plaintiffs and the Class)

246. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

247. In light of the special relationship between Defendants and Plaintiffs and Class Members, whereby Defendants became guardian of Plaintiffs' and Class Members' PII, Defendants became a fiduciary by their undertaking and guardianship of the PII, to act primarily

for Plaintiffs and Class Members, (1) for the safeguarding of Plaintiffs' and Class Members' PII; (2) to timely notify Plaintiffs and Class Members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendants did and do store.

248.    Defendants have a fiduciary duty to act for the benefit of Plaintiffs and Class Members upon matters within the scope of Defendants' relationship with their clients, in particular, to keep secure their PII.

249.    Defendants breached their fiduciary duties to Plaintiffs and Class Members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period of time.

250.    Defendants breached their fiduciary duties to Plaintiffs and Class Members by failing to encrypt and otherwise protect the integrity of the systems containing Plaintiffs' and Class Members' PII.

251.    Defendants breached their fiduciary duties owed to Plaintiffs and Class Members by failing to timely notify and/or warn Plaintiffs and Class Members of the Data Breach.

252.    Defendants breached their fiduciary duties to Plaintiffs and Class Members by otherwise failing to safeguard Plaintiffs' and Class Members' PII.

253.    As a direct and proximate result of Defendants' breaches of their fiduciary duties, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the compromise, publication, and/or theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their PII; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of

the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their PII, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII in their continued possession; (vi) future costs in terms of time, effort, and money that will be expended as result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members; and (vii) the diminished value of Defendants' services they received.

254.    As a direct and proximate result of Defendants' breach of their fiduciary duties, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A. For an Order certifying this action as a Class action and appointing Plaintiffs as Class Representatives and their counsel as Class Counsel;

B. For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class Members' Personal Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiffs and Class Members;

C. For equitable relief compelling Defendants to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of Personal Information compromised during the Data Breach;

D. For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendants' wrongful conduct;

E.  Ordering Defendants to pay for not less than three years of credit monitoring services for Plaintiffs and the Class;

F.  For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

G.  For an award of attorneys' fees and costs under the common fund doctrine, and any other applicable law;

H.  Costs and any other expense, including expert witness fees incurred by Plaintiffs in connection with this action;

I.  Pre- and post-judgment interest on any amounts awarded; and,

J.  Such other and further relief as this court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: July 28, 2023                    Respectfully Submitted,


/s/ Brian C. Gudmundson
Brian C. Gudmundson (MN Lic. #336695)
June P. Hoidal (MN Lic. #033330X)
Michael J. Laird (MN Lic. #398436)
Rachel K. Tack (MN Lic. #399529)
**ZIMMERMAN REED LLP**
1100 IDS Center, 80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 341-0400
brian.gudmundson@zimmreed.com
june.hoidal@zimmreed.com
michael.laird@zimmreed.com
rachel.tack@zimmreed.com

Christopher D. Jennings*
Tyler B. Ewigleben*
Laura Edmondson*
**THE JOHNSON FIRM**
610 President Clinton Ave., Suite 300

Little Rock, AR 72201
Tel: (501) 372-1300
chris@yourattorney.com
tyler@yourattorney.com
ledmondson@yourattorney.com

*To be admitted *pro hac vice*

*Counsel for Plaintiffs and the Proposed Class*

JS 44 (Rev. 09/19)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

DIANE WHITE, SABELA PORTILLO, and REBECCA IDDINGS, individually and on behalf of all others similarly situated,

**(b)** County of Residence of First Listed Plaintiff    Shasta County (CA)
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Brian C. Gudmundson, Zimmerman Reed LLP
1100 IDS Center, 80 S. 8th St., Minneapolis, MN 55402; (612) 341-0400

## DEFENDANTS

PENSION BENEFIT INFORMATION, LLC d/b/a PBI RESEARCH SERVICES and PROGRESS SOFTWARE CORPORATION,

County of Residence of First Listed Defendant    Hennepin County (MN)
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☐ 3 Federal Question *(U.S. Government Not a Party)*
- ☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

### CONTRACT
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

### REAL PROPERTY
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

### TORTS
**PERSONAL INJURY**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

**PERSONAL INJURY**
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☒ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

### CIVIL RIGHTS
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

### PRISONER PETITIONS
**Habeas Corpus:**
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty
**Other:**
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

### FORFEITURE/PENALTY
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

### LABOR
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

### IMMIGRATION
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

### BANKRUPTCY
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 835 Patent - Abbreviated New Drug Application
- ☐ 840 Trademark

### SOCIAL SECURITY
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit (15 USC 1681 or 1692)
- ☐ 485 Telephone Consumer Protection Act
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1332(d)
Brief description of cause:
Data breach

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ 5,000,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*

JUDGE Judge Katherine M. Menendez    DOCKET NUMBER 0:23-cv-02075

DATE 07/28/2023

SIGNATURE OF ATTORNEY OF RECORD /s/ Brian C. Gudmundson

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

**I.(a)**　　**Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations.  If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

　**(b)**　　**County of Residence.**  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing.  In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing.  (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

　**(c)**　　**Attorneys.**  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**　　**Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings.  Place an "X" in one of the boxes.  If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.
United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States.  In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked**.**  (See Section III below**; NOTE: federal question actions take precedence over diversity cases.**)

**III.**　　**Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

**IV.**　　**Nature of Suit.**  Place an "X" in the appropriate box.  If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable.  Click here for: Nature of Suit Code Descriptions.

**V.**　　**Origin.**  Place an "X" in one of the seven boxes.
Original Proceedings.  (1) Cases which originate in the United States district courts.
Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court.  (3) Check this box for cases remanded to the district court for further action.  Use the date of remand as the filing date.
Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.
Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File.  (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.**  Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.**　　**Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity.**  Example: U.S. Civil Statute: 47 USC 553  Brief Description: Unauthorized reception of cable service

**VII.**　　**Requested in Complaint.**  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand.  In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**　　**Related Cases.**  This section of the JS 44 is used to reference related pending cases, if any.  If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.**  Date and sign the civil cover sheet.