# EXHIBIT A

JURY

# U.S. District Court
## Eastern District of Virginia - (Richmond)
## CIVIL DOCKET FOR CASE #: 3:23-cv-00528-JAG

Burkett, Jr. v. Genworth Life and Annuity Insurance Company
Assigned to: District Judge John A. Gibney, Jr
Demand: $5,000,000
Cause: 28:1332 Diversity-Tort/Non-Motor Vehicle

Date Filed: 08/17/2023
Jury Demand: Plaintiff
Nature of Suit: 380 Personal Property: Other
Jurisdiction: Diversity

**Plaintiff**

**Herman Burkett, Jr.**

represented by **Steven T. Webster**
Webster Book LLP
300 N Washington Street
Suite 404
Alexandria, VA 22314
888-987-9991
Fax: 888-987-9991
Email: swebster@websterbook.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Genworth Life and Annuity Insurance Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 08/21/2023 | 1 | Complaint ( Filing fee $ 402, receipt number AVAEDC-9086824.), filed by Herman Burkett, Jr.. (Attachments: # 1 Civil Cover Sheet)(Webster, Steven) (Entered: 08/21/2023) |
| 08/21/2023 | 2 | Citizenship Disclosure Form (Local Rule 7.1) by Herman Burkett, Jr.. (Webster, Steven) (Entered: 08/21/2023) |
| 08/21/2023 | 3 | Proposed Summons by Herman Burkett, Jr.. (Webster, Steven) (Entered: 08/21/2023) |
| 08/22/2023 |  | Initial Case Assignment to District Judge John A. Gibney, Jr. (Kat) (Entered: 08/22/2023) |
| 08/22/2023 | 4 | Summons Issued as to Genworth Life and Annuity Insurance Company, NOTICE TO ATTORNEY: Please remove the headers and print two duplex copies of the electronically issued summons for each Defendant. Please serve one copy of the summons and a copy of the Complaint upon each Defendant. Please ensure that your process server returns the service copy (executed or unexecuted) to your attention. Please electronically file it using the filing events, Summons Returned Executed or Summons Returned Unexecuted. (Kat, ) (Entered: 08/22/2023) |
| 08/23/2023 | 5 | Motion to appear Pro Hac Vice by John A. Yanchunis and Certification of Local Counsel Steven T. Webster Filing fee $ 75, receipt number AVAEDC-9091502. by Herman Burkett, Jr.. (Webster, Steven) (Entered: 08/23/2023) |

| 08/23/2023 | [6](#) | Motion to appear Pro Hac Vice by Ra O. Amen and Certification of Local Counsel Steven T. Webster Filing fee $ 75, receipt number AVAEDC-9091521. by Herman Burkett, Jr.. (Webster, Steven) (Entered: 08/23/2023) |

### PACER Service Center

#### Transaction Receipt

08/23/2023 16:06:32

| PACER Login: | SidleyCHPacer | Client Code: | 030049-11670-38331 |
|---|---|---|---|
| Description: | Docket Report | Search Criteria: | 3:23-cv-00528-JAG |
| Billable Pages: | 1 | Cost: | 0.10 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| HERMAN BURKETT, JR.<br><br>                Plaintiff,<br><br>v.<br><br>GENWORTH LIFE AND ANNUITY<br>INSURANCE COMPANY,<br><br>                Defendant. | Civil Action No.: 3:23-cv-528<br><br>**PROPOSED CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Herman Burkett, Jr. (hereinafter, "Plaintiff"), individually and on behalf of all others similarly situated, upon personal knowledge of the facts pertaining to himself and on information and belief as to all other matters, by and through his counsel, hereby brings this Class Action Complaint against Defendant Genworth Life and Annuity Insurance Company (hereinafter "Genworth").

## INTRODUCTION

1. On or around May 29, 2023, Genworth lost control over its customer's highly sensitive personal information in a data breach perpetrated by cybercriminals (the "Data Breach").

2. Upon information and belief, the cybercriminals who perpetrated the Data Breach are part of the Clop crime group.[1]

---

[1] https://www.bankinfosecurity.com/latest-moveit-data-breach-victim-tally-455-organizations-a-22650 (last accessed on July 26, 2023).

3.      Genworth entrusted its customers' personal and confidential data to PBI Research Services, Inc. ("PBI").

4.      The Data Breach exposed the personal information belonging to what is estimated to be 2.5–2.7 million customers, including names, social security numbers, addresses, phone numbers, dates of birth, zip code, state of residence, policy number, the role of the individual, and general product type used by Genworth for its business operations. For deceased customers, exposed information included the city and state of death, along with the source of that information. That exposure disturbs customers, as they no longer control their highly sensitive and confidential Personal Information, cannot stop others from viewing it, cannot prevent criminals from misusing it, and crucially cannot control where and to whom that Personal Information is sold and subsequently used.

5.      Plaintiff is a Data Breach victim having received Genworth's Data Breach notice.

6.      Since Genworth's Data Breach, Plaintiff has suffered identity theft and fraud, harms that he had no ability to mitigate due to Genworth's delayed notice.

7.      Plaintiff brings this Class Action on behalf of himself and all others harmed by Genworth's misconduct.

**PARTIES**

8.      Plaintiff is an individual Texas citizen residing in Dallas, Texas.

9.      Defendant Genworth is a is a corporation organized and existing under the laws of Virginia, having its principal place of business in Richmond, Virginia. Among other products, Genworth issues universal life insurance policies in all states but New York.

**JURISDICTION & VENUE**

10.      This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332(d) because this a class action with diversity between at least one class member (including Plaintiff)

2

and one defendant and the aggregate amount of damages exceeds $5,000,000.00, and unnamed class members are citizens across the United States. This action therefore falls within the original jurisdiction of the federal courts pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d).

11.     This Court has personal jurisdiction over Genworth, which has its principal place of business in Virginia.

12.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)–(c) because Defendant resides here and the events giving rise to Plaintiff's causes of action occurred in this District.

## FACTUAL ALLEGATIONS

**A.      Appropriate Cybersecurity Measures are Crucial for Companies that Collect, Store, and Use Sensitive and Confidential Information.**

13.     Industry leaders recognize that companies need to improve their defenses, particularly how sensitive and confidential information is stored. Rob Carey, former principal deputy chief information officer for the Department of Defense, acknowledged that in years past companies "would do what was necessary, but maybe not sufficient" to protect consumers' data.[2] With the recent updates from the White House's cybersecurity strategy, Mr. Carey suggests that companies with "close[] the gap between necessary and sufficient levels of cyber defense and what is expected" to secure and protect consumers' sensitive and confidential information.[3] Indeed, "the cost of preparation and sort of defense is far less than cleaning up a cyber spill . . . or cyber-attack."[4]

---

[2]Lauren Williams, *Companies Prepare to Spend More on Cybersecurity Under New Rules*, Defense One (March 7, 2023) *available at* https://www.defenseone.com/defense-systems/2023/03/companies-prepare-spend-more-cybersecurity/383723.

[3]*Id.*

[4]*Id.*

14.     A survey of 683 chief information officers and IT executives revealed that the mean IT budget devoted to cybersecurity was 15%, with nearly one quarter of organizations (23%) devoting 20% or more of their IT budget to security.[5]  That same survey resulted in 40% of the respondents admitting that the need to increase cybersecurity protections was paramount to improving customer experience, growing the business, transforming existing business processes, and improving profitability.[6]

15.     It is undisputed that cybersecurity is crucial where consumers' sensitive and confidential information is stored by companies and organizations. However, despite the threat environment increasing, in 2023 IT and cybersecurity departments were the second most impacted by layoffs and cost cutting.[7]

16.     A survey from 2022 revealed that only 17% of organizations polled had performed an audit of their cybersecurity vulnerabilities within the preceding 12 months; 17% of organizations had cybersecurity training for employees in the last 12 months; and just 34% had business continuity plans that covered cybersecurity.[8]

**B.     Genworth Collects and Promises to Protect Customers' Confidential Information.**

17.     Founded in 1871, Genworth provides life insurance policies to its customers.

18.     Genworth has approximately 2,500 employees.

---

[5]Bob Violino, *How much should you spend on security?*, CSO Online (Aug. 20, 2019) *available at* https://www.csoonline.com/article/567633/how-much-should-you-spend-on-security.html.

[6]*Id.*

[7]*Global Survey Reveals Cybersecurity Budgets Should be Spent on Security Operations in 2023*, Arctic Wolf (Jan. 23, 2023) *available at* https://arcticwolf.com/resources/blog/cybersecurity-budgets-spent-security-operations-2023.

[8]Johnty Morgan, *How much should you be spending on your cybersecurity?*, Gallagher (April 6, 2022) *available at* https://www.ajg.com/uk/news-and-insights/2022/april/spending-on-your-cybersecurity.

19.     To operate its business, Genworth must create, collect, and store customers' Personal Information.

20.     As a result, Genworth requires its customers to disclose their Personal Information to receive Genworth's services, including their names, social security numbers, addresses, phone numbers, and dates of birth.

21.     In doing so, Genworth promises those customers that it will protect their information under state and federal law and its internal policies.

22.     On Genworth's website, Genworth represents that, "Protecting the privacy and security of your personal information is very important to us…. When you provide information to us on our websites, we use encryption and authentication tools to protect that information after it gets to us…. Once we receive your information, we use procedures and technologies designed to prevent unauthorized access to your personal information and to protect against the loss, misuse, and alteration of information under our control. We maintain physical, electronic, and procedural protections to protect personal information in accordance with applicable standards. We require that service providers who have access to your personal information implement similar standards. We require service providers to agree to keep your personal information confidential. Service providers who violate our privacy terms are subject to having their contract terminated."[9]

23.     Upon information and belief, Genworth represented to its employees, customers, policyholders, and members orally and in written contracts, marketing materials, and otherwise that it would properly protect all PII it obtained.

24.     However – as evidenced by its loss of control of its customers' data – Genworth never implemented the security safeguards sufficient to fulfill those duties, failing to adequately

---

[9] https://www.genworth.com/online-privacy-policy.html.

train its employees on data security, develop policies to prevent breaches, enforce those policies, follow industry standard guidelines on cybersecurity, and timely respond to data breaches and inform customers as required by law. As a result, Genworth left customers' Personal Information a vulnerable target for theft and misuse.

25.     Genworth's negligence in safeguarding Plaintiff's and Class Members' PII was exacerbated by repeated warnings and alerts directed to protecting and securing sensitive data, as evidenced by the trending data breach attacks in recent years.

26.     Despite the prevalence of public announcements of data breaches and data security compromises, Genworth failed to take appropriate steps to protect Plaintiff's and Class Members' PII from being compromised.

27.     Genworth failed to properly select its information security partners.

28.     Genworth failed to ensure the proper monitoring and logging of the ingress and egress of network traffic.

29.     Genworth failed to ensure the proper monitoring and logging of file access and modifications.

30.     Genworth failed to ensure the proper training of its technology partners' employees as to cybersecurity best practices.

31.     Genworth failed to ensure fair, reasonable, or adequate computer systems and data security practices to safeguard the PII of Plaintiff and Class Members.

32.     Genworth failed to timely and accurately disclose that Plaintiff's and Class Members' PII had been improperly acquired or accessed.

33.     Genworth knowingly disregarded standard information security principles, despite obvious risks, by allowing unmonitored and unrestricted access to unsecured PII.

34.     Genworth failed to provide adequate supervision and oversight of the PII with which it was and is entrusted, in spite of the known risk and foreseeable likelihood of breach and misuse, which permitted an unknown third party to gather PII of Plaintiff and Class Members, misuse the PII and potentially disclose it to others without consent.

35.     Upon information and belief, Genworth failed to ensure the proper implementation of sufficient processes to quickly detect and respond to data breaches, security incidents, or intrusions.

36.     Upon information and belief, Genworth failed to ensure the proper encryption of Plaintiff's and Class Members' PII and monitor user behavior and activity to identify possible threats.

**C.    The Data Breach**

37.     Certainly, on or around May 29, 2023, Genworth lost control over its customer's highly sensitive personal information in a data breach perpetrated by cybercriminals (the "Data Breach").

38.     The Data Breach exposed the personal information belonging to what is estimated to be 2.5–2.7 million customers, including names, social security numbers, addresses, phone numbers, dates of birth, zip code, state of residence, policy number, the role of the individual, and general product type used by Genworth for its business operations. For deceased customers, exposed information included the city and state of death, along with the source of that information. That exposure disturbs customers, as they no longer control their highly sensitive and confidential Personal Information, cannot stop others from viewing it, cannot prevent criminals from misusing it, and crucially cannot control where and to whom that Personal Information is sold and subsequently used.

39.     Genworth entrusted its customers' personal and confidential data to PBI.

40.     Upon information and belief, Genworth directly or indirectly—through PBI—used Progress Software Corporation ("PSC") for information technology management and software services, including PSC's file transfer software, MOVEit. Within this relationship, Genworth transferred and entrusted data, including Plaintiff's and Class Members PII, to PSC.

41.     Upon information and belief, PSC's file transfer software, MOVEit, was hacked by the Clop crime group, resulting in the Breach and the exfiltration of customer PII, including Plaintiff's and Class Members PII. Upon information and belief, the hackers exfiltrated Plaintiff and Class Members' Personal Information with the intent of committing or enabling the commitment of identity theft and fraud.

42.     On or about June of 2023, Genworth notified the public ("Notice of Data Breach" or "Notice") that its customers' data had been compromised in a Data Breach suffered by PSC, and informed them of the following:

**Q: What happened?**
PBI advised Genworth of a security event connected to the vulnerability in the MOVEit file transfer software that PBI uses. The estimated occurrence of the event was May 29, 2023, and the estimated end date was May 30, 2023. On June 2, 2023, PBI implemented the patches (or fixes) provided by Progress Software, the producer of MOVEit.

On June 16, 2023, PBI advised Genworth that specific Genworth files containing policyholder and agent information were compromised due to a security event that took advantage of a vulnerability identified in the widely-used MOVEit file transfer software that PBI uses.

**Q: What is MOVEit?**
MOVEit Transfer is a managed file transfer software solution that allows an organization to securely transfer files between parties.

**Q: Who is PBI? What do they do for Genworth?**
PBI Research Services, or PBI, is a third-party vendor that Genworth uses to satisfy regulatory obligations to scan social security data to determine whether a policyholder may have passed and triggered death benefits under a life insurance policy or annuity contract. We also use PBI to identify deaths that have occurred across our other lines of insurance, and of insurance agents to whom we pay commissions.

**Q: What Genworth data was accessed?**

The event included personal information for approximately 2-5-2.7 million individuals who are either customers or insurance agents. The personal information accessed included life insurance, individual and group long-term care insurance, and annuity customers.

For customers, the exposed information includes one or more of the following: social security number, first and last name, date of birth, zip code, state of residence, policy number, the role of the individual (ex. Annuitant, Joint Insured, Owner, etc.), and general product type. If deceased, the exposed information also includes the city and date of death, along with the source of that information.

For agents, the exposed information includes social security number, first and last name, date of birth, full address, and a preferred full address. If deceased, the exposed information also included date of death and the source of that information.[10]

43.     Upon information and belief, Genworth has sufficient control over its data which was stored and/or transported over PSC's file transfer software, MOVEit to properly secure that data.

44.     Upon information and belief, Plaintiff's and Class Members' affected PII was accessible, unencrypted, unprotected, and vulnerable for acquisition and/or exfiltration by unauthorized individuals.

45.     It is likely the Data Breach was targeted at PSC due to its status as large information technology provider to businesses that collect, create, and maintain PII.

46.     PSC and Genworth were unreasonably delayed in providing notice of the Breach to Plaintiff and Class Members.

47.     Time is of the essence when highly sensitive PII is subject to unauthorized access and/or acquisition. The disclosed, accessed, and/or acquired PII of Plaintiff and Class Members is likely available on the Dark Web. Hackers can access and then offer for sale the unencrypted, unredacted PII to criminals. Plaintiff and Class Members are now subject to the present and

---

[10] https://www.genworth.com/moveit.html (last accessed on August 2, 2023).

continuing risk of fraud, identity theft, and misuse resulting from the possible publication of their PII onto the Dark Web. Plaintiff and Class Members now face a lifetime risk of identity theft, which is heightened here by unauthorized access, disclosure, and/or activity by cybercriminals on computer systems containing sensitive personal information.

48.     Following the Breach and recognizing that each Class Member is now subject to the present and continuing risk of identity theft and fraud, Genworth advised impacted individuals to:

   a.   order your free credit report;

   b.   if you believe you are the victim of identity theft or have reason to believe your personal information has been misused, contact the FTC and/or your state's attorney general office about for information on how to prevent or avoid identity theft;

   c.   place a security freeze; and

   d.   place a fraud alert.11

49.     Genworth largely put the burden on Plaintiff and Class Members to take measures to protect themselves.

50.     Time is a compensable and valuable resource in the United States. According to the U.S. Bureau of Labor Statistics, 55.5% of U.S.-based workers are compensated on an hourly basis, while the other 44.5% are salaried.12

---

11 *Id.*

12 *Characteristics of minimum wage workers, 2020*, U.S. BUREAU OF LABOR STATISTICS https://www.bls.gov/opub/reports/minimum-wage/2020/home.htm#:~:text= In%202020%2C%2073.3%20million%20workers,wage%20of%20%247.25%20per%20hour (last accessed Oct. 21, 2022); *Average Weekly Wage Data*, U.S. BUREAU OF LABOR STATISTICS, *Average Weekly Wage Data,* https://data.bls.gov/cew/apps/table_maker/v4/

51. According to the U.S. Bureau of Labor Statistics' 2018 American Time Use Survey, American adults have only 36 to 40 hours of "leisure time" outside of work per week;13 leisure time is defined as time not occupied with work or chores and is "the time equivalent of 'disposable income.'"[14] Usually, this time can be spent at the option and choice of the consumer, however, having been notified of the Data Breach, consumers now have to spend hours of their leisure time self-monitoring their accounts, communicating with financial institutions and government entities, and placing other prophylactic measures in place to attempt to protect themselves.

52. Plaintiff and Class Members are now deprived of the choice as to how to spend their valuable free hours and seek renumeration for the loss of valuable time as another element of damages.

53. Upon information and belief, the unauthorized third-party cybercriminals gained access to Plaintiff's and Class Members' PII with the intent of engaging in misuse of the PII, including marketing and selling Plaintiff's and Class Members' PII.

54. Genworth also offered credit monitoring services for a period of 24 months. Such measures, however, are insufficient to protect Plaintiff and Class Members from the lifetime risks they each now face. As another element of damages, Plaintiff and Class Members seek a sum of money sufficient to provide Plaintiff and Class Members identity theft protection services for their respective lifetimes.

**D.    Plaintiff's Experience**

---

table_maker.htm%23type=1&year=2021&qtr=3&own=5&ind=10&supp=0 (last accessed Aug. 2, 2022) (finding that on average, private-sector workers make $1,253 per 40-hour work week.).

[13] Cory Stieg, *You're spending your free time wrong — here's what to do to be happier and more successful*, CNBC https://www.cnbc.com/2019/11/06/how-successful-people-spend-leisure-time-james-wallman.html (Nov. 6, 2019).

[14] *Id.*

55.     Plaintiff is a current Genworth customer.

56.     Plaintiff is also a victim of the Data Breach, having received Genworth's Notice.

57.     Plaintiff provided his Personal Information to Genworth and trusted that Genworth would use reasonable measures to protect it. Accordingly, Plaintiff expected that his Personal Information would be protected according to state and federal law and any applicable internal policies at Genworth.

58.     To deal with the problems stemming from the Data Breach, Plaintiff has devoted at least 20 hours to remediating it and mitigating the potential for it to happen again.

59.     Indeed, Plaintiff has and will spend considerable time and effort monitoring his accounts to protect himself from identity theft. Plaintiff fears for his personal financial security and uncertainty over what Personal Information was exposed in the Data Breach.

60.     Plaintiff has and is experiencing feelings of anxiety, sleep disruption, stress, fear, and frustration because of the Data Breach. The fear stems from the fact that his highly sensitive Personal Information is in criminal hands, who have already shown they will misuse his information. These emotional harms go far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

61.     Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the harms caused by the Data Breach. In addition, Plaintiff will continue to be at present, imminent, and continued increased risk of identity theft and fraud for years to come.

62.     Plaintiff does not recall ever learning that his information was compromised in a data breach incident, other than the Data Breach at issue in this case.

63.     Plaintiff suffers a present injury from the increased risk of fraud, identity theft, and misuse resulting from his Personal Information being placed in the hands of criminals. Plaintiff has a continuing interest in ensuring that his Personal Information, which is the type that cannot be changed and upon information and belief remains in Genworth's possession, is protected and safeguarded from future breaches.

64.     Genworth has not represented the business practices changes that have been implemented to prevent against further data breaches—even at a high level that would not jeopardize its security infrastructure.

**E.     Plaintiff and the Class Face Significant Risk of Continued Identity Theft.**

65.     Plaintiff and Class Members have suffered injury from the misuse of their Personal Information that can be directly traced to Genworth.

66.     As a result of Genworth's failure to prevent the Data Breach, Plaintiff and Class Members have suffered and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. They have suffered or are at an increased risk of suffering:

    a.  The loss of the opportunity to control how Plaintiff's Personal Information is used;

    b.  The compromise and continuing publication of Plaintiff's Personal Information;

    c.  Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

    d.  Lost opportunity costs and lost wages associated with the time and effort expended addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

    e.  Delay in receipt of tax refund monies;

    f.  Unauthorized use of stolen Personal Information; and

    g.  The continued increased risk to Plaintiff or his Personal Information, which remains in the possession of Genworth and is subject to further breaches so long as

Genworth fails to undertake the appropriate measures to protect the Personal Information in its possession.

67.     Stolen Personal Information is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen Personal Information can be worth up to $1,000.00 depending on the type of information obtained. Thus, criminals willingly pay money for access to Personal Information, which enables those criminals to commit fraud and identity theft to the detriment of patients and consumers, including Plaintiff and members of the Class.

68.     The value of Plaintiff's and Class Members' Personal Information on the black market is considerable. Stolen Personal Information trades on the black market for years, and criminals frequently post stolen private information openly and directly on various "dark web" internet websites, making the information publicly available, for a substantial fee of course.

69.     It can take victims years to spot identity or Personal Information theft, giving criminals plenty of time to use that information for cash.

70.     One such example of criminals using Personal Information for profit is the development of "Fullz" packages.

71.     Cyber-criminals can cross-reference two sources of Personal Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

72.     The development of "Fullz" packages means that stolen Personal Information from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' Personal Information, and other sources and identifiers. In other words, even if certain types of information may not be included in the Personal Information stolen by the cyber-criminals in the Data Breach,

criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and Class Members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff's and Class Members' stolen Personal Information are being misused, and that such misuse is fairly traceable to the Data Breach.

73.     Genworth disclosed the Personal Information of Plaintiff and Class Members to unauthorized third parties to use in the conduct of criminal activity. Specifically, Genworth exposed the Personal Information of Plaintiff and Class Members to people engaged in disruptive and unlawful business practices and tactics.

74.     Genworth's failure to properly notify Plaintiff and Class Members of the Data Breach exacerbated Plaintiff's and Class Members' injury by depriving them of the earliest ability to take appropriate measures to protect their Personal Information and take other necessary steps to mitigate the harm caused by the Data Breach.

75.     Had Genworth timely and properly notified Plaintiff and Class Members of the Data Breach, Plaintiff and Class Members could have taken proactive, rather than reactive, mitigating measures. Plaintiff, had he received timely notice, could have placed a freeze on his credit and taken other precautions, which would mitigate exposure to criminal activity.

**F.      Genworth failed to adhere to FTC Guidelines.**

76.     According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making.  To that end, the FTC has issued numerous guidelines identifying best data security practices that businesses, such as Genworth, should employ to protect against the unlawful exposure of Personal Information.

77.     In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established guidelines for fundamental data security principles and practices for business.  The guidelines explain that businesses should:

    a.   protect the personal customer information that they keep;

    b.   properly dispose of personal information that is no longer needed;

    c.   encrypt information stored on computer networks;

    d.   understand their network's vulnerabilities; and

    e.   implement policies to correct security problems.

78.     The guidelines also recommend that businesses watch for large amounts of data being transmitted from the system and have a response plan ready in the event of a breach.

79.     The FTC recommends that companies not maintain information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

80.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

81.     Genworth's failure to employ reasonable and appropriate measures to protect against unauthorized access to patients' (*i.e.*, consumers') Personal Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

## CLASS ALLEGATIONS

82.     This action is brought, and may be properly maintained, as a class action under Rule 23 of the Federal Rules of Civil Procedure. All requisite elements of Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3) are satisfied; there is a well-defined community of interests in the litigation; the proposed Class and any subclasses are ascertainable; and a single class action is the superior manner to proceed when compared to the joinder of thousands, or tens of thousands, of individual cases challenging the same practices.

83.     Plaintiff brings this action individually on behalf of himself, and on behalf of the Class and Subclass(s) defined below, for which Plaintiff is a member, under Rule 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure seeking damages, restitution, injunctive and declaratory relief pursuant to the applicable laws set forth in the state law counts below.

84.     This action is brought on behalf of a national class (the "Class"), consisting of:

All persons whose Personal Information was impacted by the Data Breach, including all who were sent a notice of the Data Breach.

85.     The Class Period for the Class dates back to the longest applicable statute of limitations for any claims asserted on behalf of that Class from the date this action was commenced and continues through the present and to the date of judgment.

86.     Excluded from the Class are Defendant, its corporate parent, subsidiaries and affiliates, officers and directors, any entity in which Defendant has a controlling interest, and the legal representatives, assigns of any such excluded persons or entities, and the attorneys for

Plaintiff herein. Also excluded from the Class are any judges presiding over these proceedings and their immediate family members.

87.     **Numerosity**: The members of the Class are so numerous that joinder of all members is impracticable. While the exact numbers of Class members are unknown to Plaintiff at this time, Plaintiff on information and belief believes that the numbers exceed 100.

88.     **Common Questions of Law and Fact Predominate**: The questions of law and fact common to the Class predominate over questions affecting only individuals. Among the questions of law and fact common to the Class are:

a.     Whether Genworth violated state and federal laws by failing to properly store, secure, and dispose of Plaintiff's and Class Members' Personal Information;

b.     Whether Genworth failed to employ reasonable and adequate data and cybersecurity measures in compliance with applicable state and federal regulations;

c.     Whether Genworth acted willfully, recklessly, or negligently regarding securing Plaintiff's and Class Members' Personal Information;

d.     How the Data Breach occurred;

e.     Whether Genworth failed to timely notify Plaintiff and Class Members of the Data Breach;

f.     Whether Plaintiff and Class Members are entitled to restitution, damages, compensation, or other monetary relief; and

g.     Whether Plaintiff and Class Members are entitled to injunctive and declaratory relief necessary to secure their Personal Information from further intrusion, exposure, and misuse.

89.     Common sources of evidence may also be used to demonstrate Genworth's unlawful conduct on a class-wide basis, including, but not limited to, documents and testimony about its data and cybersecurity measures (or lack thereof); testing and other methods that can prove Genworth's data and cybersecurity systems have been or remain inadequate; documents and

testimony about the source, cause, and extent of the Data Breach; and documents and testimony about any remedial efforts undertaken as a result of the Data Breach.

90. **Typicality**: Plaintiff's claims are typical of other Class members' claims because Plaintiff, like every other Class member, was exposed to virtually identical conduct and was overcharged.

91. **Adequacy**: Plaintiff can fairly and adequately represent the Class's interests; Plaintiff has no conflicts of interest with other Class members and has retained counsel competent and experienced in data breach litigation, class actions and complex civil litigation.

92. **Ascertainability**: The identities of individual Class members are readily ascertainable through appropriate discovery from business records maintained by Genworth and their agents.

93. **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable, the likelihood of individual Class members prosecuting separate claims is remote and individual members do not have a significant interest in individually controlling the prosecution of separate actions. No difficulty will be encountered in this case's management to preclude maintenance as a class action.

94. **Manageability**: The Class litigation will be manageable because all issues are identical, and individualized calculation of damages can be accomplished methodically by an expert via the use of data and information provided by Genworth and its agents.

95. Plaintiff and Class Members have suffered injury, harm, and damages because of Genworth's unlawful and wrongful conduct. Absent a class action, Genworth will continue to maintain Plaintiff's and Class Members' Personal Information that could be subject to future

breaches due to lax or non-existent cybersecurity measures, and such unlawful and improper conduct should not go unchecked nor remedied. Absent a class action, the Class Members will not be able to effectively litigate these claims and will suffer further harm and losses, as Genworth will be allowed to continue such conduct with impunity and benefit from its unlawful conduct.

96.     Adequate notice can be given to Class Members directly using information maintained in Genworth's records.

97.     Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include those set forth above, including in paragraph 88.

98.     Genworth has acted on grounds that apply generally to the Class as a whole, so that Class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

## CLAIMS FOR RELIEF

### COUNT I
**Negligence**
**On behalf of Plaintiff and the Class**

99.     Plaintiff realleges paragraphs 1-98 above as if fully set forth herein. Plaintiff brings this claim on behalf of the Class set forth above.

100.     Genworth had a duty to exercise reasonable care and protect and secure Plaintiff's and Class Members' Personal Information. This duty exists at common law and is also codified under Federal law (*see*, *e.g.*, FTCA, FCRA, and HIPAA) and Virginia law (*see*, *e.g.*, Va. Code Ann. § 59.1–575 *et seq.*).

101. Through its acts and omissions, Genworth breached its duty to use reasonable care to protect and secure Plaintiff's and Class Members' Personal Information by employing substandard or non-existent data and cybersecurity protocols.

102. Genworth further breached its duties by failing to employ industry standard data and cybersecurity measures to gain compliance with those laws, including, but not limited to, proper segregation, access controls, password protection, encryption, intrusion detection, secure destruction of unnecessary data, and penetration testing.

103. It was reasonably foreseeable, particularly given legal mandates governing health data protection and the growing number of data breaches of health information—including past data breaches at Genworth—that the failure to reasonably protect and secure Plaintiff's and Class Members' Personal Information would result in an unauthorized third-party again gaining access to Genworth's networks, databases, and computers that stored or contained Plaintiff's and Class Members' Personal Information.

104. Plaintiff's and Class Members' Personal Information constitutes personal property that was stolen due to Genworth's negligence, resulting in harm, injury, and damages to Plaintiff and Class Members.

105. Genworth's negligence directly and proximately caused the unauthorized access and disclosure of Plaintiff's and Class Members' unencrypted Personal Information and Class Members have suffered and will continue to suffer damages because of Genworth's conduct. Plaintiff and Class Members seek damages and other relief because of Genworth's negligence.

## COUNT II
**Breach of Express Contract**
**On behalf of Plaintiff and the Class**

106. Plaintiff realleges paragraphs 1-98 above as if fully set forth herein. Plaintiff brings this claim on behalf of the Class set forth above.

21

107.     Genworth provides life insurance products to Plaintiff and Class Members pursuant to the terms of its contracts, which all were a party to, including agreements regarding the handling of their confidential Personal Information in accordance with Genworth's policies, practices, and applicable law. Plaintiff not in possession of these contracts but upon information and belief these contracts are in the possession of Genworth. As consideration, Plaintiff and Class Members paid money to Genworth and/or their insurers for life insurance products. Accordingly, Plaintiff and Class Members paid Genworth to securely maintain and store their Personal Information. Genworth violated these contracts by failing to employ reasonable and adequate security measures to secure Plaintiff and Class Members' Personal Information and by disclosing it for purposes not required or permitted under the contracts.

108.     Plaintiff and Class Members have been damaged by Genworth's conduct, including by paying for data and cybersecurity protection that they did not receive, as well as by incurring the harms and injuries arising from the Data Breach now and in the future.

## COUNT III
### Breach of Implied Contract In Fact
### On behalf of Plaintiff and the Class

109.     Plaintiff realleges paragraphs 1-98 above as if fully set forth herein. Plaintiff brings this claim on behalf of the Class set forth above.

110.     Genworth provides life insurance products to Plaintiff and Class Members also formed an implied contract with Genworth regarding the provision of those services through their collective conduct, including by Plaintiff and Class Members paying for life insurance products from Genworth and by Genworth's sale of life insurance products, regarding the handling of their confidential Personal Information in accordance with Genworth's policies, practices, and applicable law.

111.    As consideration, Plaintiff and Class Members paid money to Genworth and/or their insurers for life insurance products. Accordingly, Plaintiff and Class Members paid Genworth to securely maintain and store their Personal Information. Genworth violated these contracts by failing to employ reasonable and adequate security measures to secure Plaintiff's and Class Members' Personal Information and by disclosing it for purposes not required or permitted under the contracts or agreements.

112.    Plaintiff and Class Members have been damaged by Genworth's conduct, including by paying for data and cybersecurity protection that they did not receive, as well as by incurring the harms and injuries arising from the Data Breach now and in the future.

**COUNT IV**
**Invasion of Privacy (Electronic Intrusion)**
**On behalf of Plaintiff and the Class**

113.    Plaintiff realleges paragraphs 1-98 above as if fully set forth herein. Plaintiff brings this claim on behalf of the Class set forth above.

114.    Plaintiff and Class Members maintain a privacy interest in their Personal Information, which is private, confidential information that is also protected from disclosure by applicable laws set forth above. Plaintiff's and Class Members' Personal Information was contained, stored, and managed electronically in Genworth's records, computers, and databases that was intended to be secured from unauthorized access to third-parties because it contained highly sensitive, confidential matters regarding Plaintiff's and Class Members' identities, unique identification numbers, medical histories, and financial records that were only shared with Genworth for the limited purpose of obtaining and paying for healthcare, medical goods and services. Additionally, Plaintiff's and Class Members' Personal Information, when contained in electronic form, is highly attractive to criminals who can nefariously use their Personal Information for fraud, identity theft, and other crimes without their knowledge and consent.

23

115.    Genworth's disclosure of Plaintiff and Class Members' Personal Information to unauthorized third parties because of its failure to adequately secure and safeguard their Personal Information is offensive to a reasonable person. Genworth's disclosure of Plaintiff's and Class Members' Personal Information to unauthorized third parties permitted the physical and electronic intrusion into Plaintiff's and Class Members' private quarters where their Personal Information was stored and disclosed private facts about their health into the public domain.

116.    Plaintiff and Class Members have been damaged by Genworth's conduct, including by paying for data and cybersecurity protection that they did not receive, as well as by incurring the harms and injuries arising from the Data Breach now and in the future.

### COUNT V
### Unjust Enrichment
### On behalf of Plaintiff and the Class

117.     Plaintiff realleges paragraphs 1-98 above as if fully set forth herein. Plaintiff brings this claim on behalf of the Class set forth above.

118.    Plaintiff and Class Members conferred a benefit on Genworth by paying for data and cybersecurity procedures to protect their Personal Information that they did not receive.

119.    This conferral of benefit was not incidental to Plaintiff's and Class Members' treatment and Class Members expected that Genworth would ensure that their Personal Information would remain secure and not be disclosed to unauthorized third parties by, *inter alia*, devoting appropriate and sufficient budgets to secure and protect that Personal Information.

120.    Genworth has retained the benefits of its unlawful conduct including the amounts received for data and cybersecurity practices that it did not provide. Due to Genworth's conduct alleged herein, it would be unjust and inequitable under the circumstances for Genworth to be permitted to retain the benefit of its wrongful conduct.

121.    Plaintiff and the Class Members are entitled to full refunds, restitution and/or damages from Genworth and/or an order of this Court proportionally disgorging all profits, benefits, and other compensation obtained by Genworth from its wrongful conduct. If necessary, the establishment of a constructive trust from which the Plaintiff and Class Members may seek restitution or compensation may be created.

122.    Additionally, Plaintiff and the Class Members may not have an adequate remedy at law against Genworth, and accordingly plead this claim for unjust enrichment in addition to or, in the alternative, to other claims pleaded herein.

**COUNT VI**
**Breach of Confidence**
**On behalf of Plaintiff and the Class**

123.    Plaintiff realleges paragraphs 1-98 above as if fully set forth herein. Plaintiff brings this claim on behalf of the Class set forth above.

124.    At all times during Plaintiff's and Class Members' relationship with Genworth, Genworth was fully aware of the confidential and sensitive nature of Plaintiff's and Class Members' Personal Information.

125.    As alleged herein and above, Genworth's relationship with Plaintiff and Class Members was governed by terms and expectations that Plaintiff's and Class Members' Personal Information would be collected, stored, and protected in confidence, and would not be disclosed to unauthorized third parties.

126.    Plaintiff and Class Members provided their Personal Information to Genworth with the explicit and implicit understandings that Genworth would protect and not permit Personal Information to be disseminated to any unauthorized parties.

127. Plaintiff and Class Members also provided their Personal Information to Genworth with the explicit and implicit understandings that Genworth would take precautions to protect such Personal Information from unauthorized disclosure.

128. Genworth voluntarily received in confidence Plaintiff's and Class Members' Personal Information with the understanding that the Personal Information would not be disclosed or disseminated to the public or any unauthorized third parties.

129. Due to Genworth's failure to prevent, detect, or avoid the Data Breach from occurring by, *inter alia*, following industry standard information security practices to secure Plaintiff's and Class Members' Personal Information, Plaintiff and Class Members' Personal Information was disclosed and misappropriated to unauthorized third parties beyond Plaintiff's and Class Members' confidence, and without their express permission.

130. As a direct and proximate cause of Genworth's actions and/or omissions, Plaintiff and Class Members have suffered damages.

131. But for Genworth's disclosure of Plaintiff's and Class Members' Personal Information in violation of the parties' understanding of confidence, their protected Personal Information would not have been compromised, stolen, viewed, accessed, and used by unauthorized third parties. Genworth's Data Breach was the direct and legal cause of the theft of Plaintiff's and Class Members' protected Personal Information, as well as the resulting damages.

132. The injury and harm Plaintiff and Class Members suffered was the reasonably foreseeable result of Genworth's unauthorized disclosure of Plaintiff's and Class Members' Personal Information.

133. As a direct and proximate result of Genworth's breaches of confidence, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual

identity theft; (ii) the compromise, publication, and/or theft of their Personal Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Personal Information; (iv) lost opportunity costs associated with effort expended to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from medical fraud, financial fraud, and identity theft; (v) costs associated with placing freezes on credit reports; (vi) the continued risk to their Personal Information, which remain in Genworth's possession and is subject to further unauthorized disclosures so long as Genworth fails to undertake appropriate and adequate measures to protect the Personal Information of patients in its continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Personal Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

134.   As a direct and proximate result of Genworth's breaches of confidence, Plaintiff and Class Members have suffered and will continue to suffer injury and/or harm.

## COUNT VII
### Breach of Fiduciary Duty
### On behalf of Plaintiff and the Class

135.   Plaintiff realleges paragraphs 1-98 above as if fully set forth herein. Plaintiff brings this claim on behalf of the Class set forth above.

136.   Considering their special relationship, Genworth has become the guardian of Plaintiff's and Class Members' Personal Information. Genworth has become a fiduciary, created by its undertaking and guardianship of patient Personal Information, to act primarily for the benefit of their patients, including Plaintiff and Class Members. This duty included the obligation to safeguard Plaintiff's and Class Members' Personal Information and to timely notify them in the event of a data breach.

137.     Genworth has a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of their relationship. Genworth has breached its fiduciary duties owed to Plaintiff and Class Members by failing to:

a.   properly encrypt and otherwise protect the integrity of the system containing Plaintiff and Class Members' protected health information and other Personal Information;

b.   timely notify and/or warn Plaintiff and Class Members of the Data Breach;

c.   ensure the confidentiality and integrity of electronic protected health information Genworth created, received, maintained, and transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

d.   implement technical policies and procedures to limit access to only those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

e.   implement policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 C.F.R. § 164.308(a)(1);

f.   to identify and respond to suspected or known security incidents; mitigate to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. § 164.308(a)(6)(ii);

g.   to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic protected health information in violation of 45 C.F.R. § 164.306(a)(2);

h.   to protect against any reasonably anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

i.   ensure compliance with the HIPAA security standard rules by their workforce in violation of 45 C.F.R. § 164.306(a)(94);

j.   improperly using and disclosing protected health information that is and remains accessible to unauthorized persons in violation of 45 C.F.R. § 164.502, et seq.;

k.   effectively train all members of their workforce (including independent contractors) on the policies and procedures with respect to protected health information as necessary and appropriate for the members of their workforce to carry out their functions and to maintain security of protected health

information in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5)

l.   design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard protected health information, in compliance with 45 C.F.R. § 164.530(c); and

m.  otherwise failing to safeguard Plaintiff and Class Members' Personal Information.

138.   As a direct and proximate result of Genworth's breaches of its fiduciary duties, Plaintiff and Class Members have suffered and will suffer injury, including, but not limited to: (i) actual identity theft; (ii) the compromise, publication, and/or theft of their Personal Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their Personal Information; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their Personal Information, which remains in Genworth's possession and is subject to further unauthorized disclosures so long as Genworth fails to undertake appropriate and adequate measures to protect patient Personal Information in their continued possession; and (vi) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Personal Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

139.   As a direct and proximate result of Genworth's breach of its fiduciary duty, Plaintiff and Class Members have suffered and will continue to suffer injury and/or harm.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff on his own and behalf of all others similarly situated, prays for relief as follows:

A.      For an Order certifying this case as a class action and appointing Plaintiff as Class Representative and the undersigned as Class Counsel;

B.      Awarding monetary and actual damages and/or restitution, as appropriate, or nominal damages in the alternative;

C.      Awarding declaratory and injunctive relief as permitted by law or equity to assure that the Class has an effective remedy, including enjoining Genworth from continuing the unlawful practices as set forth above;

D.      Awarding pre- and post-judgment interest to the extent allowed by the law;

E.      Awarding all costs, experts' fees and attorneys' fees, expenses, and costs of prosecuting this action; and

F.      Such other and further relief as the Court may deem just and proper.

DATED: August 17, 2023                Respectfully Submitted,

*/s/ Steven T. Webster*

**WEBSTER BOOK LLP**
Steven T. Webster (V.S.B. No. 31975)
300 N. Washington St., Suite 404
Alexandria, Virginia 22314
T: (888) 987-9991
swebster@websterbook.com

**STECKLER WAYNE & LOVE, PLLC**
Bruce W. Steckler*
Austin P. Smith*
Kaitlyn M. Coker*
12720 Hillcrest Road, Suite 1045
Dallas, Texas 75230
Phone: (972) 387-4040
Facsimile: (972) 387-4041
bruce@swclaw.com
austin@swclaw.com
kcoker@swclaw.com

**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
John A. Yanchunis*
Ra O. Amen*
201 North Franklin Street 7th Floor
Tampa, Florida 33602
T: (813) 223-5505
F: (813) 223-5402
jyanchunis@forthepeople.com
ramen@forthepeople.com

*Pro hac vice forthcoming*

**Counsel for Plaintiff and the Class**