# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| **BETTY GREGORY,** on behalf of herself and all others similarly situated, | Case No. _____ |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| v. | |
| **MILLIMAN SOLUTIONS, LLC** and **CMFG LIFE INSURANCE COMPANY d/b/a TRUSTAGE FINANCIAL GROUP, INC.,** | |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiff Betty Gregory ("Plaintiff"), individually and on behalf of all similarly situated persons, alleges the following against Defendants Milliman Solutions, LLC ("Milliman") and CMFG Life Insurance Company d/b/a TruStage Financial Group, Inc. ("CMFG") (collectively "Defendants"), based upon personal knowledge with respect to herself and on information and belief derived from, among other things, investigation by her counsel and review of public documents, as to all other matters:

## NATURE OF THE ACTION

1.      Plaintiff brings this class action against Defendants for their failure to properly secure and safeguard Plaintiff's and other similarly situated clients' sensitive information, including full names, addresses, dates of birth, and Social Security numbers ("PII").

2.     Milliman is an insurance services business based in Seattle, Washington, that ". . . provides a range of risk-assessment services to clients in multiple industries, including insurance companies," including but not limited to CMFG.[1]

3.     CMFG is a Madison, Wisconsin based insurance company that offers a "wide range of commercial and personal insurance products[,]"[2] of which Plaintiff is a former customer.

4.     Upon information and belief, former and current customers of the Defendants are required to entrust Defendants, directly or indirectly, with sensitive, non-public PII, without which Defendants could not perform their regular business activities, in order to obtain financial and/or other service. Defendants retain this information for at least many years and even after the consumer relationship has ended.

5.     By obtaining, collecting, using, and deriving a benefit from the PII of Plaintiff and Class Members, Defendants assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized access and intrusion.

6.     On or about May 31, 2023, Defendants learned that one of their IT vendors had been penetrated by a cyberattack and that a "third party accessed one of [its] MOVEit Transfer servers on May 29, 2023 and May 30, 2023 and downloaded data."[3] In response, Defendants "conducted a manual review of [its] records to confirm the identities of individuals potentially affected by this event and their contact information to provide notifications."[4] As a result of their

---

[1] https://www.jdsupra.com/legalnews/milliman-solutions-llc-notifies-over-1-3423555/ (last accessed Aug. 11, 2023); *see also* https://us.milliman.com/en/our-story (last accessed Aug. 11, 2023).
[2] https://www.trustage.com/ (last accessed Aug. 11, 2023).
[3] The "Notice Letter," attached hereto as ***Exhibit A***.
[4] *Id.*

investigation, Defendants concluded—on or about June 16, 2023—that Plaintiff's and Class Members' PII was compromised in the Data Breach.[5]

7.      According to the Notice Letter sent to Plaintiff and Class Members on behalf of Defendants, the compromised PII included individuals' names, addresses, dates of birth, and Social Security numbers.[6]

8.      Defendants failed to adequately protect Plaintiff's and Class Members PII—and failed to even encrypt or redact this highly sensitive information. This unencrypted, unredacted PII was compromised due to Defendants' negligent and/or careless acts and omissions and their utter failure to protect customers' sensitive data. Hackers targeted and obtained Plaintiff's and Class Members' PII because of its value in exploiting and stealing the identities of Plaintiff and Class Members. The present and continuing risk to victims of the Data Breach will remain for their respective lifetimes.

9.      Plaintiff brings this action on behalf of all persons whose PII was compromised as a result of Defendants' failure to: (i) adequately protect the PII of Plaintiff and Class Members; (ii) warn Plaintiff and Class Members of Defendants' inadequate information security practices; and (iii) effectively secure hardware containing protected PII using reasonable and effective security procedures free of vulnerabilities and incidents. Defendants' conduct amounts at least to negligence and violates federal and state statutes.

10.     Defendants disregarded the rights of Plaintiff and Class Members by intentionally, willfully, recklessly, or negligently failing to implement and maintain adequate and reasonable measures and ensure those measures were followed by their IT vendors to ensure that the PII of Plaintiff and Class Members was safeguarded, failing to take available steps to prevent an

---

[5] *Id.*
[6] *Id.*

unauthorized disclosure of data, and failing to follow applicable, required, and appropriate protocols, policies, and procedures regarding the encryption of data, even for internal use. As a result, the PII of Plaintiff and Class Members was compromised through disclosure to an unknown and unauthorized third party.

11.     Plaintiff and Class Members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

12.     Plaintiff and Class Members have suffered injury as a result of Defendants' conduct. These injuries include: (i) invasion of privacy; (ii) lost or diminished value of PII; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; and (v) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII.

13.     Plaintiff and Class Members seek to remedy these harms and prevent any future data compromise on behalf of herself and all similarly situated persons whose PII was compromised and stolen as a result of the Data Breach and who remain at risk due to Defendants' inadequate data security practices.

14.     Plaintiff seeks remedies including, but not limited to, compensatory damages, nominal damages, and reimbursement of out-of-pocket costs.

15.     Plaintiff also seeks injunctive and equitable relief to prevent future injury on behalf of herself and the putative Class.

## PARTIES

16.     Plaintiff is, and at all times mentioned herein was, an individual citizen of California.

17.     Milliman is a Delaware corporation with its principal place of business located in Seattle, Washington.

18.     CMFG is an Iowa corporation with its principal place of business located in Madison, Wisconsin.

## JURISDICTION AND VENUE

19.     The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of Class Members is over 100, many of whom reside outside the state of Wisconsin and have different citizenship from CMFG and Milliman, including Plaintiff. Thus, minimal diversity exists under 28 U.S.C. §1332(d)(2)(A).

20.     This Court has jurisdiction over Defendants because they operate in this District.

21.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because CMFG's principal place of business is located in this District, a substantial part of the events giving rise to this action occurred in this District, and Defendants have harmed Class Members residing in this District.

## FACTUAL ALLEGATIONS

### *Defendants' Business*

22.     Milliman is an insurance services business based in Seattle, Washington, that ". . . provides a range of risk-assessment services to clients in multiple industries, including insurance

companies," including but not limited to CMFG.[7]

23.     CMFG is a Madison, Wisconsin based insurance company that offers a "wide range of commercial and personal insurance products[,]"[8] of which Plaintiff is a former customer

24.     Plaintiff and Class Members are current and former customers of Defendants.

25.     As a condition of receiving their products and/or services, Defendants require that their customers, including Plaintiff and Class Members, entrust them with highly sensitive PII.

26.     The information held by Defendants in their computer systems or those of their vendors at the time of the Data Breach included the unencrypted PII of Plaintiff and Class Members.

27.     Upon information and belief, Defendants made promises and representations to their clients' customers, including Plaintiff and Class Members, that the PII collected from them as a condition of obtaining products and/or services at Defendants' client companies would be kept safe, confidential, that the privacy of that information would be maintained, and that Defendants would delete any sensitive information after they were no longer required to maintain it.

28.     Indeed, Milliman's Privacy Policy provides that: "Milliman stores Personal Data on a secure server that is password protected and shielded from unauthorized access by a firewall. Milliman has in place security policies that are intended to ensure the security and integrity of all Personal Data. Milliman has appropriate technical and organizational measures in place to protect against unauthorized or unlawful processing of Personal Data and against accidental loss or

---

[7] https://www.jdsupra.com/legalnews/milliman-solutions-llc-notifies-over-1-3423555/ (last accessed Aug. 11, 2023); *see also* https://us.milliman.com/en/our-story (last accessed Aug. 11, 2023).
[8] https://www.trustage.com/ (last accessed Aug. 11, 2023).

destruction of, or damage to, Personal Data held or processed by Milliman. If Milliman forwards Personal Data to any third party, Milliman requires that those third parties have appropriate technical and organizational measures in place to comply with this Privacy Policy and applicable laws."[9]

29.     CMFG's Privacy Policy provides that:

We maintain physical, technological and administrative safeguards to protect your personal information and prevent unauthorized or accidental use, access, or loss. We limit access to personal information about you to those who have a business need for such access. Individuals who process personal information on our Business Partner's behalf generally may do so only in an authorized manner and are required to keep your information confidential. We have policies in place that regulate how our employees and contractors handle information about you. We limit access to our premises and to our computer networks and take steps to safeguard against unauthorized access to such premises and networks. We have procedures in place to manage any suspected data security incident and will notify you consistent with applicable legal requirements.[10]

30.     Plaintiff and Class Members provided their PII to Defendants, directly or indirectly, with the reasonable expectation and on the mutual understanding that Defendants would comply with their obligations to keep such information confidential and secure from unauthorized access.

31.     Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their PII. Plaintiff and Class Members relied on the sophistication of Defendants to keep their PII confidential and securely maintained, to use this information for necessary purposes only, and to make only authorized disclosures of this information. Plaintiff and Class Members value the confidentiality of their PII and demand security to safeguard their PII.

---

[9] https://us.milliman.com/en/global-privacy-policy (last accessed Aug. 5, 2023).
[10] https://www.trustage.com/legal/privacy (last accessed Aug. 8, 2023)

32.     Defendants had a duty to adopt reasonable measures to protect the PII of Plaintiff and Class Members from involuntary disclosure to third parties and to audit, monitor, and verify the integrity of their IT vendors and affiliates. Defendants has a legal duty to keep consumer's PII safe and confidential.

33.     Defendants had obligations created by FTC Act, Gramm-Leach-Bliley Act, contract, industry standards, and representations made to Plaintiff and Class Members, to keep their PII confidential and to protect it from unauthorized access and disclosure.

34.     Defendants derived a substantial economic benefit from collecting Plaintiff's and Class Members' PII. Without the required submission of PII, Defendants could not perform the services they provide.

35.     By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' PII, Defendants assumed legal and equitable duties and knew or should have known that they were responsible for protecting Plaintiff's and Class Members' PII from disclosure.

***The Data Breach***

36.     On or about July 21, 2023, Pension Benefit Information, LLC, on behalf of Defendants, began sending Plaintiff and other Data Breach victims a Notice Letter, informing them that:

> **What Happened?** On or around May 31, 2023, Progress Software, the provider of MOVEit Transfer software disclosed a vulnerability in their software that had been exploited by an unauthorized third party. PBI utilizes MOVEit in the regular course of our business operations to securely transfer files. PBI promptly launched an investigation into the nature and scope of the MOVEit vulnerability's impact on our systems. Through the investigation, we learned that the third party accessed one of our MOVEit Transfer servers on May 29, 2023 and May 30, 2023 and downloaded data. We then conducted a manual review of our records to confirm the identities of individuals potentially affected by this event and their contact information to provide notifications. We recently completed this review on June 16, 2023, and confirmed that information concerning a limited number of consumers was among the records involved in this incident.

**What Information Was Involved?** Our investigation determined that the following types of information related to you were present in the server at the time of the event: name, address, date of birth, and Social Security number.[11]

37. Omitted from the Notice Letter were the details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a breach does not occur again. To date, these critical facts have not been explained or clarified to Plaintiff and Class Members, who retain a vested interest in ensuring that their PII remains protected.

38. This "disclosure" amounts to no real disclosure at all, as it fails to inform, with any degree of specificity, Plaintiff and Class Members of the Data Breach's critical facts. Without these details, Plaintiff's and Class Members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

39. Defendants did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, causing the exposure of PII, such as encrypting the information or deleting it when it is no longer needed. Moreover, Defendants failed to exercise due diligence in selecting their IT vendors or deciding with whom they would share sensitive PII.

40. The attacker accessed and acquired files Defendants shared with a third party containing unencrypted PII of Plaintiff and Class Members, including their Social Security numbers and other sensitive information. Plaintiff's and Class Members' PII was accessed and stolen in the Data Breach.

41. Plaintiff further believes his PII, and that of Class Members, was subsequently sold on the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals

---

[11] Notice Letter.

that commit cyber-attacks of this type.

**_Defendants Acquire, Collect, And Store Plaintiff's and the Class' PII_**

42.     As a condition to obtain products and/or services from Milliman's client companies, Plaintiff and Class Members were required to give their sensitive and confidential PII, directly or indirectly, to Defendants.

43.     Defendants retain and store this information and derives a substantial economic benefit from the PII that they collect. But for the collection of Plaintiff's and Class Members' PII, Defendants would be unable to perform their services.

44.     By obtaining, collecting, and storing the PII of Plaintiff and Class Members, Defendants assumed legal and equitable duties and knew or should have known that they were responsible for protecting the PII from disclosure.

45.     Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their PII and relied on Defendants to keep their PII confidential and maintained securely, to use this information for business purposes only, and to make only authorized disclosures of this information.

46.     Defendants could have prevented this Data Breach by properly securing and encrypting the files and file servers containing the PII of Plaintiff and Class Members or by exercising due diligence in selecting their IT vendors and properly auditing those vendor's security practices.

47.     Upon information and belief, as stated above, Defendants made promises to Plaintiff and Class Members to maintain and protect their PII, demonstrating an understanding of the importance of securing PII.

48.     Defendants' negligence in safeguarding the PII of Plaintiff and Class Members is

exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

***Defendants Knew or Should Have Known of the Risk Because Insurance Companies In Possession Of PII Are Particularly Suspectable To Cyber Attacks***

49.     Defendants' data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting insurance companies that collect and store PII, like Defendants, preceding the date of the breach.

50.     Data thieves regularly target companies like Defendants due to the highly sensitive information that they custody. Defendants knew and understood that unprotected PII is valuable and highly sought after by criminal parties who seek to illegally monetize that PII through unauthorized access.

51.     In 2021, a record 1,862 data breaches occurred, resulting in approximately 293,927,708 sensitive records being exposed, a 68% increase from 2020.[12]

52.     Indeed, cyber-attacks, such as the one experienced by Defendants, have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack. As one report explained, smaller entities that store PII are "attractive to ransomware criminals…because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[13]

53.     In light of recent high profile data breaches at other industry leading companies, including, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January

---

[12] *See* 2021 Data Breach Annual Report (ITRC, Jan. 2022) (available at https://notified.idtheftcenter.org/s/), at 6.
[13] https://www.law360.com/consumerprotection/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware?nl_pk=3ed44a08-fcc2-4b6c-89f0-aa0155a8bb51&utm_source=newsletter&utm_medium=email&utm_campaign=consumerprotection (last accessed Aug. 11, 2023).

2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Defendants knew or should have known that the PII that they collected and maintained would be targeted by cybercriminals.

54.     As a custodian of PII, Defendants knew, or should have known, the importance of safeguarding the PII entrusted to them by Plaintiff and Class Members, and of the foreseeable consequences if their data security systems were breached, including the significant costs imposed on Plaintiff and Class Members as a result of a breach.

55.     Despite the prevalence of public announcements of data breach and data security compromises, Defendants failed to take appropriate steps to protect the PII of Plaintiff and Class Members from being compromised.

56.     At all relevant times, Defendants knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members and of the foreseeable consequences that would occur if Defendants' data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

57.     Additionally, as companies became more dependent on computer systems to run their business,[14] e.g., working remotely as a result of the Covid-19 pandemic, and the Internet of Things ("IoT"), the danger posed by cybercriminals is magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.[15]

58.     Defendants were, or should have been, fully aware of the unique type and the significant volume of data on Defendants' server(s), amounting to potentially over one million

---

[14] https://www.federalreserve.gov/econres/notes/feds-notes/implications-of-cyber-risk-for-financial-stability-20220512.html (last accessed Aug. 11, 2023).
[15] https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022 (last accessed Aug. 11, 2023).

individuals' detailed, PII, and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

59.     In the Notice Letter, Defendants offer to cover identity monitoring services for a period of 12 months. This is wholly inadequate to compensate Plaintiff and Class Members as it fails to provide for the fact victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft, financial fraud, and it entirely fails to provide sufficient compensation for the unauthorized release and disclosure of Plaintiff and Class Members' PII. Moreover, once this service expires, Plaintiff and Class Members will be forced to pay out of pocket for necessary identity monitoring services.

60.     Defendants' offer of credit and identity monitoring establishes that Plaintiff's and Class Members' sensitive PII *was* in fact affected, accessed, compromised, and exfiltrated from Defendants' computer systems.

61.     The injuries to Plaintiff and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class Members.

62.     The ramifications of Defendants' failure to keep secure the PII of Plaintiff and Class Members are long lasting and severe. Once PII is stolen—particularly Social Security numbers—fraudulent use of that information and damage to victims may continue for years.

63.     As entities in possession of their clients' current and former customers' PII, Defendants knew, or should have known, the importance of safeguarding the PII entrusted to them by Plaintiff and Class Members and of the foreseeable consequences if their data security systems were breached. This includes the significant costs imposed on Plaintiff and Class Members as a result of a breach. Nevertheless, Defendants failed to take adequate cybersecurity

measures to prevent the Data Breach.

### Value Of PII

64.     The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[16] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[17]

65.     The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[18]

66.     For example, PII can be sold at a price ranging from $40 to $200.[19] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[20]

67.     Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to

---

[16] 17 C.F.R. § 248.201 (2023).

[17] *Id.*

[18] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last accessed Oct. 17, 2022).

[19] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last accessed Oct. 17, 2022).

[20] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last accessed Oct. 17, 2022).

change—names and Social Security numbers.

68.     This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information . . . [is] worth more than 10x on the black market."[21]

69.     Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

70.     The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[22]

### Defendants Failed to Comply with FTC Guidelines

71.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in

---

[21] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), *available at*:
https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last accessed Oct. 17, 2022).
[22] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:*
https://www.gao.gov/assets/gao-07-737.pdf (last accessed Oct. 17, 2022).

violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. *See, e.g., FTC v. Wyndham Worldwide Corp.,* 799 F.3d 236 (3d Cir. 2015).

72.     In October 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

73.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

74.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by the FTCA. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

75.     These FTC enforcement actions include actions against insurance companies, like Defendants.

76.     As evidenced by the Data Breach, Defendants failed to properly implement basic data security practices and failed to audit, monitor, or ensure the integrity of its vendor's data security practices. Defendants failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' PII constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

77.     Defendants were, at all times, fully aware of its obligation to protect the PII of its clients' customers yet failed to comply with such obligations. Defendants were also aware of the significant repercussions that would result from their failure to do so.

### *Defendants Failed to Comply with the Gramm-Leach-Bliley Act*

78.     Defendants are financial institutions, as that term is defined by Section 509(3)(A) of the Gramm-Leach-Bliley Act ("GLBA"), 15 U.S.C. § 6809(3)(A), and thus are subject to the GLBA.

79.     The GLBA defines a financial institution as "any institution the business of which is engaging in financial activities as described in Section 1843(k) of Title 12 [The Bank Holding Company Act of 1956]." 15 U.S.C. § 6809(3)(A).

80.     Defendants collect nonpublic personal information, as defined by 15 U.S.C. § 6809(4)(A), 16 C.F.R. § 313.3(n) and 12 C.F.R. § 1016.3(p)(1). Accordingly, during the relevant time period Defendants were subject to the requirements of the GLBA, 15 U.S.C. §§ 6801.1, *et seq.*, and is subject to numerous rules and regulations promulgated on the GLBA statutes.

81.     The GLBA Privacy Rule became effective on July 1, 2001. *See* 16 C.F.R. Part 313. Since the enactment of the Dodd-Frank Act on July 21, 2010, the Bureau of Consumer Financial Protection ("CFPB") became responsible for implementing the Privacy Rule. In December 2011, the CFPB restated the implementing regulations in an interim final rule that

established the Privacy of Consumer Financial Information, Regulation P, 12 C.F.R. § 1016 ("Regulation P"), with the final version becoming effective on October 28, 2014.

82.    Accordingly, Defendants' conduct is governed by the Privacy Rule prior to December 30, 2011 and by Regulation P after that date.

83.    Both the Privacy Rule and Regulation P require financial institutions to provide customers with an initial and annual privacy notice. These privacy notices must be "clear and conspicuous." 16 C.F.R. §§ 313.4 and 313.5; 12 C.F.R. §§ 1016.4 and 1016.5. "Clear and conspicuous means that a notice is reasonably understandable and designed to call attention to the nature and significance of the information in the notice." 16 C.F.R. § 313.3(b)(1); 12 C.F.R. § 1016.3(b)(1). These privacy notices must "accurately reflect[] [the financial institution's] privacy policies and practices." 16 C.F.R. § 313.4 and 313.5; 12 C.F.R. §§ 1016.4 and 1016.5. They must include specified elements, including the categories of nonpublic personal information the financial institution collects and discloses, the categories of third parties to whom the financial institution discloses the information, and the financial institution's security and confidentiality policies and practices for nonpublic personal information. 16 C.F.R. § 313.6; 12 C.F.R. § 1016.6. These privacy notices must be provided "so that each consumer can reasonably be expected to receive actual notice." 16 C.F.R. § 313.9; 12 C.F.R. § 1016.9. As alleged herein, Defendants violated the Privacy Rule and Regulation P.

84.    Upon information and belief, Defendants failed to provide annual privacy notices to customers after the customer relationship ended, despite retaining these customers' PII and storing that PII on Defendants' network systems.

85.    Defendants failed to adequately inform their customers that they were storing and/or sharing, or would store and/or share, the customers' PII on an insecure platform, accessible

to unauthorized parties from the internet, and would do so after the customer relationship ended.

86.     The Safeguards Rule, which implements Section 501(b) of the GLBA, 15 U.S.C. § 6801(b), requires financial institutions to protect the security, confidentiality, and integrity of customer information by developing a comprehensive written information security program that contains reasonable administrative, technical, and physical safeguards, including: (1) designating one or more employees to coordinate the information security program; (2) identifying reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information, and assessing the sufficiency of any safeguards in place to control those risks; (3) designing and implementing information safeguards to control the risks identified through risk assessment, and regularly testing or otherwise monitoring the effectiveness of the safeguards' key controls, systems, and procedures; (4) overseeing service providers and requiring them by contract to protect the security and confidentiality of customer information; and (5) evaluating and adjusting the information security program in light of the results of testing and monitoring, changes to the business operation, and other relevant circumstances. 16 C.F.R. §§ 314.3 and 314.4.

87.     As alleged herein, Defendants violated the Safeguard Rule.

88.     Defendants failed to assess reasonably foreseeable risks to the security, confidentiality, and integrity of customer information and failed to monitor the systems of their IT partners or verify the integrity of those systems.

89.     Defendants violated the GLBA and their own policies and procedures by sharing the PII of Plaintiff and Class Members with a non-affiliated third party without providing Plaintiff and Class Members (a) an opt-out notice and (b) a reasonable opportunity to opt out of such disclosure.

*Defendants Failed to Comply with Industry Standards*

90.     As noted above, experts studying cybersecurity routinely identify insurance companies as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

91.     Some industry best practices that should be implemented by insurance companies dealing with sensitive PII, like Milliman and CMFG, include but are not limited to: educating all employees, strong password requirements, multilayer security including firewalls, anti-virus and anti-malware software, encryption, multi-factor authentication, backing up data, and limiting which employees can access sensitive data. As evidenced by the Data Breach, Defendants failed to follow some or all of these industry best practices.

92.     Other best cybersecurity practices that are standard in the insurance industry include: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; and training staff regarding these points. As evidenced by the Data Breach, Defendants failed to follow these cybersecurity best practices.

93.     Defendants failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

94.     Defendants failed to comply with these accepted standards in the insurance

industry, thereby permitting the Data Breach to occur.

***Defendants Breached Their Duty to Safeguard Plaintiff's and Class Members' PII***

95.     In addition to its obligations under federal and state laws, Defendants owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the PII in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendants owed a duty to Plaintiff and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols, and those of the parties with whom it shared PII, adequately protected the PII of Class Members

96.     Defendants breached their obligations to Plaintiff and Class Members and/or were otherwise negligent and reckless because they failed to properly maintain and safeguard their computer systems and data and failed to audit, monitor, or ensure the integrity of its vendor's data security practices. Defendants' unlawful conduct includes, but is not limited to, the following acts and/or omissions:

   a.   Failing to maintain an adequate data security system that would reduce the risk of data breaches and cyberattacks;

   b.   Failing to adequately protect customers' PII;

   c.   Failing to properly monitor its own data security systems for existing intrusions;

   d.   Failing to audit, monitor, or ensure the integrity of its vendor's data security practices;

   e.   Failing to sufficiently train its employees and vendors regarding the proper handling of its customers PII;

   f.   Failing to fully comply with FTC guidelines for cybersecurity in violation of the

FTCA;

g. Failing to adhere to the Gramm-Leach-Bliley Act and industry standards for cybersecurity as discussed above; and

h. Otherwise breaching its duties and obligations to protect Plaintiff's and Class Members' PII.

97. Defendants negligently and unlawfully failed to safeguard Plaintiff's and Class Members' PII by allowing cyberthieves to access its computer network and systems which contained unsecured and unencrypted PII.

98. Had Defendants remedied the deficiencies in thier information storage and security systems or those of its vendors and affiliates, followed industry guidelines, and adopted security measures recommended by experts in the field, they could have prevented intrusion into their information storage and security systems and, ultimately, the theft of Plaintiff's and Class Members' confidential PII.

### *Common Injuries & Damages*

99. As a result of Defendants' ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of PII ending up in the possession of criminals, the risk of identity theft to the Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including: (a) invasion of privacy; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (c) the loss of benefit of the bargain (price premium damages); (d) diminution of value of their PII; (e) invasion of privacy; and (f) the continued risk to their PII, which remains in the possession of Defendants, and which is subject to further breaches, so long as Defendants fail to undertake appropriate and adequate measures to protect

Plaintiff's and Class Members' PII.

### The Data Breach Increases Victims' Risk of Identity Theft

100.    Plaintiff and Class Members are at a heightened risk of identity theft for years to come.

101.    The unencrypted PII of Class Members will end up for sale on the dark web because that is the *modus operandi* of hackers. In addition, unencrypted PII may fall into the hands of companies that will use the detailed PII for targeted marketing without the approval of Plaintiff and Class Members. Unauthorized individuals can easily access the PII of Plaintiff and Class Members.

102.    The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal PII to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

103.    Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity--or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

104.    For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data Breaches

can be the starting point for these additional targeted attacks on the victim.

105.     One such example of criminals piecing together bits and pieces of compromised PII for profit is the development of "Fullz" packages.[23]

106.     With "Fullz" packages, cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

107.     The development of "Fullz" packages means here that the stolen PII from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

108.     The existence and prevalence of "Fullz" packages means that the PII stolen from the data breach can easily be linked to the unregulated data (like driver's license numbers) of

---

[23] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.,* Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecuritv.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-](https://krebsonsecuritv.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-finn/ (last accessed on May 26, 2023).

Plaintiff and the other Class Members.

109. Thus, even if certain information (such as driver's license numbers) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package.

110. Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

### *Loss Of Time To Mitigate Risk Of Identity Theft And Fraud*

111. As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual is notified by a company that their PII was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet, the resource and asset of time has been lost.

112. Thus, due to the actual and imminent risk of identity theft, Plaintiff and Class Members must, as Defendants' Notice Letter instructs,[24] "remain vigilant" and monitor their financial accounts for many years to mitigate the risk of identity theft.

113. Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions to remedy the harms they have or may experience as a result of the Data Breach, such as researching and verifying the legitimacy of the Data Breach upon receiving the Notice Letter.

114. These efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and

---

[24] Notice Letter.

credit record."[25]

115. These efforts are also consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[26]

116. A study by Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of personal and financial information:[27]



---

[25] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf.

[26] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps (last accessed July 7, 2022).

[27] Credit Card and ID Theft Statistics" by Jason Steele, 10/24/2017, available at: https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276.php (last accessed Sep. 13, 2022).

117.    And for those Class Members who experience actual identity theft and fraud, the United States Government Accountability Office's GAO Report noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[28]

### Diminution Value Of PII

118.    PII is a valuable property right.[29] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that PII has considerable market value.

119.    An active and robust legitimate marketplace for PII exists. In 2019, the data brokering industry was worth roughly $200 billion.[30]

120.    In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[31]

121.    Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[32]

---

[28] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf (last accessed Sep. 13, 2022) ("GAO Report").

[29] *See, e.g.,* Randall T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[30] https://www.latimes.com/business/story/2019-11-05/column-data-brokers

[31] https://datacoup.com/

[32] Nielsen Computer & Mobile Panel, *Frequently Asked Questions, available at* https://computermobilepanel.nielsen.com/ui/US/en/faqen.html

122.    Conversely sensitive PII can sell for as much as $363 per record on the dark web according to the Infosec Institute.[33]

123.    As a result of the Data Breach, Plaintiff's and Class Members' PII, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the PII is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

124.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change, *e.g.*, names and Social Security numbers.

125.    Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

126.    The fraudulent activity resulting from the Data Breach may not come to light for years.

127.    At all relevant times, Defendants knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members, and of the foreseeable consequences that would occur if Defendants' data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a

---

[33] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last accessed Sep. 13, 2022).

result of a breach.

128.     Defendants were, or should have been, fully aware of the unique type and the significant volume of data on Defendants' network, amounting to over one million individuals' detailed personal information, upon information and belief, and thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

129.     The injuries to Plaintiff and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class Members.

### *Future Cost of Credit and Identity Theft Monitoring is Reasonable and Necessary*

130.     Given the type of targeted attack in this case and sophisticated criminal activity, the type of PII involved, and the volume of data obtained in the Data Breach, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the PII for identity theft crimes–*e.g.,* opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

131.     Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or his Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

132.     Consequently, Plaintiff and Class Members are at a present and continuous risk of fraud and identity theft for many years into the future.

133.     The retail cost of credit monitoring and identity theft monitoring can cost around

$200 a year per Class Member. This is a reasonable and necessary cost to monitor to protect Class Members from the risk of identity theft that arose from Defendants' Data Breach. This is a future cost that Plaintiff and Class Members would not need to bear but for Defendants' failure to safeguard their PII.

### Plaintiff's Experience

134.     Plaintiff is a former customer at CMFG, which, upon information and belief, is affiliated with Milliman.

135.     As a condition of opening an account at CMFG, she was required to provide her PII, directly or indirectly, to Defendants, including her name, address, date of birth, and Social Security number.

136.     At the time of the Data Breach—approximately May 29, 2023, through May 30, 2023—Defendants retained Plaintiff's PII in their system.

137.     Plaintiff is very careful about sharing his sensitive PII. Plaintiff stores any documents containing his PII in a safe and secure location. She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff would not have entrusted his PII to Defendants had she known of Defendants lax data security policies.

138.     Plaintiff received the Notice Letter, by U.S. mail, from Pension Benefit Information, LLC on behalf of Defendants, dated July 21, 2023. According to the Notice Letter, Plaintiff's PII was improperly accessed and obtained by unauthorized third parties, including his name, address, and email address, date of birth, and Social Security number.

139.     As a result of the Data Breach, and at the direction of Defendants' Notice Letter, Plaintiff made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach upon receiving the Notice Letter. Plaintiff has

spent significant time dealing with the Data Breach—valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

140.    Plaintiff suffered actual injury from having his PII compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) lost or diminished value of PII; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; and (v) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII.

141.    The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not fully informed her of key details about the Data Breach's occurrence.

142.    As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

143.    As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

144.    Plaintiff has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

## **CLASS ACTION ALLEGATIONS**

145.    Plaintiff brings this action individually and on behalf of all other persons similarly situated, pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3).

146.    Specifically, Plaintiff proposes the following nationwide class, subject to amendment as appropriate:

All individuals in the United States whose PII was impacted as a result of the Data Breach (the "Class").

147.    Excluded from the Class are Defendants and their parents or subsidiaries, any entities in which they have a controlling interest, as well as their officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns. Also excluded is any judge to whom this case is assigned as well as their judicial staff and immediate family members.

148.    Plaintiff reserves the right to modify or amend the definition of the proposed Class, as well as add subclasses, before the Court determines whether certification is appropriate.

149.    The proposed Class meets the criteria for certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

150.    <u>Numerosity</u>. The Class Members are so numerous that joinder of all members is impracticable. Although the precise number of Class Members is unknown to Plaintiff, according to the report submitted to the Office of the Maine Attorney General, at least 1,200,000 persons were impacted in the Data Breach.[34] Thus, numerosity is met.

151.    <u>Commonality</u>. There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a.    Whether Defendants engaged in the conduct alleged herein;

b.    Whether Defendants' conduct violated the FTCA and/or GBLA;

c.    When Defendants learned of the Data Breach;

---

[34] https://apps.web.maine.gov/online/aeviewer/ME/40/a98d9ae9-b898-4aaa-8dde-de04551aaedb.shtml (last accessed Aug. 5, 2023).

d.   Whether Defendants' response to the Data Breach was adequate;

e.   Whether Defendants unlawfully lost or disclosed Plaintiff's and Class Members'
     PII;

f.   Whether Defendants failed to implement and maintain reasonable security
     procedures and practices appropriate to the nature and scope of the PII
     compromised in the Data Breach;

g.   Whether Defendants' data security systems prior to and during the Data Breach
     complied with applicable data security laws and regulations;

h.   Whether Defendants' data security systems prior to and during the Data Breach
     were consistent with industry standards;

i.   Whether Defendants' owed a duty to Class Members to safeguard their PII;

j.   Whether Defendants' breached their duty to Class Members to safeguard their PII;

k.   Whether hackers obtained Class Members' PII via the Data Breach;

l.   Whether Defendants had a legal duty to provide timely and accurate notice of the
     Data Breach to Plaintiff and the Class Members;

m.   Whether Defendants' breached their duty to provide timely and accurate notice of
     the Data Breach to Plaintiff and Class Members;

n.   Whether Defendants knew or should have known that their data security systems
     and monitoring processes were deficient;

o.   What damages Plaintiff and Class Members suffered as a result of Defendants'
     misconduct;

p.   Whether Defendants' conduct was negligent;

q.   Whether Defendants were unjustly enriched;

r. Whether Plaintiff and Class Members are entitled to actual and/or statutory damages;

s. Whether Plaintiff and Class Members are entitled to additional credit or identity monitoring and monetary relief; and

t. Whether Plaintiff and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

152. <u>Typicality</u>. Plaintiff's claims are typical of those of other Class Members because Plaintiff's PII, like that of every other Class Member, was compromised in the Data Breach. Plaintiff's claims are typical of those of the other Class Members because, *inter alia*, all Class Members were injured through the common misconduct of Defendants. Plaintiff is advancing the same claims and legal theories on behalf of herself and all other Class Members, and there are no defenses that are unique to Plaintiff. The claims of Plaintiff and those of Class Members arise from the same operative facts and are based on the same legal theories.

153. <u>Adequacy of Representation.</u> Plaintiff will fairly and adequately represent and protect the interests of Class Members. Plaintiff's counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

154. <u>Predominance</u>. Defendants had engaged in a common course of conduct toward Plaintiff and Class Members in that all of Plaintiff's and Class Members' data was stored on the same computer systems and unlawfully accessed and exfiltrated in the same way. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

155.    <u>Superiority</u>. A class action is superior to other available methods for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Milliman. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

156.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2). Milliman has acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate as to the Class as a whole.

157.    Finally, all members of the proposed Class are readily ascertainable. Defendants had access to the names and addresses and/or email addresses of Class Members affected by the Data Breach. Class Members have already been preliminarily identified and sent a Notice Letter of the Data Breach by Defendants.

**CAUSES OF ACTION**

**COUNT I**
**Negligence**
**(On Behalf of Plaintiff and all Class Members)**

158.    Plaintiff hereby repeats and realleges all preceding paragraphs contained herein.

159.    Defendants require their clients' customers, including Plaintiff and Class Members,

to submit non-public PII in the ordinary course of providing its services.

160.    Defendants gathered, stored, and shared the PII of Plaintiff and Class Members as part of their business of soliciting its services to their clients and their clients' customers, which solicitations and services affect commerce.

161.    Plaintiff and Class Members entrusted Defendants with their PII, directly or indirectly, with the understanding that Defendants would safeguard their information.

162.    Defendants had full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and Class Members could and would suffer if the PII were wrongfully disclosed.

163.    By assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendants had a duty of care to use reasonable means to secure and to prevent disclosure of the information, and to safeguard the information from theft. Defendants' duty included a responsibility to exercise due diligence in selecting IT vendors and to audit, monitor, and ensure the integrity of their vendor's systems and practices and to give prompt notice to those affected in the case of a data breach.

164.    Defendants had a duty to employ reasonable security measures under Section 5 of the FTCA, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

165.    Defendants' duty to use reasonable security measures also arose under the GLBA, under which they were required to protect the security, confidentiality, and integrity of customer information by developing a comprehensive written information security program that contains reasonable administrative, technical, and physical safeguards.

166.    Defendants owed a duty of care to Plaintiff and Class Members to provide data

security consistent with industry standards and other requirements discussed herein, and to ensure that their systems and networks, and the personnel responsible for them, adequately protected the PII.

167.    Defendants' duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendants and Plaintiff and Class Members. That special relationship arose because Plaintiff and the Class entrusted Defendants with their confidential PII, a necessary part of being customers of Defendants'.

168.    Defendants' duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendants are bound by industry standards to protect confidential PII.

169.    Defendants were subject to an "independent duty," untethered to any contract between Defendants and Plaintiff or the Class.

170.    Defendants also had a duty to exercise appropriate clearinghouse practices to remove former customers' PII the were no longer required to retain pursuant to regulations.

171.    Moreover, Defendants had a duty to promptly and adequately notify Plaintiff and the Class of the Data Breach.

172.    Defendants had and continue to have a duty to adequately disclose that the PII of Plaintiff and the Class within Defendants' possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiff and the Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PII by third parties.

173.    Defendants breached their duties, pursuant to the FTCA, GLBA, and other applicable standards, and thus was negligent, by failing to use reasonable measures to protect Class

Members' PII. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

    a.  Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII;

    b.  Failing to adequately monitor the security of their networks and systems;

    c.  Failing to audit, monitor, or ensure the integrity of their vendor's data security practices;

    d.  Allowing unauthorized access to Class Members' PII;

    e.  Failing to detect in a timely manner that Class Members' PII had been compromised;

    f.  Failing to remove former customers' PII they were no longer required to retain pursuant to regulations,

    g.  Failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages; and

    h.  Failing to secure their stand-alone personal computers, such as the reception desk computers, even after discovery of the data breach.

174.    Defendants violated Section 5 of the FTCA and GLBA by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein. Defendants' conduct was particularly unreasonable given the nature and amount of PII they obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

175.    Plaintiff and Class Members were within the class of persons the FTCA and GLBA

were intended to protect and the type of harm that resulted from the Data Breach was the type of harm these statues were intended to guard against.

176.    Defendants violation of Section 5 of the FTCA and GLBA constitutes negligence.

177.    The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

178.    A breach of security, unauthorized access, and resulting injury to Plaintiff and the Class was reasonably foreseeable, particularly in light of Defendants' inadequate security practices.

179.    It was foreseeable that Defendants' failure to use reasonable measures to protect Class Members' PII would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the insurance industry.

180.    Defendants have full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and the Class could and would suffer if the PII were wrongfully disclosed.

181.    Plaintiff and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendants knew or should have known of the inherent risks in collecting and storing the PII of Plaintiff and the Class, the critical importance of providing adequate security of that PII, and the necessity for encrypting PII stored on Defendants' systems.

182.    It was therefore foreseeable that the failure to adequately safeguard Class Members' PII would result in one or more types of injuries to Class Members.

183.    Plaintiff and the Class had no ability to protect their PII that was in, and possibly remains in, Defendants' possession.

184. Defendants were in a position to protect against the harm suffered by Plaintiff and the Class as a result of the Data Breach.

185. Defendants' duty extended to protecting Plaintiff and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

186. Defendants have admitted that the PII of Plaintiff and the Class was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

187. But for Defendants' wrongful and negligent breach of duties owed to Plaintiff and the Class, the PII of Plaintiff and the Class would not have been compromised.

188. There is a close causal connection between Defendants' failure to implement security measures to protect the PII of Plaintiff and the Class and the harm, or risk of imminent harm, suffered by Plaintiff and the Class. The PII of Plaintiff and the Class was lost and accessed as the proximate result of Defendants' failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

189. Defendants' conduct, as alleged herein, allowed them to gain a competitive advantage over companies offering the same or similar services because, rather than properly implement data security protocols, or verify the integrity of their partners' systems, as required by statute and industry standards, Defendants diverted money intended to apply to data security towards their own profit. Defendants' conduct, and the unfair advantage realized thereby, creates a race to the bottom by encouraging companies to divert funds intended for data security towards

profits in order to remain competitive. The end effect is that both consumers and the marketplace in general are harmed through the widespread adoption of substandard data security practices and the concomitantly increased risk of cyberattacks and fraud and identity theft (which disrupt the lives of victims and impose a burden on the state to investigate and prevent criminal activity).

190. By collecting and taking custody of Plaintiff's and Class Members' PII with full awareness of both the likelihood of a cyberattack targeted to acquire that information and the severe consequences that would result to Plaintiff and Class Members if the confidentiality of the PII was breached, Defendants assumed a special relationship that required them to guard against the foreseeable conduct of a criminal third party. If Defendants had not intervened by taking charge of Plaintiff's and Class Member's Private Information, no harm would have resulted to Plaintiff and Class Members as a result of the Data Breach.

191. As a direct and proximate result of Defendants' negligence, Plaintiff and the Class have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) lost or diminished value of PII; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; and (v) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII.

192. As a direct and proximate result of Defendants' negligence, Plaintiff and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

193. Additionally, as a direct and proximate result of Defendants' negligence, Plaintiff and the Class have suffered and will suffer the continued risks of exposure of their PII, which remain in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants failed to undertake appropriate and adequate measures to protect the PII in their continued possession.

194. Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

195. Defendants' negligent conduct is ongoing, in that they still hold the PII of Plaintiff and Class Members in an unsafe and insecure manner.

196. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

## COUNT II
### Negligence *Per Se*
### (On behalf of Plaintiff and all Class Members)

197. Plaintiff hereby repeats and realleges all preceding paragraphs contained herein.

198. Pursuant to the Federal Trade Commission Act, 15 U.S.C. § 45, Defendants had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

199. Defendants breached their duties to Plaintiff and Class Members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

200.    Defendants' failure to comply with applicable laws and regulations constitutes negligence *per se.*

201.    The injuries to Plaintiff and Class Members resulting from the Data Breach were directly and indirectly caused by Defendants' violation of the statute described herein.

202.    Plaintiff and Class Members were within the class of persons the FTC Act were intended to protect and the type of harm that resulted from the Data Breach was the type of harm the statue was intended to guard against.

203.    But for Defendants' wrongful and negligent breach of their duties owed to Plaintiff and Class Members, Plaintiff and Class Members would not have been injured.

204.    The injuries and harms suffered by Plaintiff and Class Members were the reasonably foreseeable result of Defendants' breach of their duties. Defendants knew or should have known that it was failing to meet its duties and that Defendants' breach would cause Plaintiff and Class Members to experience the foreseeable harms associated with the exposure of their Private Information.

205.    As a direct and proximate result of Defendants' negligent conduct, Plaintiff and Class Members have suffered injuries and are entitled to compensatory, consequential, and punitive damages in an amount to be proven at trial.

### <u>COUNT III</u>
### Breach of Implied Contract
### (On behalf of Plaintiff and all Class Members)

206.    Plaintiff hereby repeats and realleges all preceding paragraphs contained herein.

207.    Defendants offered to provide financial services to its Customers, including Plaintiff and Class Members, in exchange for payment.

208.    Defendants also required Plaintiff and the Class Members to provide Defendants with their Private Information to receive services from Defendants.

209.    In turn, Defendants impliedly promised to protect Plaintiff's and Class Members'
Private Information through adequate data security measures.

210.    Customers accepted Defendants offer by providing Private Information to
Defendants in exchange for receiving Defendants' services, and then by paying for and receiving
the same.

211.    Plaintiff and Class Members would not have entrusted their Private Information to
Defendants but-for the above-described agreement with Defendant.

212.    Defendants materially breached their agreement(s) with Plaintiff and Class
Members by failing to safeguard such Private Information, violating industry standards necessarily
incorporated in the agreement.

213.    Plaintiff and Class Members have performed under the relevant agreements, or such
performance was waived by the conduct of Defendants.

214.    The covenant of good faith and fair dealing is an element of every contract. All
such contracts impose on each party a duty of good faith and fair dealing. The parties must act
with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in
connection with executing contracts and discharging performance and other duties according to
their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the
parties to a contract are mutually obligated to comply with the substance of their contract along
with its form.

215.    Defendants conduct as alleged herein also violated the implied covenant of good
faith and fair dealing inherent in every contract.

216.    The losses and damages Plaintiff and Class Members sustained as described herein
were the direct and proximate result of Defendants breach of the implied contracts with them,

including breach of the implied covenant of good faith and fair dealing.

## COUNT IV
### Unjust Enrichment
### (On behalf of Plaintiff and all Class Members)

217.    Plaintiff hereby repeats and realleges all preceding paragraphs contained herein.

218.    This Count is brought in the alternative to Count III, Breach of Implied Contract.

219.    Plaintiff and Class Members conferred a monetary benefit on Defendants by providing Defendants with their valuable Private Information. In doing so, Plaintiff and Class Members understood that part of the benefit Defendants derived from the Private Information would be applied to data security efforts to safeguard the Private Information.

220.    Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Private Information.

221.    Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendants instead calculated to avoid their data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' failure to provide the requisite security.

222.    Under the principles of equity and good conscience, Defendants should not be permitted to retain the monetary value of the benefit belonging to Plaintiff and Class Members, because Defendants failed to implement appropriate data management and security measures that are mandated by industry standards.

223.    Defendants acquired the monetary benefit and Private Information through inequitable means in that they failed to disclose the inadequate security practices previously alleged.

224.    If Plaintiff and Class Members knew that Defendants had not secured their Private

Information, they would not have agreed to provide their Private Information to Defendants.

225.    Plaintiff and Class Members have no adequate remedy at law.

226.    As a direct and proximate result of Defendants conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their Private Information is used; (iii) the compromise, publication, and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their Private Information, which remain in Defendants possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect Private Information in their continued possession and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

227.    As a direct and proximate result of Defendants conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

228.    Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that it unjustly received from them.

**COUNT V**
**Declaratory Judgment**
**(On behalf of Plaintiff and all Class Members)**

229.    Plaintiff hereby repeats and realleges all preceding paragraphs contained herein.

230.     Defendants owe duties of care to Plaintiff and Class Members that require Defendants to adequately secure their Private Information.

231.     Defendants still possess Plaintiff's and Class Members' Private Information.

232.     Plaintiff and Class Members are at risk of harm due to the exposure of their Private Information and Defendants failure to address the security failings that lead to such exposure.

233.     Plaintiff, therefore, seek a declaration that (1) Defendants existing security measures do not comply with its duties of care to provide reasonable security procedure and practices appropriate to the nature of the information to protect Customers' Private Information, and (2) to comply with its duties of care, Defendants must implement and maintain reasonable security measures, including, but not limited to:

    a.  Engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

    b.  Engaging third-party security auditors and internal personnel to run automated security monitoring;

    c.  Auditing, testing, and training its security personnel regarding any new or modified procedures;

    d.  Segmenting its user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Defendants' systems;

    e.  Conducting regular database scanning and security checks;

f.   Routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

g.   Purchasing credit monitoring services for Plaintiff and Class Members for a period of ten years; and

h.   Meaningfully educating Plaintiff and Class Members about the threats they face as a result of the loss of their Private Information to third parties, as well as the steps they must take to protect themselves.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment as follows:

A.   For an Order certifying this action as a class action and appointing Plaintiff and his counsel to represent the Class;

B.   For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' PII, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

C.   For equitable relief compelling Defendants to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of PII compromised during the Data Breach;

D.   For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

     i.   Prohibiting Defendants from engaging in the wrongful and unlawful acts described herein;

ii.    Requiring Defendants to protect, including through encryption, all data collected through the course of their business in accordance with all applicable regulations, industry standards, and federal, state, or local laws;

iii.   Requiring Defendants to delete, destroy, and purge the PII of Plaintiff and Class Members unless Defendants can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

iv.    Requiring Defendants to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiff and Class Members;

v.     Prohibiting Defendants from maintaining the PII of Plaintiff and Class Members on a cloud-based database;

vi.    Requiring Defendants to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

vii.   Requiring Defendants to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii.  Requiring Defendants to audit, test, and train their security personnel regarding any new or modified procedures;

ix.        Requiring Defendants to segment data by, among other things, creating firewalls and access controls so that if one area of Defendants' network is compromised, hackers cannot gain access to other portions of Defendants' systems;

x.        Requiring Defendants to conduct regular database scanning and securing checks;

xi.        Requiring Defendants to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

xii.        Requiring Defendants to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiii.        Requiring Defendants to implement a system of tests to assess their respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendants' policies, programs, and systems for protecting personal identifying information;

xiv.        Requiring Defendants to implement, maintain, regularly review, and revise as necessary a threat management program designed to

appropriately monitor Defendants' information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xv. Requiring Defendants to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves; and

xvi. Requiring Defendants to implement logging and monitoring programs sufficient to track traffic to and from Defendants' servers; and

xvii. for a period of 10 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendants' compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the Class, and to report any deficiencies with compliance of the Court's final judgment.

E. For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendants' wrongful conduct;

F. Ordering Defendants to pay for not less than ten years of credit monitoring services for Plaintiff and the Class;

G. For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

H. For an award of punitive damages, as allowable by law;

I.     For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

J.     Pre- and post-judgment interest on any amounts awarded; and

K.     Such other and further relief as this court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff demands a trial by jury on all claims so triable.

Dated: August 15, 2023        Respectfully submitted,

*/s/ Andrew Shamis*
Andrew Shamis
Bar No. 101754
**SHAMIS & GENTILE, P.A.**
14 NE 1ST Avenue, Suite 705
Miami, FL 33132
Phone: (305) 479-2299
ashamis@shamisgentile.com

Gary M. Klinger*
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN LLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Phone: (866) 252-0878
gklinger@milberg.com

Jeff Ostrow*
Kristen Lake Cardoso*
Steven Sukert*
**KOPELOWITZ OSTROW**
**FERGUSON WEISELBERG GILBERT**
One West Las Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Telephone: 954-525-4100
ostrow@kolawyers.com
cardoso@kolawyers.com
sukert@kolawyers.com

*Attorney for Plaintiff and*
*the Proposed Class*

*Pro Hac Vice* application forthcoming

# EXHIBIT A



July 21, 2023



**Notice of Data Breach**

Dear Betty Gregory,

Pension Benefit Information, LLC ("PBI") provides audit and address research services for insurance companies, pension funds, and other organizations, including CMFG Life Insurance Company ("CMFG"). PBI is providing notice of a third-party software event that may affect the security of some of your information. Although we have no indication of identity theft or fraud in relation to this event, we are providing you with information about the event, our response, and additional measures you can take to help protect your information, should you feel it appropriate to do so.

**What Happened?** On or around May 31, 2023, Progress Software, the provider of MOVEit Transfer software disclosed a vulnerability in their software that had been exploited by an unauthorized third party. PBI utilizes MOVEit in the regular course of our business operations to securely transfer files. PBI promptly launched an investigation into the nature and scope of the MOVEit vulnerability's impact on our systems. Through the investigation, we learned that the third party accessed one of our MOVEit Transfer servers on May 29, 2023 and May 30, 2023 and downloaded data. We then conducted a manual review of our records to confirm the identities of individuals potentially affected by this event and their contact information to provide notifications. We recently completed this review on June 16, 2023, and confirmed that information concerning a limited number of CMFG's consumers was among the records involved in this incident.

**What Information Was Involved?** Our investigation determined that the following types of information related to you were present in the server at the time of the event: name, address, date of birth, and Social Security number.

**What We Are Doing.** We take this event and the security of information in our care seriously. Upon learning about this vulnerability, we promptly took steps to patch servers, investigate, assess the security of our systems, and notify potentially affected customers and individuals associated with those customers. In response to this event, we are also reviewing and enhancing our information security policies and procedures.

While we are unaware of any identity theft or fraud as a result of this event, as an additional precaution, PBI is offering you access to 12 months of complimentary credit monitoring and identity restoration services through Kroll. Details of this offer and instructions on how to activate these services are enclosed with this letter.

**What You Can Do.** We encourage you to remain vigilant against incidents of identity theft and fraud by reviewing your account statements and monitoring your free credit reports for suspicious activity and to detect errors. Please also review the enclosed Other Important Information, which contains information on what you can do to safeguard against possible misuse of your information. You can also enroll in the credit monitoring services that we are offering.

**For More Information.** If you have additional questions, you may call our toll-free assistance line at (866) 373-9045 Monday through Friday from 9:00 am to 6:30 pm Eastern time (excluding U.S. holidays). You may also write to PBI at 333 South Seventh Street, Suite 2400, Minneapolis, MN 55402.

Sincerely,

John Bikus
President
Pension Benefit Information, LLC

513550-U4

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
BETTY GREGORY, on behalf of herself and all others similarly situated

### DEFENDANTS
MILLIMAN SOLUTIONS, LLC and CMFG LIFE INSURANCE COMPANY d/b/a TRUSTAGE FINANCIAL

**(b)** County of Residence of First Listed Plaintiff   Riverside County, CA
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   King County, WA
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Shamis & Gentile, PA
14 NE 1st Ave., Suite 705, Miami, FL 33132
Telephone: 305-479-2299

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1   U.S. Government Plaintiff
- [ ] 2   U.S. Government Defendant
- [ ] 3   Federal Question *(U.S. Government Not a Party)*
- [x] 4   Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [x] 4 |
| Citizen of Another State | [x] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | **PERSONAL INJURY** | **INTELLECTUAL PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | [ ] 365 Personal Injury - Product Liability | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine | [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | [ ] 368 Asbestos Personal Injury Product Liability | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 460 Deportation |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle | **PERSONAL PROPERTY** | [ ] 840 Trademark | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability | [ ] 370 Other Fraud | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [x] 190 Other Contract | [ ] 360 Other Personal Injury | [ ] 371 Truth in Lending | **LABOR** | [ ] 485 Telephone Consumer Protection Act |
| [ ] 195 Contract Product Liability | [ ] 362 Personal Injury - Medical Malpractice | [ ] 380 Other Personal Property Damage | [ ] 710 Fair Labor Standards Act | [ ] 490 Cable/Sat TV |
| [ ] 196 Franchise | | [ ] 385 Property Damage Product Liability | [ ] 720 Labor/Management Relations | [ ] 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 740 Railway Labor Act | [ ] 890 Other Statutory Actions |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | **Habeas Corpus:** | [ ] 751 Family and Medical Leave Act | [ ] 891 Agricultural Acts |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | [ ] 790 Other Labor Litigation | [ ] 893 Environmental Matters |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate Sentence | [ ] 791 Employee Retirement Income Security Act | [ ] 895 Freedom of Information Act |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations | [ ] 530 General | | [ ] 896 Arbitration |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | [ ] 535 Death Penalty | **IMMIGRATION** | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | **Other:** | [ ] 462 Naturalization Application | [ ] 950 Constitutionality of State Statutes |
| | [ ] 448 Education | [ ] 540 Mandamus & Other | [ ] 465 Other Immigration Actions | |
| | | [ ] 550 Civil Rights | | |
| | | [ ] 555 Prison Condition | | |
| | | [ ] 560 Civil Detainee - Conditions of Confinement | | |

**SOCIAL SECURITY**
[ ] 861 HIA (1395ff)
[ ] 862 Black Lung (923)
[ ] 863 DIWC/DIWW (405(g))
[ ] 864 SSID Title XVI
[ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**
[ ] 870 Taxes (U.S. Plaintiff or Defendant)
[ ] 871 IRS—Third Party 26 USC 7609

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1   Original Proceeding
- [ ] 2   Removed from State Court
- [ ] 3   Remanded from Appellate Court
- [ ] 4   Reinstated or Reopened
- [ ] 5   Transferred from Another District *(specify)*
- [ ] 6   Multidistrict Litigation - Transfer
- [ ] 8   Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1332(d)
Brief description of cause:
NEGLIGENCE, Negligence Per Se, Breach of Implied Contract, Unjust Enrichment, Declaratory Judgment

## VII. REQUESTED IN COMPLAINT:
[x] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**
5,000,000

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   [x] Yes   [ ] No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*   JUDGE _____   DOCKET NUMBER _____

DATE
August 15, 2023

SIGNATURE OF ATTORNEY OF RECORD
/s/ Andrew Shamis

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.(a)   **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

   (b)   **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

   (c)   **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II.   **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

III.   **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV.   **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: <u>Nature of Suit Code Descriptions.</u>

V.   **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

VI.   **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

VII.   **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII.   **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

_____ District of _____

<table>
<tr><td></td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>_____</td><td>)</td><td></td></tr>
<tr><td><i>Plaintiff(s)</i></td><td>)</td><td></td></tr>
<tr><td>v.</td><td>)</td><td>Civil Action No.</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>_____</td><td>)</td><td></td></tr>
<tr><td><i>Defendant(s)</i></td><td>)</td><td></td></tr>
</table>

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____
                                                          *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*
                                                                                              .


My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .


I declare under penalty of perjury that this information is true.


Date: _____

                                      _____
                                              *Server's signature*

                                      _____
                                              *Printed name and title*

                                      _____
                                              *Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

_____ District of _____

|  |  |  |
|---|---|---|
|  | ) |  |
|  | ) |  |
|  | ) |  |
| _____ | ) |  |
| *Plaintiff(s)* | ) | Civil Action No. |
| v. | ) |  |
|  | ) |  |
|  | ) |  |
|  | ) |  |
| _____ | ) |  |
| *Defendant(s)* | ) |  |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____

*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❑ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❑ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

❑ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❑ I returned the summons unexecuted because _____ ; or

❑ Other *(specify):*
_____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

# U.S. District Court
## Western District of Wisconsin (Madison)
## CIVIL DOCKET FOR CASE #: 3:23-cv-00559-slc

Gregory, Betty v. Milliman Solutions, LLC et al
Assigned to: Magistrate Judge Stephen L. Crocker
Cause: 28:1332 Diversity-Breach of Contract

Date Filed: 08/15/2023
Jury Demand: Plaintiff
Nature of Suit: 190 Contract: Other
Jurisdiction: Diversity

**Plaintiff**

**Betty Gregory**
*on behalf of herself and all others similarly
situated*

represented by **Andrew John Shamis**
Shamis & Gentile, P.A.
14 NE 1st Avenue, Suite 1205
Miami, FL 33132
305-479-2299
Fax: 786-623-0915
Email: ashamis@shamisgentile.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Milliman Solutions, LLC**

**Defendant**

**CMFG Life Insurance Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 08/15/2023 | 1 | COMPLAINT against CMFG Life Insurance Company, Milliman Solutions, LLC. ( Filing fee $ 402 receipt number AWIWDC-3289667.), filed by Betty Gregory. (Attachments:<br># 1 Exhibit A - Data Breach Notice Letter,<br># 2 JS-44 Civil Cover Sheet,<br># 3 Summons,<br># 4 Summons) (Shamis, Andrew) Modified on 8/15/2023: Corrected demand, county and cause of action. Added exhibit description. (lak) (Entered: 08/15/2023) |
| 08/15/2023 | | Case randomly assigned to Magistrate Judge Stephen L. Crocker. (lak) (Entered: 08/15/2023) |
| 08/15/2023 | | Standard attachments for Magistrate Judge Stephen L. Crocker required to be served on all parties with summons or waiver of service: Corporate Disclosure Statement, Order Regarding Assignment of Cases, Notice of Assignment to a Magistrate Judge and |

| | | Consent/Request for Reassignment, Order on Dispositive Motions. (lak) (Entered: 08/15/2023) |
|---|---|---|
| 08/15/2023 | 2 | Summons Issued as to Defendants. (lak) (Entered: 08/15/2023) |
| 08/23/2023 | 3 | Summons Returned Executed. CMFG Life Insurance Company served on 8/18/2023, answer due 9/8/2023. (Shamis, Andrew) (Entered: 08/23/2023) |

---

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 08/24/2023 14:53:08 | | |
| **PACER Login:** | | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |