# EXHIBIT A

# U.S. District Court
## Eastern District of Virginia - (Richmond)
## CIVIL DOCKET FOR CASE #: 3:23-cv-00560-DJN

Manar v. Genworth Financial, Inc.                                    Date Filed: 08/30/2023
Assigned to: District Judge David J. Novak                           Jury Demand: Plaintiff
Cause: 28:1332 Diversity-Personal Injury                             Nature of Suit: 360 P.I.: Other
                                                                     Jurisdiction: Diversity

**Plaintiff**

**April Manar**                              represented by   **Erin Elizabeth Jewell**
*individually and on behalf of all others*                    Harty Jewell, PLLC
*similarly situated*                                          6515 George Washington Mem Hwy
                                                              Suite 205
                                                              Yorktown, VA 23692
                                                              757-568-9635
                                                              Fax: 757-703-0357
                                                              Email: erin@hartyjewell.com
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

                                                             **William Wesley Coleman Harty**
                                                              Harty Jewell PLLC
                                                              6515 George Washington Mem. Hwy.
                                                              Suite 205
                                                              Yorktown, VA 23692
                                                              757-568-9631
                                                              Email: will@hartyjewell.com
                                                              *ATTORNEY TO BE NOTICED*

**Defendant**

**Genworth Financial, Inc.**

| Date Filed | # | Docket Text |
|---|---|---|
| 08/30/2023 | 1 | Complaint ( Filing fee $ 402, receipt number AVAEDC-9103060.), filed by April Manar. (Attachments: # 1 Civil Cover Sheet)(Jewell, Erin) (Main Document 1 replaced to include civil case number on 8/31/2023) (jenjones, ). (Entered: 08/30/2023) |
| 08/30/2023 | 2 | Proposed Summons re 1 Complaint by April Manar. (Jewell, Erin) (Entered: 08/30/2023) |
| 08/31/2023 | | Notice of Correction re 1 : Filing attorney notified that the civil case number was omitted from the complaint and to include the civil case number on all future filings. The error has been corrected and no further action is required. (jenjones, ) (Entered: 08/31/2023) |
| 08/31/2023 | | Case assigned to District Judge David J. Novak. (jenjones, ) (Entered: 08/31/2023) |

PACER Service Center

PACER Service Center

| Transaction Receipt | | | |
|---|---|---|---|
| 08/31/2023 09:42:15 | | | |
| **PACER Login:** | SidleyCHPacer | **Client Code:** | 030049-11670-38331 |
| **Description:** | Docket Report | **Search Criteria:** | 3:23-cv-00560-DJN |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGNIA**
**RICHMOND DIVISION**

| | |
|---|---|
| **APRIL MANAR, individually and on**<br>**behalf of all others similarly situated,** | ) |
| | ) |
| | ) |
| **Plaintiffs**, | ) |
| | ) Case No: |
| v. | ) |
| | ) |
| **GENWORTH FINANCIAL, INC.,** | ) |
| | ) |
| **Defendant.** | ) |

**CLASS ACTION COMPLAINT**

Plaintiff, April Manar, individually and on behalf of all others similarly situated, and on behalf of the general public, upon personal knowledge of facts pertaining to her and upon information and belief as to all other matters, and by and through undersigned counsel, hereby brings this Class Action Complaint against Defendant, Genworth Financial, Inc. ("Genworth" or "Defendant"), and alleges as follows:

**INTRODUCTION**

1.      Plaintiff brings this action on behalf of themself and all others individuals similarly situated ("Class Members") against Genworth for its failure to secure and safeguard the personally identifiable information ("PII") of at least 2.5 million individuals who are either customers or insurance agents of the company.

2.      Genworth, headquartered in Richmond, Virginia, provides life insurance, long-term care insurance, mortgage insurance, and annuities. In the regular course of its business, Genworth is required to maintain reasonable and adequate security measures to secure, protect, and safeguard their PII against unauthorized access and disclosure.

3.      Genworth could have prevented the Data Breach by properly vetting and monitoring the systems of its third-party vendors, including PBI and its use of a highly vulnerable file transfer software MOVEit.

4.      Plaintiff and Class Members entrusted Genworth with, and allowed Genworth to gather, highly sensitive information as part of obtaining financial and insurance services. They did so in confidence, and they had the legitimate expectation that Genworth would respect their privacy and act appropriately, including only sharing their information with vendors and business associates who legitimately needed the information and were equipped to protect it through having adequate processes in place to safeguard it.

5.      Every year, millions of Americans have their most valuable PII stolen and sold online because of data breaches. Despite the dire warnings about the severe impact of data breaches on Americans of all economic strata, companies still fail to make the necessary investments to implement important and adequate security measures to protect their customers' and employees' data.

6.      Defendant Genworth required its customers to provide it with their sensitive PII and failed to protect it. Defendant had an obligation to secure its customers' PII by implementing reasonable and appropriate data security safeguards. This was part of the bargain between Plaintiff and Class Members and Genworth.

7.      As a result of Genworth's failure to provide reasonable and adequate data security, Plaintiff's and the Class Members' unencrypted, non-redacted PII has been exposed to unauthorized third parties. Plaintiff and the Class are now at much higher risk of identity theft and cybercrimes of all kinds, especially considering the highly sensitive PII stolen here and the fact that the compromised PII is already being sold on the dark web. This risk constitutes a

concrete injury suffered by Plaintiff and the Class, as they no longer have control over their PII, which PII is now in the hands of third- party cybercriminals. This substantial and imminent risk of identity theft has been recognized by numerous courts as a concrete injury sufficient to establish standing.

8.      Furthermore, Plaintiff and the Class, as also set forth below, will have to incur costs to pay a third-party credit and identity theft monitoring service for the rest of their lives as a direct result of the Data Breach.

9.      Plaintiff brings this action on behalf of themselves and those similarly situated to seek redress for the lifetime of harm they will now face, including, but not limited to reimbursement of losses associated with identity theft and fraud, out-of-pocket costs incurred to mitigate the risk of future harm, compensation for time and effort spent responding to the Data Breach, the costs of extending credit monitoring services and identity theft insurance, and injunctive relief requiring Genworth to ensure that its third-party vendors implement and maintain reasonable data security practices going forward.

## THE PARTIES

10.     Plaintiff April Manar is a resident of Platte City, Platte County, Missouri, whose Personal Information was compromised in the Data Breach.

11.     Defendant Genworth Financial, Inc. is a Virginia corporation, with its principal place of business at 6620 W Broad St., Richmond, Virginia, 23230.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d) because there are more than 100 Class Members, at

least one class member is a citizen of a state different from that of Defendant, and the amount in controversy exceeds $5 million, exclusive of interest and costs.

13.     Venue is likewise proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendant conducts much of its business in this District and Defendant has caused harm to Class Members residing in this District.

## FACTUAL ALLEGATIONS

14.     Genworth advertises that it provides financial and insurance services to help its customers "navigate caregiving options, protect and grow their retirement income, and prepare for financial challenges that come as we age."[1]

15.     In the course of these services, Genworth collects and maintains patients' highly sensitive PII, including, but not limited to, their Social Security numbers, first and last names, dates of birth, zip codes, states of residence, policy numbers, cities, and dates of death, where applicable.

16.     By obtaining, collecting, and storing the PII of Plaintiff and Class Members, Genworth assumed legal and equitable duties and knew or should have known it was responsible for protecting the PII from unauthorized disclosure.

17.     Genworth understands the importance of protecting its customers' and insurance agents' PII and maintains a Privacy Policy confirming such. According to Genworth's Privacy Policy, it complies with "[f]ederal and State requirements related to the protection and use of your data. This means that we only share data where we are permitted or required to do so. We

---

[1] https://www.genworth.com/about-us.html (Last visited August 22, 2023).

also may be required to obtain your authorization before disclosing certain types of personal data."[2]

18.    Genworth further states that it does "not sell personal data about current or former customers or their accounts. We do not share your personal data for marketing purposes with anyone outside our family companies. When affiliates or outside companies perform a service on our behalf, we may share your personal data with them. We require them to protect your personal data, and we only permit them to use your personal data to perform these services."[3]

19.    Genworth also maintains a "Code of Ethics," which "contains the core policies that govern [employees'] work, as well as an outline of [their] responsibilities in upholding the Code and protecting it."[4] With regard to customer information, Genworth's Code of Ethics states that "[o]ur customers, distributors, employees, and other individuals have entrusted sensitive personal data to us with the full expectation that we will exercise the appropriate degree of care in handling and storing it…Many of us have access to information that is sensitive in nature and confidential. Confidential information includes non-public information that might be useful to our competitors, or harmful to the Company or its customers, if disclosed…Genworth is committed to (1) handling and storing all sensitive personal data responsibly and in full compliance with applicable privacy laws, and (2) maintaining the confidentiality of property or other sensitive information, as appropriate."[5]

20.    Genworth further states that "[i]f Genworth will need to disclose sensitive personal data to a supplier or other third party, partner with an internal legal counsel, a

---

[2] https://pro.genworth.com/riiproweb/productinfo/pdf/45242.pdf (Last visited August 22, 2023).
[3] *Id.*
[4] https://pro.genworth.com/riiproweb/productinfo/pdf/GF90384.pdf (Last visited August 22, 2023).
[5] *Id.*

compliance officer, data security team member, or a sourcing representative to (1) assess the supplier's security safeguards, and (2) include adequate legal protections…Disclosures to a third party should be limited to the minimum necessary to accomplish the intended purpose."[6]

21.     Despite recognizing its duty to do so, Genworth failed to assess and monitor its third-party vendor's security safeguards to protect Plaintiff's and Class Members' PII.

22.     Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their PII and relied on Genworth to keep their PII confidential and maintained securely, to use this information for business purposes only, to make only authorized disclosures of this information, and to ensure that its third-party vendors take similar steps.

### The Data Breach

23.     According to a data breach notice sent by PBI on behalf of Genworth ("Breach Notice"), an unauthorized party accessed one of PBI's MOVEit Transfer servers on May 29, 2023 and May 30, 2023, exploiting a glaring vulnerability in the software and downloading highly sensitive PII of at least 2.5 million Genworth customers and insurance agents stored on its servers, including Social Security numbers, first and last names, dates of birth, zip codes, states of residence, policy numbers, cities, and dates of death, where applicable.

24.     The Breach Notice further provided that "[w]e take this event and the security of information in our care seriously. Upon learning about this vulnerability we promptly took steps to patch servers, investigate, assess the security of our systems, and notify potentially affected customers and individuals associated with those customers. In response to this event, we are also reviewing and enhancing our information security policies and procedures."

---

[6] *Id.*

25. In a report field with the Securities and Exchange Commission, Genworth described its discovery of the Data Breach as follows:

> Genworth Financial, Inc. (the "Company") has been notified by PBI Research Services ("PBI"), a third-party vendor to the Company, that PBI, in common with numerous other organizations and governmental agencies, was subject to the widely reported security events involving the MOVEit file transfer system, which PBI uses in the performance of its services. The MOVEit file transfer system security event resulted in the unauthorized acquisition by a third-party of data from several organization and governmental agencies, including Company data. As further described below, the Company believes that the personal information of a significant number of insurance policyholders or other customers of its life insurance businesses was unlawfully accessed, and is working to ensure that protection services are provided to those impacted individuals.[7]

26. Genworth also posted a Security Event Notice ("Security Notice") on its website that vaguely discusses the Data Breach and imprecisely addresses the steps taken to ensure a Data Breach of this kind does not happen again: "At Genworth, we have implemented technical, physical, and process safeguards to maintain the confidentiality of customer information. Further, we require third parties that receive and store the personal information of our customers to take similar steps, and we work to understand the measures they have taken. While the MOVEit event has impacted various organizations globally, Genworth will continue to focus on and seek opportunities to improve how third parties protect the data of our customers."[8]

27. Absent from the Breach Notice and Security Notice are any details regarding how the Data Breach happened, what Genworth did in response to the ransom demand, or how Genworth's actions have remediated the root cause of the Data Breach.

---

[7] https://investor.genworth.com/sec-filings/all-sec-filings/content/0001193125-23-172549/d463993d8k.htm (Last visited August 22, 2023).
[8] https://www.genworth.com/moveit.html (Last visited August 22, 2023).

*The Data Breach was Preventable*

28.     As noted above, following the Data Breach, Genworth stated that it has "implemented technical, physical, and process safeguards to maintain the confidentiality of customer information [and requires] third parties that receive and store the personal information of our customers to take similar steps."[9]

29.     Had Genworth ensured that PBI maintained industry-standard safeguards to monitor, assess, and update security controls and related system risks, Genworth could have ensured that sensitive customer and agent data was not transferred to a vendor that was unequipped to protect it. Genworth's lack of oversight of PBI's security controls, and PBI's implementation of enhanced security measures only after the Data Breach are inexcusable.

30.     Genworth was at all times fully aware of its obligation to protect its customers' and insurance agents' PII and the risks associated with failing to do so. Genworth observed frequent public announcements of data breaches affecting finance and insurance industries and knew that information of the type collected, maintained, and stored by Genworth is highly coveted and a frequent target of hackers.

31.     Indeed, insurance institutions are prime targets for cyberattacks because of their size and scope, along with the substantial amount of sensitive data they manage and store. There have been at least three major insurance related data breaches in the United States since the beginning of this year, some also perpetrated by the CLOP gang.[10]

32.     For example, in April 2023 NationsBenefits, "disclosed that thousands of its members had their personal information compromised in a late-January ransomware attack

---

[9] *Id.*

[10] https://www.insurancebusinessmag.com/us/guides/the-insurance-industry-cyber-crime-report-recent-attacks-on-insurance-businesses-448429.aspx (Last visited August 22, 2023)

targeting Fortra's GoAnywhere platform, a file-transfer software that the firm was using. According to news reports, ransomware gang CLOP claimed responsibility for the attack, saying it took advantage of a previously unknown vulnerability."[11]

33.      In mid-April 2023, "the second-largest health insurer [Point32Health], in Massachusetts, suffered major technical outages resulting from a ransomware attack. The incident brought down the company's systems that it uses to service members and providers, resulting in some members having difficulty contacting their insurers."[12]

34.      In May 2023, MCNA Insurance Company disclosed that "personal health information of nearly nine million patients was compromised in a cyber incident discovered in March. In a data breach notification letter filed with the Maine state attorney general's office dated May 26, the firm said that it detected unauthorized access to its systems on March 6, with some found to be infected with malicious code…According to MCNA, the hackers were successful in accessing patient personal information."[13]

35.      Moreover, ransomware attacks are especially prevalent in the insurance industry.[14] For years federal agencies have warned about the increasing risk of ransomware attacks on companies holding PII. For example, in October 2019, the Federal Bureau of Investigation published online an article titled "High-Impact Ransomware Attacks Threaten U.S. Businesses and Organizations" that, among other things, warned that "[a]lthough state and local governments have been particularly visible targets for ransomware attacks, ransomware actors

---

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] *Id.*

have also targeted health care organizations, industrial companies, and the transportation sector."[15]

36. In April 2020, ZDNet reported in an article titled "Ransomware mentioned in 1,000+ SEC filings over the past year", that "[r]ansomware gangs are now ferociously aggressive in their pursuit of big companies. They breach networks, use specialized tools to maximize damage, leak corporate information on dark web portals, and even tip journalists to generate negative news for complaints as revenge against those who refuse to pay."[16]

37. In September 2020, the United States Cybersecurity and Infrastructure Security Agency published online a "Ransomware Guide" advising that "[m]alicious actors have adjusted their ransomware tactics over time to include pressuring victims for payment by threatening to release stolen data if they refuse to pay and publicly naming and shaming victims as secondary forms of extortion."[17]

38. Stolen PII is often trafficked on the dark web, as is the case here. Law enforcement has difficulty policing the dark web due to this encryption, which allows users and criminals to conceal identities and online activity.

39. When malicious actors infiltrate companies and copy and exfiltrate the PII that those companies store, that stolen information often ends up on the dark web because the malicious actors buy and sell that information for profit.[18]

---

[15] https://www.ic3.gov/Media/Y2019/PSA191002 (Last visited August 22, 2023).

[16] https://www.zdnet.com/article/ransomware-mentioned-in-1000-sec-filings-over-the-past-year/ (Last visited August 22, 2023).

[17] https://www.cisa.gov/sites/default/files/2023-01-CISA_MS-ISAC_Ransomware%20Guide_8508C.pdf (Last visited August 22, 2023).

[18] *Shining a Light on the Dark Web with Identity Monitoring*, IdentityForce, Dec. 28, 2020, *available at:* https://www.identityforce.com/blog/shining-light-dark-web-identity- monitoring (Last visited August 15, 2023).

40.     Another example is when the U.S. Department of Justice announced its seizure of AlphaBay in 2017, AlphaBay had more than 350,000 listings, many of which concerned stolen or fraudulent documents that could be used to assume another person's identity. Other Marketplaces similar to the now-defunct AlphaBay, "are awash with [PII] belonging to victims from countries all over the world. One of the key challenges of protecting PII online is its pervasiveness. As data breaches in the news continue to show, PII about employees, customers and the public is housed in all kinds of organizations, and the increasing digital transformation of today's businesses only broadens the number of potential sources for hackers to target."[19]

41.     The PII of consumers remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[20]  Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[21] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[22]

42.     Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of

---

[19] *Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web*, Armor, April 3, 2018, *available at:* https://www.armor.com/resources/blog/stolen-pii-ramifications- identity-theft-fraud-dark-web/ (Last visited July 28, 2021).

[20] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal- data-sold-on-the-dark-web-how-much-it-costs/ (Last visited July 28, 2021).

[21] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask- experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (Last visited July 28, 2021).

[22] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the- dark/ (Last visited July 28, 2021).

an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[23]

43.    What is more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

44.    Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "The credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[24]

45.    Because of this, the information compromised in the Data Breach here is significantly more harmful to lose than the loss of, for example, credit card information in a retailer payment card breach because victims can simply cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

---

[23] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf (Last visited August 22, 2023).
[24] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*: http://www.npr.org/2015/02/09/384875839/data-stolen- by-anthem-s-hackers-has-millionsworrying- about-identity-theft (last visited July 28, 2021).

46. The PII compromised in the Data Breach demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10 times on the black market."[25]

47. Once PII is sold, it is often used to gain access to various areas of the victim's digital life, including bank accounts, social media, credit card, and tax details. This can lead to additional PII being harvested from the victim, as well as PII from family, friends and colleagues of the original victim.

48. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses in 2019, resulting in more than $3.5 billion in losses to individuals and business victims.

49. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

50. Data breaches facilitate identity theft as hackers obtain consumers' PII and thereafter use it to siphon money from current accounts, open new accounts in the names of their victims, or sell consumers' PII to others who do the same.

51. For example, the United States Government Accountability Office noted in a June 2007 report on data breaches (the "GAO Report") that criminals use PII to open financial accounts, receive government benefits, and make purchases and secure credit in a victim's

---

[25] Time Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), *available at*: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells- for- 10x-price-of-stolen-credit-card-numbers.html (last visited July 28, 2021).

name.[26] The GAO Report further notes that this type of identity fraud is the most harmful because it may take some time for a victim to become aware of the fraud, and can adversely impact the victim's credit rating in the meantime. The GAO Report also states that identity theft victims will face "substantial costs and inconveniences repairing damage to their credit records . . . [and their] good name."[27]

52.     The exposure of Plaintiff's and Class Members' PII to cybercriminals will continue to cause substantial risk of future harm (including identity theft) that is continuing and imminent in light of the many different avenues of fraud and identity theft utilized by third-party cybercriminals to profit off of this highly sensitive information.

### Genworth Failed to Comply with Federal Trade Commission Requirements

53.     Federal and State governments have established security standards and issued recommendations to minimize data breaches and the resulting harm to individuals and financial institutions. The Federal Trade Commission ("FTC") has issued numerous guides for businesses that highlight the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[28]

54.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and

---

[26] *See* Government Accountability Office, *Personal Information: Data Breaches are Frequent, but Evidence of Resulting Identity Theft is Limited; However, the Full Extent is Unknown* (June 2007), https://www.gao.gov/assets/gao- 07-737.pdf (last visited July 28, 2021).
[27] *Id.*
[28] *See* Federal Trade Commission, *Start With Security* (June 2015), https://www.ftc.gov/system/files/documents/plain- language/pdf0205-startwithsecurity.pdf (last visited July 28, 2021).

practices for business.[29] Among other things, the guidelines note businesses should properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[30]

55. Additionally, the FTC recommends that companies limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[31]

56. Highlighting the importance of protecting against phishing and other types of data breaches, the FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect PII, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

57. Genworth was fully aware of its obligation to implement and use reasonable measures to protect the PII of its customers and insurance agents, but failed to comply with these

---

[29] *See* Federal Trade Commission, *Protecting Personal Information: A Guide for Business* (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited August 22, 2023).
[30] *Id.*
[31] Federal Trade Commission, *Start With Security*, *supra footnote 28*.

basic recommendations and guidelines that would have prevented this breach from occurring. Genworth's failure to employ reasonable measures to protect against unauthorized access to patient information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act § 45.

### The Impact of Data Breach on Victims

58. Genworth's failure to keep Plaintiff's and Class Members' PII secure has severe ramifications. Given the highly sensitive nature of the PII stolen in the Data Breach – Social Security numbers, first and last names, dates of birth, zip codes, stats of residence, and policy numbers, etc. – hackers can commit identity theft, financial fraud, and other identity-related fraud against Plaintiff and Class Members now and into the indefinite future. As a result, Plaintiff has suffered injury and faces an imminent and substantial risk of further injury including identity theft and related cybercrimes due to the Data Breach.

59. The PII exposed in the Data Breach is highly-coveted and valuable on underground markets. Identity thieves can use the PII to: (a) commit insurance fraud; (b) obtain a fraudulent driver's license of ID card in the victim's name; (c) obtain fraudulent government benefits; (d) file a fraudulent tax return using the victim's information; (e) commit medical and healthcare-related fraud; (f) access financial and investment accounts and records; (g) engage in mortgage fraud; and/or (h) commit any number of other frauds, such as obtaining a job, procuring housing, or giving false information to police during an arrest.

60. Further, malicious actors often wait months or years to use the PII obtained in data breaches, as victims often become complacent and less diligent in monitoring their accounts after a significant period has passed. These bad actors will also re-use stolen PII, meaning individuals can be victims of several cybercrimes stemming from a single data breach.

61. Given the confirmed exfiltration of Genworth's customers' and insurance agents' PII from PBI's systems, many victims of the Data Breach have likely already experienced significant harms as the result of the Data Breach, including, but not limited to, identity theft and fraud. Plaintiff and Class Members have also spent time, money, and effort dealing with the fallout of the Data Breach, including purchasing credit monitoring services, reviewing financial and insurance statements, checking credit reports, and spending time and effort searching for unauthorized activity.

62. It is no wonder then, that identity theft exacts a severe emotional toll on its victims. The 2021 Identity Theft Resource Center survey evidences the emotional suffering experienced by victims of identity theft:

- 84% reported anxiety;

- 76% felt violated;

- 32% experienced financial related identity problems;

- 83% reported being turned down for credit or loans;

- 32% reported problems with family members as a result of the breach;

- 10% reported feeling suicidal.[32]

63. Identity theft can also exact a physical toll on its victims. The same survey reported that respondents experienced physical symptoms stemming from their experience with identity theft:

- 48% of respondents reported sleep disturbances;

- 37.1% reported an inability to concentrate/lack of focus;

---

[32] https://www.idtheftcenter.org/wp-content/uploads/2021/09/ITRC_2021_Consumer_Aftermath_Report.pdf (Last visited August 22, 2023).

- 28.7% reported they were unable to go to work because of physical symptoms;

- 23.1% reported new physical illnesses (aches and pains, heart palpitations, sweating, stomach issues); and

- 12.6% reported a start or relapse into unhealthy or addictive behaviors.[33]

64.     Annual monetary losses from identity theft are in the billions of dollars.

According to a Presidential Report on identity theft produced in 2007:

> In addition to the losses that result when identity thieves fraudulently open accounts…individual victims often suffer indirect financial costs, including the costs incurred in both civil litigation initiated by creditors and in overcoming the many obstacles they face in obtaining or retaining credit. Victims of non-financial identity theft, for example, health-related or criminal record fraud, face other types of harm and frustration.

> In addition to our-of-pocket expenses that can reach thousands of dollars for the victims of new account identity theft, and the emotional toll identity theft can take, some victims have to spend what can be a considerable amount of time to repair the damage caused by the identity thieves. Victims of new account identity theft, for example, must correct fraudulent information in their credit reports and monitor their reports for future inaccuracies, close existing bank accounts and open new ones, and dispute charges with individual creditors.

65.     The unauthorized disclosure of Social Security Numbers can be particularly damaging because Social Security numbers cannot be easily replaced. In order to obtain a new number, a person must prove, among other things, he or she continues to be disadvantaged by the misuse. Thus, under current rules, no new number can be obtained until the damage has been done. Furthermore, as the Social Security Administration warns:

> A new number probably will not solve all your problems. This is because other governmental agencies (such as the Internal Revenue Service and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number. Also, because credit reporting companies use the number, along with other Personal Information, to identify your credit record, using a new number will not guarantee you a fresh start. This is especially true if your other Personal Information, such as your name and address, remains the same.

---

[33] *Id.*

If you receive a new Social Security Number, you will not be able to use the old number anymore.

For some victims of identity theft, a new number actually creates new problems. If the old credit card information is not associated with the new number, the absence of any credit history under the new number may make it more difficult for you to get credit.[34]

66.     The unauthorized disclosure of the sensitive PII to data thieves also reduces its inherent value to its owner, which has been recognized by courts as an independent form of harm.[35]

67.     Consumers are injured every time their data is stolen and traded on underground markets, even if they have been victims of previous data breaches. Indeed, the dark web is comprised of multiple discrete repositories of stolen information that can be aggregated together or accessed by different criminal actors who intend to use it for different fraudulent purposes. Each data breach increases the likelihood that a victim's personal information will be exposed to more individuals who are seeking to misuse it at the victim's expense.

68.     As the result of the wide variety of injuries that can be traced to the Data Breach, Plaintiff and Class Members have and will continue to suffer economic loss and other actual harm for which they are entitled to damages, including, but not limited to, the following:

a.      The unconsented disclosure of confidential information to a third party;

b.      Unauthorized use of their PII without compensation;

c.      Losing the value of the explicit and implicit promises of data security;

---

[34] Social Security Administration, *Identity Theft and Your Social Security Number* (June 2017), http://www.ssa.gov/pubs/10064.html (Last visited August 15, 2023).

[35] *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—that the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

d.      Losing the value of access to their PII permitted by Genworth without permission;

e.      Identity theft and fraud resulting from the theft of their PII;

f.      Costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

g.      Anxiety, emotional distress, and loss of privacy;

h.      The present value of ongoing credit monitoring and identity theft protection services necessitated by the Data Breach;

i.      Unauthorized charges and loss of use of and access to their accounts;

j.      Lowered credit scores resulting from credit inquiries following fraudulent activities;

k.      Costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to mitigate and address the actual and future consequences of the Data Breach, including searching for fraudulent activity, imposing withdrawal and purchase limits on compromised accounts, and the stress, nuisance, and annoyance of dealing with the repercussions of the Data Breach; and

l.      The continued, imminent, and certainly impending injury flowing from potential fraud and identity theft posed by their PII being in the possession of one or many unauthorized third parties.

69.      Even in instances where an individual is reimbursed for a financial loss due to identity theft or fraud, that does not make that individual whole again as there is typically significant time and effort associated with seeking reimbursement. The Department of Justice's Bureau of Justice Statistics found that identity theft victims "reported spending an average of about 7 hours clearing up the issues" relating to identity theft or fraud.[36]

70.      There may also be a significant time lag between when personal information is stolen and when it is misused for fraudulent purposes. According to the Government Accountability Office, which conducted a study regarding data breaches: "law enforcement

---

[36] E. Harrell, U.S. Department of Justice, *Victims of Identity Theft, 2014* (revised Nov. 14, 2017), http://www.bjs.gov/content/pub/pdf/vit14.pdf (Last visited August 22, 2023).

officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data has been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[37]

71.     Plaintiff and Class Members place significant value in data security. According to a survey conducted by cyber-security company FireEye Mandiant, approximately 50% of consumers consider data security to be a main or important consideration when making purchasing decisions and nearly the same percentage would be willing to pay more to work with a provider that has better data security. Seventy percent of consumers would provide less personal information to organizations that suffered a data breach.[38]

72.     Plaintiff and Class Members have a direct interest in Genworth's promises and duties to protect their PII, i.e., that Genworth *not increase* their risk of identity theft and fraud. Because Genworth failed to live up to its promises and duties in this respect, Plaintiff and Class Members seek the present value of ongoing identity protection services to compensate them for the present harm and present and continuing increased risk of harm caused by Genworth's wrongful conduct. Through this remedy, Plaintiff seeks to restore themselves and Class Members as close to the same position as they would have occupied but for Genworth's wrongful conduct, namely its failure to adequately protect Plaintiff's and the Class Members' PII.

73.     Plaintiff and Class Members further seek to recover the value of the unauthorized access to their PII permitted through Genworth's wrongful conduct. This measure of damages is analogous to the remedies for unauthorized use of intellectual property. Like a technology

---

[37] https://www.gao.gov/assets/gao-07-737.pdf (Last visited August 22, 2023).
[38] https://web.archive.org/web20220205174527/https://www.fireeye.com/blog/executive-perspective/2016/05/beyong_the_bottomli.html (Last visited August 15, 2023).

covered by a trade secret or patent, use or access to a person's PII is non-rivalrous—the unauthorized use by another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, a Plaintiff may generally recover the reasonable use of value of the IP—i.e., a "reasonable royalty" from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as in the case of a nonpracticing patentee) and even though the owner would not have otherwise licensed such IP to the infringer. A similar royalty or license measure of damages is appropriate here under common law damages principles authorizing recovery of rental or use value. This measure is appropriate because (a) Plaintiff and Class Members have a protectible property interest in their PII; (b) the minimum damages measure for the unauthorized used of personal property is its rental value; and (c) rental value is established with reference to market value, i.e., evidence regarding the value of similar transactions.

74.     Plaintiff and Class Members have an interest in ensuring that their PII is secured and not subject to further theft because Genworth continues to hold their PII.

## **CLASS ACTION ALLEGATIONS**

75.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of herself and the following proposed Nationwide Class, defined as follows:

**Nationwide Class**

All persons residing in the United States who are current or former customers of Genworth or any Genworth affiliate, parent, or subsidiary, and had their PII compromised by an unknown third-party cybercriminal as a result of the Data Breach.

In addition, Plaintiff brings this action on behalf of the following proposed Missouri Subclass, defined as follows:

**Missouri Subclass**

All persons residing in the State of Missouri who are current or former customers of Genworth or any Genworth affiliate, parent, or subsidiary, and had their PII compromised as a result of the Data Breach.

76.     Both the proposed Nationwide Class and the proposed Missouri Subclass will be collectively referred to as the Class, except where it is necessary to differentiate them.

77.     Excluded from the proposed Class are any officer or director of Defendant; any officer or director of any affiliate, parent, or subsidiary of Genworth; anyone employed by counsel in this action; and any judge to whom this case is assigned, her or his spouse, and members of the judge's staff.

78.     **Numerosity.** Members of the proposed Class likely number in the tens of thousands and are thus too numerous to practically join in a single action. Membership in the Class is readily ascertainable from Defendant's own records.

79.     **Commonality and Predominance.** Common questions of law and fact exist as to all proposed Class Members and predominate over questions affecting only individual Class Members. These common questions include:

   a.   Whether Defendant engaged in the wrongful conduct alleged herein;

   b.   Whether Defendant's inadequate data security measures were a cause of the Data Breach;

   c.   Whether Defendant owed a legal duty to Plaintiff and the other Class Members to exercise due care in collecting, storing, and safeguarding their PII;

   d.   Whether Defendant negligently or recklessly breached legal duties owed to Plaintiff and the Class Members to exercise due care in collecting, storing, and safeguarding their PII;

   e.   Whether Plaintiff and the Class are at an increased risk for identity theft because of the Data Breach;

   f.   Whether Defendant failed to implement and maintain reasonable security procedures and practices for Plaintiff's and Class Members' PII in violation Section 5 of the FTC Act;

g.   Whether Plaintiff and the other Class Members are entitled to actual, statutory, or other forms of damages, and other monetary relief; and

h.   Whether Plaintiff and the other Class Members are entitled to equitable relief, including, but not limited to, injunctive relief and restitution.

80.   Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff individually and on behalf of the other Class Members. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quantity and quality, to the numerous questions that dominate this action.

81.   **Typicality:** Plaintiff's claims are typical of the claims of the Members of the Class. All Class Members were subject to the Data Breach and had their PII accessed by and/or disclosed to unauthorized third parties. Defendant's misconduct affected all Class Members in the same manner.

82.   **Adequacy of Representation:** Plaintiff is an adequate representative of the Class because their interests do not conflict with the interests of the other Class Members they seek to represent; they have retained counsel competent and experienced in complex class action litigation, and Plaintiff will prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and their counsel.

83.   **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this matter as a class action. The damages, harm, or other financial detriment suffered individually by Plaintiff and the other Class Members are relatively small compared to the burden and expense that would be required to litigate their claims on an individual basis against Defendant, making it impracticable for Class Members to individually seek redress for Defendant's wrongful conduct. Even if Class Members could afford individual

litigation, the court system could not. Individualized litigation would create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## COUNT I
### Negligence
**(On behalf of Plaintiff and the Nationwide Class or, alternatively, the Missouri Subclass)**

84.    Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.

85.    Defendant owed a duty to Plaintiff and the Class to exercise reasonable care in obtaining, securing, safeguarding, storing, and protecting Plaintiff's and Class Members' PII from being compromised, lost, stolen, and accessed by unauthorized persons. This duty includes, among other things, designing, maintaining, and testing its data security systems to ensure that Plaintiff's and Class Members' PII in Defendant's possession was adequately secured and protected.

86.    Defendant owed a duty of care to Plaintiff and Members of the Class to provide security, consistent with industry standards, to ensure that its protocols, systems, and networks adequately protected the PII of its current and former customers.

87.    Defendant owed a duty of care to Plaintiff and Class Members because they were foreseeable and probable victims of any inadequate data security practices. Defendant knew or should have known of the inherent risks in collecting and storing the PII of its current and former customers, especially in light of its recent history of data breaches; Defendant also should have known of the critical importance of adequately securing such information.

88.     Plaintiff and Class Members entrusted Defendant with their PII with the understanding that Defendant would safeguard it, that Defendant would not store it longer than necessary, and that Defendant was in a position to protect against the harm suffered by Plaintiff and Class Members as a result of the Data Breach.

89.     Defendant's own conduct also created a foreseeable risk of harm to Plaintiff and Class Members and their PII. Defendant's misconduct included failing to implement the necessary systems, policies, employee training and procedures necessary to prevent the Data Breach.

90.     Defendant knew, or should have known, of the risks inherent in collecting and storing PII and the importance of adequate security. Defendant knew about – or should have been aware of – numerous, well-publicized data breaches affecting businesses in the United States.

91.     Defendant breached its duties to Plaintiff and Class Members by failing to provide fair, reasonable, or adequate computer systems and data security to safeguard the PII of Plaintiff and Class Members.

92.     Plaintiff's injuries and damages, as described below, are a reasonably certain consequence of Genworth's breach of its duties.

93.     Because Defendant knew that a breach of its systems would damage millions of current and former Genworth customers whose PII was being carelessly maintained, Defendant had a duty to improve its data systems and adequately protect the PII contained therein.

94.     Defendant had a special relationship with current and former customers, including with Plaintiff and Class Members, by virtue of their being current or former customers. Plaintiff and Class Members reasonably believed that Defendant would take adequate security

precautions to protect their PII. Defendant also had independent duties under state and federal laws that required Defendant to reasonably safeguard Plaintiff's and Class Members' PII.

95.     Through Defendant's acts and omissions, including Defendant's failure to provide adequate security and its failure to protect Plaintiff's and Class Members' PII from being foreseeably accessed, Defendant unlawfully breached its duty to use reasonable care to adequately protect and secure the PII of Plaintiff and Class Members during the time it was within Defendant's possession or control.

96.     By engaging in the negligent acts and omissions alleged herein, which permitted an unknown third party to access Genworth's systems containing the PII at issue, Defendant failed to meet the data security standards set forth under Section 5 of the FTC Act, which prohibits "unfair…practices in or affecting commerce." This prohibition includes failing to have adequate data security measures, which Defendant has failed to do as discussed herein.

97.     Defendant's failure to meet this standard of data security established under Section 5 of the FTC Act is evidence of negligence.

98.     Neither Plaintiff nor the other Class Members contributed to the Data Breach as described in this Complaint.

99.     As a direct and proximate cause of Defendant's actions and inactions, including but not limited to its failure to properly encrypt its systems and otherwise implement and maintain reasonable security procedures and practices, Plaintiff and Class Members have suffered and/or will suffer concrete injury and damages, including but not limited to: (i) the loss of the opportunity to determine for themselves how their PII is used; (ii) the publication and/or theft of their PII; (iii) out-of- pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII, including the need

for substantial credit monitoring and identity protection services for an extended period of time; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest and recover from tax fraud and identity theft; (v) costs associated with placing freezes on credit reports and password protection; (vi) anxiety, emotional distress, loss of privacy, and other economic and non-economic losses; (vii) the continued risk to their PII, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII of customers and former customers in its continued possession; and (viii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised PII for the rest of their lives.

## COUNT II

**Breach of Implied Contract**
**(On behalf of Plaintiff and the Nationwide Class**
**or, alternatively, the Missouri Subclass)**

100. Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.

101. Defendant offered products and services to the current or former customers, including Plaintiff and Class Members, in exchange for monetary payment.

102. As a condition of the purchase, Defendant required Plaintiff and Class Members to provide their PII, including names, addresses, dates of birth, Social Security numbers, driver's license numbers, and other personal information. Implied in these exchanges was a promise by Defendant to ensure that the PII of Plaintiff and Class Members in its possession was only used to provide the agreed-upon products and services from Defendant.

103.    These exchanges constituted an agreement between the parties: Plaintiff and Class Members would provide their PII in exchange for the products and services provided by Defendant.

104.    These agreements were made by Plaintiff or Class Members who were customers of Defendant.

105.    It is clear by these exchanges that the parties intended to enter into an agreement. Plaintiff and Class Members would not have disclosed their PII to Defendant but for the prospect of Defendant's promise of providing the products and services purchased by Plaintiff and the Class. Conversely, Defendant presumably would not have taken Plaintiff's and Class Members' PII if it did not intend to provide Plaintiff and Class Members with the bargained-for products and services.

106.    Defendant was therefore required to reasonably safeguard and protect the PII of Plaintiff and Class Members from unauthorized disclosure and/or use.

107.    Plaintiff and Class Members accepted Defendant's offer of products and services and fully performed their obligations under the implied contract with Defendant by providing payment and their PII, directly or indirectly, to Defendant, among other obligations.

108.    Plaintiff and Class Members would not have provided and entrusted their PII to Defendant in the absence of their implied contracts with Defendant and would have instead retained the opportunity to control their PII for uses other than the purchase and use of Genworth's products and services.

109.    Defendant breached the implied contracts with Plaintiff and Class Members by failing to reasonably safeguard and protect Plaintiff's and Class Members' PII.

110.   Defendant's failure to implement adequate measures to protect the PII of Plaintiff and Class Members violated the purpose of the agreement between the parties.

111.   Defendant was on notice that its systems and data security protocols were inadequate yet failed to invest in the proper safeguarding of Plaintiff's and Class Members' PII.

112.   Instead of spending adequate financial resources to safeguard Plaintiff's and Class Members' PII, which Plaintiff and Class Members were required to provide to Defendant, Defendant instead used that money for other purposes, thereby breaching its implied contracts it had with Plaintiff and Class Members.

113.   As a proximate and direct result of Defendant's breaches of its implied contracts with Plaintiff and Class Members, Plaintiff and the Class Members suffered damages as described in detail above.

**COUNT III**
**Breach of Confidence**
**(On behalf of Plaintiff and the Nationwide Class or,**
**alternatively, the Missouri Subclass)**

114.   Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.

115.   At all times during Plaintiff's and Class Members' interactions with Defendant as its customers, Defendant was fully aware of the confidential and sensitive nature of Plaintiff's and Class Members' PII that Plaintiff and Class Members provided to Defendant.

116.   Plaintiff's and Class Members' PII constitutes confidential and novel information. Indeed, Plaintiff's and Class Members' Social Security numbers can be changed only with great difficulty and time spent, which still enables a threat actor to exploit that information during the interim; additionally, an individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend

against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

117.    As alleged herein and above, Defendant's relationship with Plaintiff and Class Members was governed by terms and expectations that Plaintiff's and Class Members' PII would be collected, stored, and protected in confidence, and would not be disclosed to unauthorized third parties.

118.    Plaintiff and Class Members provided their respective PII to Defendant with the explicit and implicit understandings that Defendant would protect and not permit the PII to be disseminated to any unauthorized parties.

119.    Defendant voluntarily received in confidence Plaintiff's and Class Members' PII with the understanding that the PII would not be disclosed or disseminated to the public or any unauthorized third parties.

120.    Due to Defendant's failure to prevent, detect, and avoid the Data Breach from occurring by, *inter alia*, not following best information security practices and by not providing proper employee training to secure Plaintiff's and Class Members' PII, Plaintiff's and Class Members' PII was disclosed and misappropriated to unauthorized third parties beyond Plaintiff's and Class Members' confidence, and without their express permission.

121.    As a direct and proximate cause of Defendant's actions and/or omissions, Plaintiff and Class Members have suffered damages.

122.    But for Defendant's disclosure of Plaintiff's and Class Members' PII, in violation of the parties' understanding of confidence, Plaintiff's and Class Members' PII would not have been compromised, stolen, viewed, accessed, and used by unauthorized third parties.

Defendant's Data Breach was the direct and legal cause of the theft of Plaintiff's and Class Members' PII, as well as the resulting damages.

123.    This disclosure of Plaintiff's and Class Members' PII constituted a violation of Plaintiff's and Class Members' understanding that Defendant would safeguard and protect the confidential and novel PII that Plaintiff and Class Members were required to disclose to Defendant.

124.    The concrete injury and harm Plaintiff and Class Members suffered was the reasonably foreseeable result of Defendant's unauthorized disclosure of Plaintiff's and Class Members' PII. Defendant knew its data security procedures for accepting and securing Plaintiff's and Class Members' PII had numerous security and other vulnerabilities that placed Plaintiff's and Class Members' PII in jeopardy.

125.    As a direct and proximate result of Defendant's breaches of confidence, Plaintiff and Class Members have suffered and/or are at a substantial risk of suffering concrete injury that includes but is not limited to: (a) actual identity theft; (b) the compromise, publication, and/or theft of their PII; (c) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their PII; (d) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (e) the continued risk to their PII, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in its continued possession; and (f) future costs in terms of time,

effort, and money that will be expended as result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

### COUNT IV
### Invasion of Privacy
**(On behalf of Plaintiff and the Nationwide Class or, alternatively, the Missouri Subclass)**

126.     Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.

127.     Plaintiff and Class Members had a legitimate and reasonable expectation of privacy with respect to their PII and were accordingly entitled to the protection of this personal information against disclosure to and acquisition by unauthorized third parties.

128.     Defendant owed a duty to its customers, including Plaintiff and Class Members, to keep their PII private and confidential.

129.     The unauthorized access, acquisition, appropriation, disclosure, encumbrance, exfiltration, release, theft, use, and/or viewing of PII, especially the PII that is the subject of this action, is highly offensive to a reasonable person.

130.     This intrusion of privacy was an intrusion into a place or thing belonging to Plaintiff and Class Members that was private and is entitled to remain private. Plaintiff and Class Members disclosed their PII to Defendant as part of their purchases of Defendant's products and services but did so privately with the intention and understanding that the PII would be kept confidential and protected from unauthorized access, acquisition, appropriation, disclosure, encumbrance, exfiltration, release, theft, use, and/or viewing. Plaintiff and Class Members were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization. The Data Breach, which was caused by Defendant's negligent actions and inactions, constitutes an intentional interference with Plaintiff's and Class Members'

interest in solitude or seclusion, either as to their persons or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

131.    Defendant acted with a knowing state of mind when it permitted the Data Breach because it knew its information security practices were inadequate.

132.    Defendant invaded Plaintiff's and Class Members' privacy by failing to adequately implement data security measures, despite its obligations to protect current and former customers' highly sensitive PII.

133.    Defendant's motives leading to the Data Breach were financially based. In order to save on operating costs, Defendant decided against the implement of adequate data security measures.

134.    Defendant's intrusion upon Plaintiff's and Class Members' privacy in order to save money constitutes an egregious breach of social norms.

135.    Acting with knowledge, Defendant had notice and knew that its inadequate cybersecurity practices would cause injury to Plaintiff and Class Members.

136.    As a proximate result of Defendant's acts and omissions, Plaintiff's and Class Members' PII was accessed by, acquired by, appropriated by, disclosed to, encumbered by, exfiltrated by, obtained by, released to, stolen by, used by, and/or viewed by third parties without authorization, causing Plaintiff and Class Members to suffer concrete damages as described herein.

137.    Unless and until enjoined and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and Class Members in that the PII maintained by Defendant can still be accessed by, acquired by,

appropriated by, disclosed to, encumbered by, exfiltrated by, released to, stolen by, used by, and/or viewed by unauthorized persons.

138.     Plaintiff and Class Members have no adequate remedy at law for the injuries they have suffered and are at imminent risk of suffering in that a judgment for monetary damages will not end the invasion of privacy for Plaintiff and Class Members.

### COUNT V
**Breach of Fiduciary Duty**
**(On behalf of Plaintiff and the Nationwide Class**
**or, alternatively, the Missouri Subclass)**

139.     Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.

140.     In light of their special relationship, Defendant became the guardian of Plaintiff's and Class Members' PII. Defendant became a fiduciary, created by its undertaking and guardianship of its customers' PII, to act primarily for the benefit of those customers, including Plaintiff and Class Members. This duty included the obligation to safeguard Plaintiff's and Class Members' PII and to timely detect and notify them in the event of a data breach.

141.     In order to provide Plaintiff and Class Members compensation and employment benefits, or to even consider Plaintiff and Class Members for employment, Defendant required that Plaintiff and Class Members provide their PII.

142.     Defendant knowingly undertook the responsibility and duties related to the possession of Plaintiff's and Class Members' PII for the benefit of Plaintiff and Class Members in order to provide Plaintiff and Class Members compensation and employment benefits.

143.     Defendant has a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of its relationship with them. Defendant breached its fiduciary duties owed to Plaintiff and Class Members by failing to properly encrypt and otherwise protect Plaintiff's and Class Members' PII. Defendant further breached its fiduciary

duties owed to Plaintiff and Class Members by failing to timely detect the Data Breach and notify and/or warn Plaintiff and Class Members of the Data Breach.

144.     As a direct and proximate result of Defendant's breaches of its fiduciary duties, Plaintiff and Class Members have suffered or will suffer concrete injury, including but not limited to (a) actual identity theft; (b) the loss of the opportunity of how their PII is used; (c) the unauthorized access, acquisition, appropriation, disclosure, encumbrance, exfiltration, release, theft, use, and/or viewing of their PII; (d) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their PII; (e) lost opportunity costs associated with efforts expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (f) the continued risk to their PII, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' PII in its continued possession; and (g) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a direct and traceable result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

145.     As a direct and proximate result of Defendant's breach of its fiduciary duty, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

**COUNT VI**
**Breach of Covenant of Good Faith and Fair Dealing**
**(On behalf of Plaintiff and the Nationwide Class**
**or, alternatively, the Missouri Subclass)**

146.     Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.

147. As described above, when Plaintiff and the Class Members provided their PII to Defendant, they entered into implied contracts in which Defendant agreed to comply with its statutory and common law duties and industry standards to protect Plaintiff's and Class Members' PII and to timely detect and notify them in the event of a data breach.

148. These exchanges constituted an agreement between the parties: Plaintiff and Class Members were required to provide their PII in exchange for products and services provided by Defendant, as well as an implied covenant by Defendant to protect Plaintiff's PII in its possession.

149. It was clear by these exchanges that the parties intended to enter into an agreement. Plaintiff and Class Members would not have disclosed their PII to Defendant but for the prospect of Defendant's promise of certain products and services. Conversely, Defendant presumably would not have taken Plaintiff's and Class Members' PII if it did not intend to provide Plaintiff and Class Members with the products and services it was offering.

150. Implied in these exchanges was a promise by Defendant to ensure that the PII of Plaintiff and Class Members in its possession was only used to provide the agreed- upon products and services.

151. Plaintiff and Class Members therefore did not receive the benefit of the bargain with Defendant, because they provided their PII in exchange for Genworth's implied agreement to keep it safe and secure.

152. While Defendant had discretion in the specifics of how it met the applicable laws and industry standards, this discretion was governed by an implied covenant of good faith and fair dealing.

153.     Defendant breached this implied covenant when it engaged in acts and/or omissions that are declared unfair trade practices by the FTC and state statutes and regulations. These acts and omissions included: omitting, suppressing, and concealing the material fact of the inadequacy of the privacy and security protections for Plaintiff's and Class Members' PII; storing the PII of former customers, despite any valid purpose for the storage thereof having ceased upon the termination of the business relationship with those individuals; and failing to disclose to Plaintiff and Class Members at the time they provided their PII to it that Defendant's data security systems failed to meet applicable legal and industry standards.

154.     Plaintiff and Class Members did all or substantially all the significant things that the contract required them to do.

155.     Likewise, all conditions required for Defendant's performance were met.

156.     Defendant's acts and omissions unfairly interfered with Plaintiff's and Class Members' rights to receive the full benefit of their contracts.

157.     Plaintiff and Class Members have been or will be harmed by Defendant's breach of this implied covenant in the many ways described above, including actual identity theft and/or imminent risk of certainly impending and devastating identity theft that exists now that cyber criminals have their PII, and the attendant long-term expense of attempting to mitigate and insure against these risks.

158.     Defendant is liable for its breach of these implied covenants, whether or not it is found to have breached any specific express contractual term.

159.     Plaintiff and Class Members are entitled to damages, including compensatory damages and restitution, declaratory and injunctive relief, and attorney fees, costs, and expenses.

## COUNT VII
### Declaratory and Injunctive Relief
### (On behalf of Plaintiff and Nationwide Class
### or, alternatively, the Missouri Subclass)

160.    Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.

161.    This Count is brought under the federal Declaratory Judgment Act, 28 U.S.C. §2201.

162.    As previously alleged, Plaintiff and Class Members entered into an implied contract that required Defendant to provide adequate security for the PII it collected from Plaintiff and Class Members.

163.    Defendant owes a duty of care to Plaintiff and Class Members requiring it to adequately secure their PII.

164.    Defendant still possesses Plaintiff's and Class Members' PII.

165.    Since the Data Breach, Defendant has announced few, if any, changes to its data security infrastructure, processes, or procedures to fix the vulnerabilities in its computer systems and/or security practices which permitted the Data Breach to occur and, thereby, prevent future attacks.

166.    Defendant has not satisfied its contractual obligations and legal duties to Plaintiff and Class Members. In fact, now that Defendant's insufficient data security is known to hackers, the PII in Defendant's possession is even more vulnerable to cyberattack.

167.    Actual harm has arisen in the wake of the Data Breach regarding Defendant's contractual obligations and duties of care to provide security measures to Plaintiff and Class Members. Further, Plaintiff and Class Members are at risk of additional or further harm due to the exposure of their PII and Defendant's failure to address the security failings that led to such exposure.

168.    There is no reason to believe that Defendant's security measures are any more adequate now than they were before the Data Breach to meet Defendant's contractual obligations and legal duties.

169.    Plaintiff, therefore, seeks a declaration (1) that Defendant's existing security measures do not comply with its contractual obligations and duties of care to provide adequate security, and (2) that to comply with its contractual obligations and duties of care, Defendant must implement and maintain reasonable security measures, including, but not limited to:

a.   Ordering that Defendant engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

b.   Ordering that Defendant engage third-party security auditors and internal personnel to run automated security monitoring;

c.   Ordering that Defendant audit, test, and train its security personnel regarding any new or modified procedures;

d.   Ordering that Defendant segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's systems is compromised, hackers cannot gain access to other portions of Defendant's systems;

e.   Ordering that Defendant purge, delete, and destroy in a reasonably secure manner customer data not necessary for its provisions of services;

f.   Ordering that Defendant conduct regular computer system scanning and security checks;

g.   Ordering that Defendant routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

h.   Ordering Defendant to meaningfully educate its current, former, and prospective customers about the threats they face as a result of the loss of their PII to third parties, as well as the steps they must take to protect themselves.

## **COUNT VIII**
**VIOLATIONS OF MISSOURI MERCHANDISING PRACTICES ACT ("MMPA")**
**MO. REV. STAT. § 407.010 ET SEQ.**
**(On Behalf of the Missouri Subclass)**

170.     Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

171.     RSMo. § 407.020 prohibits the use of any "deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…"

172.     An "unfair practice" is defined by Missouri law as any practice which:

   (A) Either-

      1.   Offends any public policy as it has been established by the Constitution, statutes or common law of this state, or by the Federal Trade Commission, or its interpretive decision; or

      2.   Is unethical, oppressive or unscrupulous; and

   (B) Presents a risk of, or causes, substantial injury to consumers. *See* 15 CSR 60-8.020.

173.     An "unfair practice" is also defined as "an unfair practice for any person in connection with the advertisement or sale of merchandise to violate the duty of good faith in solicitation, negotiation and performance, or in any manner *fail to act in good faith*" (emphasis added); *see* 15 CSR 60-8.040.

174.     Plaintiff and Defendant are "persons" within the meaning of Section 407.010(5).

175.     "Merchandise" is defined by the MMPA to include providing "goods" and "services."

176.     Efforts to maintain the privacy and confidentiality of customer PII are part of the services associated with a "good."

177.     Plaintiff's and the Class Members' goods and services purchased from Defendant were for "personal, family or household purposes" within the meaning of the Missouri Merchandising Practices Missouri Revised Statutes.

178.     As set forth herein, Defendant's acts, practices and conduct violate Section 407.010(i) in that, among other things, Defendant has used and/or continues to use unfair practices, concealment, suppression and/or omission of material facts in connection with the advertising, marketing, and offering for sale of its offered goods and services. Such acts offend the public policy established by Missouri statute and constitute an "unfair practice" as that term is used in Section 407.020(1).

179.     Defendant's unfair, unlawful and deceptive acts, practices and conduct include the following: (i) representing to its customers that it would not disclose their sensitive PII to an unauthorized third party or parties; (ii) failing to implement proper security measures such as securing the records in a safe place; and (3) failing to adequately train its personnel.

180.     Defendant's conduct also violates the enabling regulations for the MMPA because it (i) offends public policy; (ii) is unethical, oppressive and unscrupulous; (iii) causes substantial injury to consumers; (iv) is not in good faith; (v) is unconscionable; and (vi) is unlawful. See Mo. Code Regs. Ann. tit. 15, Section 60-8.

181.     As a direct and proximate cause of Defendant's unfair and deceptive acts, Plaintiff and Class Members have suffered damages in that they (i) paid more for Genworth products and services than they otherwise would have, and (ii) paid for privacy protections that

42

they did not receive. In this respect, Plaintiff and Class Members have not received the benefit of the bargain and have suffered an ascertainable loss.

182.     As a direct result of Defendant's breach of its duty of confidentiality and privacy and the disclosure of Plaintiff's and Class Members' PII, Plaintiff and Class Members suffered damages, including, without limitation, loss of the benefit of the bargain, exposure to heightened future risk of identity theft, loss of privacy, confidentiality, embarrassment, emotional distress, humiliation and loss of enjoyment of life, out-of-pocket expenses incurred to mitigate the increased risk of identity theft and/or identity fraud pressed upon them by the Data Breach, the value of their time spent mitigating identity theft and/or identity fraud and/or the increased risk of identity theft and/or identity fraud.

183.     Plaintiff, on behalf of herself and the Class, as well as on behalf of the general public, seeks actual damages for all monies paid to Defendant in violation of the MMPA. In addition, Plaintiff seeks attorneys' fees.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually, and on behalf of herself and all others similarly situated, and on behalf of the general public, respectfully requests that the Court enter an order:

    a.  Certifying the proposed Class as requested herein;

    b.  Appointing Plaintiff as Class Representative and the undersigned counsel as Class Counsel;

    c.  Finding that Defendant engaged in the unlawful conduct as alleged herein;

    d.  Granting injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

        i.  prohibiting Genworth from engaging in the wrongful and unlawful acts described herein;

ii. requiring Genworth to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

iii. requiring Genworth to delete, destroy, and purge the PII of Plaintiff and Class Members unless Genworth can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

iv. requiring Genworth to implement and maintain a comprehensive information security program designed to protect the confidentiality and integrity of the PII of Plaintiff and Class Members' PII;

v. prohibiting Genworth from maintaining Plaintiff's and Class Members' PII on a cloud-based database;

vi. requiring Genworth to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Genworth's systems on a periodic basis, and ordering Genworth to promptly correct any problems or issues detected by such third-party security auditors;

vii. assess whether monitoring tools are appropriately configured, tested, and updated;

viii. requiring Genworth to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential PII to third parties, as well as the steps affected individuals must take to protect themselves;

ix. requiring Genworth to implement logging and monitoring programs sufficient to track traffic to and from Genworth's servers;

x. for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Genworth's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

xi. requiring Defendant to design, maintain, and test its computer systems to ensure that PII in its possession is adequately secured and protected;

xii. requiring Genworth to engage independent third-party security auditors and internal personnel to run automated security monitoring;

    xiii.  requiring Genworth to audit, test, and train its security personnel regarding any new or modified procedures;

    xiv.  requiring Genworth to segment data by, among other things, creating firewalls and access controls so that if one area of Genworth's network is compromised, hackers cannot gain access to other portions of Genworth's systems;

    xv.  requiring Genworth to conduct regular database scanning and securing checks;

    xvi.  requiring Genworth to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling PII, as well as protecting the PII of Plaintiff and Class Members;

    xvii.  requiring Genworth to conduct internal training and education routinely and continually and, on an annual basis, inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

    xviii.  requiring Genworth to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Genworth's policies, programs, and systems for protecting PII;

    xix.  requiring Genworth to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Genworth's information networks for threats, both internal and external, and

    xx.  requiring Defendant to implement multi-factor authentication requirements, if not already implemented;

    xxi.  requiring Defendant's employees to change their passwords on a timely and regular basis, consistent with best practices; and

    xxii.  requiring Defendant to provide lifetime credit monitoring and identity theft repair services to Class Members.

e.  Awarding Plaintiff and Class Members damages;

f.  Awarding Plaintiff and Class Members pre-judgment and post-judgment interest on all amounts awarded;

g.  Awarding Plaintiff and the Class Members reasonable attorneys' fees, costs, and expenses; and

h.  Granting such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of herself and the proposed Class, as well as on behalf of the general public, hereby demands a trial by jury as to all matters so triable.

Date: August 30th, 2023

Respectfully submitted,

By: ___/s/ Erin E. Jewell_____
       *Of Counsel*

William W.C. Harty, Esq. (VSB # 45447)
Erin E. Jewell, Esq. (VSB # 71082)
**HARTY JEWELL, PLLC**
6515 George Washington Mem. Hwy
Suite 205
Yorktown, VA 23692
757-568-9633 Telephone
757-703-0357 Fax
Will@hartyjewell.com
Erin@hartyjewell.com

Maureen M. Brady MO #57800
(*pro hac vice motion forthcoming*)
MCSHANE & BRADY, LLC
1656 Washington Street, Suite 120
Kansas City, MO 64108
Telephone: (816) 888-8010
Facsimile: (816) 332-6285
E-mail: mbrady@mcshanebradylaw.com

Sharon J. Zinns, GA Bar No. 552920
(*pro hac vice motion forthcoming*)
ZINNS LAW, LLC
4243 Dunwoody Club Drive
Suite 104
Atlanta, Georgia 30350
(404) 882-9002
sharon@zinnslaw.com

**ATTORNEYS FOR THE PLAINTIFF
AND THE CLASS**