**BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| **IN RE MOVEIT CUSTOMER DATA SECURITY BREACH LITIGATION** | MDL DOCKET NO.: 3083 |

**INTERESTED PARTY FORTUNO JEANFORT RESPONSE IN OPPOSITION TO THE
MOTION FOR TRANSFER AND CENTRALIZATION OF RELATED ACTIONS**

Interested Party, Plaintiff Fortuno Jeanfort ("Plaintiff"), by and through his undersigned counsel, respectfully submits this Response in Opposition to Plaintiff Bruce Bailey's ("Movant") Motion for Transfer and Centralization of Related Actions to the District of Minnesota pursuant to 28 U.S.C. § 1407 for Consolidated Pretrial Proceedings ("MDL Motion") [ECF No. 1]. In support thereof, Plaintiff would show the following:

**I.      INTRODUCTION**

The Panel should deny the MDL Motion as it relates to Plaintiff's action. Plaintiff Jeanfort filed suit against TD Ameritrade, Inc. ("TD Ameritrade") after receiving a notice that his personally identifiable information ("PII") was accessed and obtained by cybercriminals as a result of a data breach involving TD Ameritrade. TD Ameritrade used MOVEit software (the "*Jeanfort* Action").[1] The *Jeanfort* Action does not name Progress Software Corporation ("PSC"), Ipswitch, Inc. ("Ipswitch"), or any other defendant identified in the MDL Motion[2] (collectively "MDL Defendants"). The *Jeanfort* Action brings claims against TD Ameritrade, its affiliates, and subsidiaries, only. Progress Software, owner of MOVEit, is not a party to the Jeanfort Action. Plaintiff Jeanfort does not seek relief from Progress Software. As the Court knows, the Plaintiff is master of its Complaint.[3]

---

[1] [Doc. 205-2].
[2] [Doc. 1, p. 1].
[3] *See Moore v. Kansas City Public Schools*, 838 F.3d 687, 691 (8th Cir. 2016).

Yet, on September 2, 2023, the United States Judicial Panel on Multidistrict Litigation filed a Notice of Related Actions from JPML indicating that it had been notified of the *Jeanfort* Action for potential inclusion in the proposed MDL.[4] While it is unclear what prompted this notice, it is assumed that the *Jeanfort* Action was noticed because it mentions the MOVEit software. Again, Progress Software is not a party to the Jeanfort Action. Insofar as the *Jeanfort* Complaint may have mentioned the MOVEit software is not sufficient to warrant transfer and consolidation to this MDL. Plaintiff Jeanfort does not assert any claims against or seek any relief from any of the MDL Defendants

In *In re: Accellion, Inc., Customer Data Security Breach Litigation* ("*Accellion*")—a similar proposed MDL involving multiple breaches through Accellion's File Transfer Appliance ("FTA") similar to MOVEit's file transfer application at issue here—the Panel denied centralization, finding factual differences specific to each defendant outweighed any overlap among the actions as to Accellion's FTA product.[5] The same reasoning should guide the Panel here. This proposed MDL would potentially involve thousands of defendants with no relationship beyond use of Progress Software's MOVEit software. Many of the potential actions do not name Progress Software as a defendant and focus only the named defendants' conduct with its suppliers and use of the MOVEit software. As such, the Panel should conclude centralization is unnecessary and that any efficiencies to be gained by centralization can be accomplished through informal coordination, where necessary.

---

[4] [Doc. 205].
[5] *In re Accellion, Inc., Customer Data Sec. Breach Litig.*, No. 3002 (J.P.M.L 2021) ("Accellion MDL").

As other interested parties have already explained through industry leading experts on information technology and cybersecurity, "[e]ach [company] was responsible for securing their installation of the MOVEit Transfer. software," "[e]ach MOVEit user has a network infrastructure specific to their organization," and "[d]esigning and security the network infrastructure is the responsibility of each defendant" such that "[f]or each [company], the specific security practices, will determine how 'Clop' [the hacker] was able to access the server to be able to exploit the MOVEit Transfer web application."[6] Simply put, "[i]t is up to [each] MOVEit user[] to employ software and practices to control and monitor access to their data and systems," such that each company whose systems was accessed using the MOVEit vulnerability suffered a separate, independent data breach.[7]

## II.    FACTUAL BACKGROUND

MOVEit is a widely-used file transfer service created, owned, and/or operated by PSC and/or Ipswitch. TD Ameritrade, Inc. is one of thousands of customers of PSC/Ipswitch. Like any other software program, MOVEit users are each separately responsible for deciding what kinds of files to transfer using MOVEit, and for configuring the product to operate in a secure manner in their environments. PSC acknowledges as much and publishes detailed recommendations for users regarding the configuration of its product, recommending that each user review the user's "updates, settings, accounts, and policies" on a monthly or quarterly basis, and that administrators perform regular security audits. PSC also recommends that users review their configuration for "unexpected activity":

> Updates, settings, accounts, and policies should be reviewed on a regular cadence
> to ensure the configuration is meeting current compliance frameworks and to
> review for unexpected activity or behavior that needs to be addressed. It is

---

[6] [Doc. 240-1, pp. 4–6].
[7] *Id.* at p. 3.

3

recommended that MOVEit administrators perform a regular security audit with their corporate security and compliance teams. Many teams perform this monthly or quarterly. This document is intended to provide MOVEit administrators with a starting point to create their own security checklist that can be used for regular reviews. The list is not exhaustive and not all recommendations will apply to all MOVEit installations.[8]

Jeffrey A. Hansen founded Hansen Legal Technologies, Inc., which performs computer forensic analysis and investigations and analyses of electronic data.[9] Mr. Hansen has thirty years of extensive experience in the electronic and information technology field and obtained many certifications such as MCP 4.0, A+, Network+, MCP 2000, MCSA, MCSE, Linux+, I-Net+, Security+, CIW Security Analyst. *Id.* Mr. Hansen explained that:

> Progress Software Corporation, the creators of the MOVEit Transfer application, gives a detailed installation and configuration manual so that MOVEit users are in control of the security features offered in the software. (See exhibits installation manual, security,etc) Additionally, Progress Software provides an administrator guide and a security best practices guide to aid in configuring and securing the MOVEit Transfer application. (See exhibit) The MOVEit Transfer web application is dependent on other software such as Windows Server, Microsoft SQL Server (MSSQL) or MySQL, and IIS. (See Exhibit C - MOVEit system requirements) Additionally, other software and hardware solutions are involved such as routers, firewalls, and mail servers which could have provided access to the MOVEit server to those who should not have it like "Clop" who is based in Russia. Those other software solutions and systems are not produced or maintained by Progress Software Corporation and are not the responsibility of Progress Software Corporation to secure. Only one weak link in the chain of security is needed for the adversary to gain access and that link will be different for every defendant.[10]

Therefore, Mr. Hansen explained that each MOVEit user experienced separate data breaches of their own, independent, individual systems, not one shared breach of a single MOVEit instance:

> For each [MOVEit user], the specific security practices, will determine how "Clop" was able to access the server to be able to exploit the MOVEit Transfer web application …. The media, on the other hand, leaves the general public to assume Progress Software hosted and maintained the data for each of the defendants. That assumption is false; the data is hosted, maintained, and secured by each defendant.

---

[8] https://community.progress.com/s/article/MOVEit-Security-Best-Practices-Guide.
[9] [Doc. 240-1, pp. 1–2].
[10] *Id.* at p. 5.

Each defendant was responsible for securing their installation of the MOVEit Transfer software. Each MOVEit user has a network infrastructure specific to their organization. Designing and security the network infrastructure is the responsibility of each defendant. For a complete security configuration of just the MOVEit Transfer software is provided by Progress Software ,,,, I understand that media reports seem to point to the MOVit application as being responsible for all the data breaches, but that would be unreasonable for any Information Security professional to rely on.[11]

PSC's website claims MOVEit is used by hundreds of thousands of companies worldwide.[12] On or about May 28, 2023, PSC notified its MOVEit customers that its MOVEit software contained a vulnerability through which hackers could access information stored on its customers' systems:[13]

> Hackers have stolen data **from the systems of a number of users** of the popular file transfer tool MOVEit Transfer, U.S. security researchers said on Thursday, one day after the maker of the software disclosed that a security flaw had been discovered. Software maker [PSC], after disclosing the vulnerability . . . said it could lead to **potential unauthorized access into *users'* systems.**

Before PSC's announcement, hackers had already exploited the vulnerability to access the separate, individual systems of thousands of MOVEit customers. To date, reports have shown that the breach affected 1,062 organizations and approximately 65,435,631 individuals.[14] Other estimates run into the thousands of ***separate organizations***, encompassing diverse entities ranging from the State of California's Pension system to New York City public schools to the Louisiana DMV.[15] Some of the affected parties are huge financial institutions, like New York-based Teachers

---

[11] *Id.* at pp. 4, 6.

[12] https://investors.progress.com/news-releases/news-release-details/progress-releases-moveit2022-advanced-capabilities-secure-and (last visited August 9, 2023).

[13] https://www.reuters.com/technology/hackers-use-flaw-popular-file-transfer-tool-steal-data-researchers-say-2023-06-02/ (last visited August 9, 2023).

[14] Top 10 Facts About MOVEit Breach, SOCRadar (Sept. 13, 2023) https://socradar.io/top-10-facts-about-moveit-breach/.

[15] Analysis: MOVEit Hack Spawned Over 600 Breaches But is Not Done Yet – Cyber Analysts, Reuters (Aug. 8, 2023) https://www.reuters.com/technology/moveit-hack-spawned-around-600-breaches-isnt-done-yet-cyber-analysts-2023-08-08/.

Insurance and Annuity Association of America, which manages pension programs for 15,000 institutional clients.[16]

Reuters has described the MOVEit breach as "hydra-headed" and has warned that it is not yet over, as new information about victims is still coming to light. Corporations who use MOVEit are making daily announcements regarding data exposure and exfiltration. Some of these announcements mention MOVEit, while others just identify the existence of a breach and describe the nature of the data exposed. Indeed, in just the past couple of weeks, numerous new entities have announced they were the victims of breaches exploiting vulnerabilities in their configurations of MOVEit.[17] For example, Eversource announced at the end of August that approximately 1,400 of its customers' information stored on its MOVEit software was breached.[18]

Importantly, not all MOVEit customers may have been impacted. Indeed, some MOVEit customers had appropriate monitoring and other security measures in place and, as a result, were able to detect and thwart efforts to exploit the MOVEit vulnerability on their systems. For instance, on May 27, 2023, Akamai, a managed detection and response service that corporations can hire to monitor their data systems, detected the attack and prevented it. "Akamai researchers detected exploitation attempts against one of Akamai's financial customers — an attack that was blocked by the Akamai Adaptive Security Engine."[19] Likewise, Mr. Hansen explained the security

---

[16] *Id.*

[17] McGee, Marianne Kolbasuk, MOVEit Health Data Breach Tally Keeps Growing, Bank Info Security (Aug. 23, 2023) https://www.bankinfosecurity.com/moveit-health-data-breaches-a-22916.

[18] Soule, Alexander, Eversource Reports Data Breach as Companies Across Connecticut Struggle with Cyber Attacks, CT Insider (Aug. 31, 2023) https://www.ctinsider.com/business/article/eversource-cleresult-ct-ma-moveit-hack-breach-18340125.php.

[19] MOVEit SQLi Zeor-Day (CVE-2023-34362) Exploited by CL0P Ransomware Group, Akamai (June 8, 2023) https://www.akamai.com/blog/security-research/moveit-sqli-zero-day-exploit-clop-ransomware.

measures unique to each MOVEit user, that the users could have taken to prevent hackers from exploiting the MOVEit vulnerability to access their independent systems:

> For this particular vulnerability with the MOVEit Transfer application, exercising some basic security practices would have mitigated the vulnerability, to gain access, which would have prevented the data breaches. "Clop" used the ATT&CK Techniques for Enterprise. "Clop" simply exploited a weakness in the web application MOVEit Transfer to write a file to the web server which was a Remote Access Tool. Security measures to prevent unauthenticated users from Russian IP addresses accessing the server would have stopped the attack in its tracks. A deny all default approach to security would have prevented the attack. Any one of the following security measures, if employed by a MOVEit user, could have stopped the attack, and together they would have strengthened each user's security:
>
> • Denying write access to all but local account used for writing to the web directory. There is no reason to grant unauthenticated user and all user access to a file or directory that does not need write access. Additionally, there are solutions with MOVEit and third-party solutions to provide and email or SMS notification in the event files are accessed, created, or modified.
>
> • A firewall dropping all packets originating from IP addresses outside of the organization. By dropping all packets from foreign IP addresses would have prevented "Clop" the ability to connect to perform the SQL injection.
>
> • Placing the server in a DMZ. This would have prevented "Clop" from delivering the TrueBot malware stopping the attack. Publicly facing web servers can provide an attacker access inside the organization where they can traverse systems on the inside of any perimeter firewalls. A DMZ would help mitigate that vulnerability. Depending on the MOVEit users' needs it might be worth entertaining having the MOVEit server on the intranet only (verses internet).[20]

Simply put, Movant's claim that there was a single "exfiltration of data from the MOVEit file transfer software"[21] is not supported by the emerging facts. Instead, there were hundreds, possibly over a thousand, separate exfiltrations, all of which capitalized, at least in part, on an underlying software vulnerability, but all of which also involved entirely different facts and circumstances depending on the customer who was breached, the data security measures that customer did (or did not) have in place, and the nature of the data at issue. In stark contrast to the

---

[20] [Doc. 240-1, pp. 6–7].

[21] [Doc. 155, p. 4].

picture Movant paints, multiple cybersecurity and data breach experts have uniformly explained that cybercriminals exploited a vulnerability in MOVEit that allowed them "unauthorized access into [MOVEit] users' systems."[22] There are many separate breaches, each of which is an independent exfiltration of "stolen data from the systems of … users of the popular file transfer tool MOVEit."[23]

Lawsuits against MOVEit users/customers will therefore center upon those users' separate and independent decisions including:

- how to protect and configure the environments in which MOVEit was operating;

- what kind of data was transferred via MOVEit;

- whether and how to encrypt that data;

- whether to monitor or respond to early indicators that hackers were taking steps to access and exfiltrate that data;

- data retention dates; and

- whether the data stored on the MOVEit software was properly stored on an internet-based platform.

Given that this is not a single breach, but instead multiple breaches–involving different companies, types of data, and security decisions–the foundation of Movant's MDL Motion collapses.

## III.    PROCEDURAL HISTORY

On July 5, 2023, Movant filed a class action complaint in the District of Minnesota alleging claims arising from the Data Breach, in which he named only PSC, PBI, and Ipswitch (collectively,

---

[22] https://www.reuters.com/technology/hackers-use-flaw-popular-file-transfer-tool-steal-data-researchers-say-2023-06-02/
[23] *Id.*

the "MDL Defendants").[24] The next day, Movant filed a Motion for Centralization and Transfer of Related Actions to the District of Minnesota pursuant to 28 U.S.C. § 1407 for Consolidated Pretrial Proceedings ("MDL Motion") in MDL No. 3083.[25] By its terms, the MDL Motion sought only to consolidate and transfer other actions naming the MDL Defendants.[26]

Subsequently, MOVEit users who have been named in separate suits are divided on their support for consolidation. Some MOVEit customers, such as Berwyn Group, Inc.,[27] Union Bank and Trust Company,[28] and Genworth Financial, Inc.,[29] many of whom are named in actions that do not include any of the MDL Defendants, have filed in support of consolidation. Still other MOVEit customers, including the Illinois Department of Innovation and Technology[30] and Johns Hopkins Health System,[31] have filed in opposition.

Despite initially limiting the scope of the proposed MDL to only cases naming the MDL Defendants, and contrary to the bedrock principle that new arguments cannot be raised for the first time on reply,[32] in his MDL Reply,[33] Movant vastly expands the scope of requested centralization to include all actions stemming from breaches that involved the MOVEit software vulnerability–even those that do not name any of the MDL Defendants, such as the *Jeanfort* Action.[34]

---

[24] *Bailey v. Progress Software Corp.*, et al., No. 0:23-cv-2028 (D. Minn.).

[25] [Doc. 1].

[26] *Id.*

[27] [Doc. 86].

[28] [Doc. 132].

[29] [Doc. 135].

[30] [Doc. 126].

[31] [Doc. 140].

[32] *Adrieanna Hooks v. Target Corp., et al.*, No. 5:22-CV-00052-SSS-SPX, 2023 WL 4680337, at *1 (C.D. Cal. May 11, 2023) ("Raising new facts or arguments on reply is improper") (collecting cases).

[33] [Doc. 155].

[34] *See also, e.g.*, *King v. Genworth Financial, Inc.*, No. 3:23-cv-00426 (E.D. Va.) (naming only Genworth as defendant); *Scott v. Union Bank and Trust Company*, No. 4:23-cv-03126 (D. Neb.)

On August 28, 2023, Plaintiff Jeanfort filed a class action complaint against TD Ameritrade in the District Court of Nebraska alleging claims arising from the negligent and wrongful conduct of TD Ameritrade, its affiliates, and subsidiaries, in their use of the MOVEit software.[35] The *Jeanfort* Action does not name any of the MDL Defendants or assert claims which would require intervention of any of the MDL Defendants. Neither Plaintiff Jeanfort nor TD Ameritrade have requested to be transferred to and consolidated with this MDL, nor have any of the MDL Defendants filed a motion to intervene in the *Jeanfort* Action. Rather, it appears that the *Jeanfort* Action's sole relation to this MDL is its mention of the MOVEit software.[36]

Plaintiff Jeanfort alleges that TD Ameritrade's systems were accessed by hackers exploiting the flaw in the MOVEit software, and exfiltrated data from Milliman's systems (or the systems of its vendors/business affiliates). Plaintiff Jeanfort alleges TD Ameritrade breached their non-delegable duties to class members by failing to implement and maintain reasonable security procedures and practices to protect the PII entrusted to them from unauthorized access and disclosure, including by failing to ensure their vendors and business associates had secure services, processes and procedures in place to safeguard PII that TD Ameritrade shared with those third parties. Plaintiff Jeanfort specifically alleges, among other things, that TD Ameritrade failed to properly configure the MOVEit system, failed to properly use and monitor the MOVEit system, was negligent in storing or failing to destroy data beyond its use date, and was negligent in responding to the data breach.

## IV.    LEGAL STANDARD

---

(naming only Union Bank as defendant); *Berry v. PBI Research Services, LLC*, No. 3:23- cv-03297 (N.D. Cal.) (naming only PBI and the Berwyn Group as defendants).
[35] [Doc. 205-2].
[36] [Doc. 205].

Federal civil actions are eligible for transfer pursuant to 28 U.S.C. § 1407 if they involve "common questions of fact" subject to discovery.[37] Where the evidentiary needs of some actions fundamentally differ from others, transfer and centralization will not promote efficiency.[38] A party moving to centralize cases into a muti-district litigation bears "a **heavy** burden to show that [the] common questions of fact are sufficiently complex, and that the accompanying discovery will be so time-consuming as to justify transfer under Section 1407."[39]

## V.   ARGUMENT

### A.  The *Jeanfort* action does not share common facts to make it eligible for transfer.

Consolidation and transfer are appropriate only where common questions of fact prevail. 28 U.S.C. § 1407. There is nearly a total lack of common questions of fact between the *Jeanfort* Action and those naming the MDL Defendants sought to be consolidated by the MDL Motion. The same is true of the numerous other actions filed against MOVEit users that do not name the MDL Defendants.[40] Indeed, as other interested parties have pointed out, each MOVEit user's separate, independent system was accessed in separate data breaches, rather than one collective breach of MOVEit.[41] And each MOVEit user could have taken steps to prevent MOVEit from

---

[37] *See* 28 U.S.C. § 1407(a); *In re Kugel Mesh Hernia Patch Prods. Liab. Litig.*, 493 F. Supp. 2d 1371, 1372-73 (J.P.M.L. 2007).

[38] *See In re Comcast Corp. Emp. Wage & Hour Emp. Pracs. Litig.*, 190 F. Supp. 3d 1344, 1345 (J.P.M.L. 2016) ("despite the factual commonality among the actions, we are not convinced that centralization is necessary to ensure the efficient conduct of these cases").

[39] *In re 21st Century Prods., Inc. "Thrilsphere" Contract Litig.*, 448 F. Supp. 271, 273 (J.P.M.L. 1978) (emphasis added).

[40] *See, e.g., King v. Genworth Financial, Inc.*, No. 3:23-cv-00426 (E.D. Va.) (naming only Genworth as defendant); *Scott v. Union Bank and Trust Company*, No. 4:23-cv-03126 (D. Neb.) (naming only Union Bank as defendant); *Berry v. PBI Research Services, LLC*, No. 3:23-cv-03297 (N.D. Cal.) (naming only PBI and the Berwyn Group as defendants).

[41] Doc. 240-1, pp. 3–6.

being used to access their systems and extract sensitive data therefrom such that each company's liability will turn on their own, unique, individualized security practices (or failures).[42]

Plaintiff Jeanfort's claims and discovery in the *Jeanfort* Action focus on TD Ameritrads's duty to its customers to protect sensitive private personal and health data, TD Ameritrade's data privacy processes and procedures, it's failure to detect the Data Breach, it's failure to prevent or minimize the scope of the Data Breach, it's response to the Data Breach after discovering it, the steps it took to mitigate the damage, the value of the information exfiltrated during the Breach, and the facts surrounding TD Ameritrade's eventual transmission of notice of the Data Breach to impacted individuals. Each of these issues are unique to TD Ameritrade, alone, and do not directly involve the MDL Defendants. Likewise, Plaintiff Jeanfort makes no allegations the MDL Defendants failed to protect his data. The only shared fact between the *Jeanfort* Action and the other actions naming the MDL Defendants is the hackers' exploitation of the MOVEit software vulnerability which, standing alone, falls far short of satisfying the "heavy burden" of warranting centralization. The same will be true of other cases in which only MOVEit customers, and not the MDL Defendants, are named.

The situation here is almost identical to the *Accellion* data breach MDL, in which the Panel denied transfer and consolidation.[43] Like here, the *Accellion* MDL involved a situation where one company (Accellion) experienced a data breach of its file transfer service (like MOVEit) that impacted many other companies that used Accellion's file transfer service. Multiple class action lawsuits were filed against Accellion, and others were filed against companies that used

---

[42] *Id.* at pp. 6–7.
[43] *In re Accellion, Inc., Customer Data Sec. Breach Litig.*, No. 3002 (J.P.M.L 2021).

Accellion's service but did not name Accellion as a defendant.[44] In denying consolidation, the Panel reasoned as follows:

> Any factual overlap among the actions as to Accellion's [file transfer] product, its vulnerability to attack, and its alleged support of this "legacy" product may be eclipsed by factual issues specific to each [Accellion]-client defendant. Opponents of centralization argue that, rather than a single data breach, there were numerous data breaches of each client defendant, occurring at different times and involving each client defendant's own servers. Moreover, each client defendant's knowledge of the [file transfer service]'s alleged vulnerability to attack will be unique …. Other unique factual issues include when each [Accellion]-client was made aware of a data breach and when it notified its customers and/or employees. Proponents of centralization argue that even in the actions in which Accellion is not named, it will be involved in some third-party discovery. But we are persuaded that such discovery can be informally coordinated.[45]

These same facts that the Panel found dispositive in Accellion are present here: (1) there were numerous data breaches at different times of each MOVEit user, such as TD Ameritrade, which is evidenced by the fact that some companies were able to detect and prevent the exfiltration while others were not; (2) TD Ameritrade's vulnerability to the Data Breach is entirely unique from that of other impacted companies and the MDL Defendants; (3) when TD Ameritrade was made aware of the Data Breach is unique to TD Ameritrade; (4) what TD Ameritrade did to investigate, mitigate, and respond to the Data Breach is completely unique to TD Ameritrade; and (5) when, why, and how TD Ameritrade chose to notify impacted individuals is unique from other impacted companies and the MDL Defendants. Therefore, the same result as Accellion should follow here and consolidation should be denied.

**B. Transfer and Consolidation of the *Jeanfort* action creates no procedural efficiencies.**

---

[44] Specifically, as summarized by the Panel: "Of the 26 actions and potential tag-along actions now pending, nine name only Accellion as the defendant, ten name only one Accellion client, and seven are multi-defendant actions naming Accellion and one of its clients." *Id.* at 1373.
[45] *Id.* at 1374.

The mere fact that the TD Ameritrade used MOVEit does not create any efficiency to be gained by transferring under § 1407. Even if Plaintiff Jeanfort needs some discovery from PSC, as in Accellion, such discovery could be centrally coordinated.[46] The far more time-consuming, and important discovery will be that which Plaintiff Jeanfort seeks from TD Ameritrade, namely depositions of TD Ameritrade executives and employees, including cybersecurity officers and those in charge of protecting consumers' health information. Litigating unrelated claims against hundreds of varying defendants in one consolidated action will create significant inefficiencies as the transferee court and the parties will constantly have to sort out which issues overlap and which do not. It will also multiply the parties and counsel involved in a manner that will not help streamline the cases[47]. Furthermore, the Panel has consistently explained its "usual reluctance to centralize actions against different defendants in one MDL"—like consolidating the *Jeanfort* Action here would do—because "a multi-defendant MDL may prolong pretrial proceedings, because of, inter alia, the possible need for separate discovery and motion tracks, as well as the need for additional bellwether trials."[48] The fact that some of the non-MDL Defendant companies impacted by the MOVEit breach—such as TD Ameritrade —may be competitors (e.g., financial

---

[46] Indeed, in *Accellion¸* the Panel explained that the need to depose the non-party file transfer provider (here, MOVEit) was not a sufficient basis to warrant centralization: "Proponents of centralization argue that even in the action in which Accellion is not named, it will be involved in some third-party discovery. But we are persuaded that such discovery can be informally coordinated." *In re Accellion*, 543 F. Supp. 3d at 1374.

[47] *See In re Accellion*, 543 F. Supp. 3d at 1374; *see also In re Watson Fentanyl Patch Prods. Liab. Litig.*, 883 F. Supp. 2d 1350, 1351 (J.P.M.L. 2012) (denying motion to centralize all actions involving fentanyl patches irrespective of manufacturer); *In re Yellow Brass Plumbing Component Prods. Liab. Litig.*, 844 F. Supp. 2d 1377, 1378 (J.P.M.L. 2012) (denying centralization of 13 product liability actions involving different plumbing products, stating that "we are typically hesitant to centralize litigation against multiple, competing defendants which marketed, manufactured and sold similar products").

[48] *In re CP4 Fuel Pump Mktg., Sales Pract., and Prods. Liab. Litig.*, 412 F. Supp. 3d 1365, 1367 (J.P.M.L. 2019) (denying motion to centralize ten single-defendant cases).

institutions, health companies, universities, and other businesses) also militates against centralization in one case, as it would create unmanageable confidentiality issues in discovery. As the Panel has previously recognized, "centralizing competing defendants in the same MDL likely would complicate case management due to the need to protect trade secrets and confidential information."[49]

### C. Centralization of the *TD Ameritrade* cases, if any, should be in the District Court of Nebraska.

Just as there is no support for a "global" MDL, there is also no need for centralization of defendant-specific MDLs.[50] There are currently three pending cases against TD Ameritrade, all of which are pending in the District Court of Nebraska. Counsel in all cases have already begun to met and conferred regarding how those cases can be handled most efficiently in the District Court of Nebraska and anticipate coordinating their efforts through trial. Given the Panel's deference to informal coordination, no defendant-specific MDL for TD Ameritrade is needed here.

To the extent the Panel considers defendant-specific MDLs, the *Jeanfort* Action and any other actions against TD Ameritrade should be coordinated in the District Court of Nebraska. As explained above, centralizing and transferring the *Jeanfort* Action to Minnesota will not serve the convenience of the parties and witnesses. TD Ameritrade is not a citizen of Minnesota and the pertinent witnesses to the *Jeanfort* Action are not located in Minnesota. Rather, the pertinent witnesses and evidence are located in Nebraska, where the *Jeanfort* Action was filed.

Therefore, the acts giving rise to Plaintiff Jeanfort's claims occurred in Nebraska such that it will be the locus of fact discovery as all of TD Ameritrade's relevant employees and document custodians are located, or worked from, their offices in Nebraska. For that reason, to the extent

---

[49] *Id.*
[50] *See In re Accellion*, 543 F. Supp. 3d at 1374, n.3.

depositions are conducted in-person, they will occur in Nebraska. As aptly explained by Movant, "the Panel has often ruled that the single most important factor in deciding where to send the MDL is the presence of key documents and witnesses," which in this case is solely Washington and no documents or witnesses from Milliman are located in Minnesota.[51] Therefore, transfer and consolidation in the District of Minnesota will not serve the convenience of the parties, and any TD Ameritrade-specific MDL should instead proceed in the District Court of Nebraska.

**D.  Premature centralization deprives litigants of the opportunity to respond.**

The vast breadth of centralization Movant sought for the first time on Reply means that parties in cases that do not name the MDL Defendants who are not monitoring the MDL Docket had no way of knowing that their cases are at risk of being swept up in a sprawling MDL. Contrary to the Panel's rules, no such litigants have received formal notice. Moreover, because PSC's customers who are impacted by the Breach are being identified on a near-daily basis, the Panel is not presently as well-positioned as it could be to fully assess the number of litigants, the type of litigants, or the nature of the claims that any MDL would encompass. Should the Panel decide to consider an MDL of the scope proposed in Movant's Reply, Movant should be required to provide notice to all affected litigants, who should have the opportunity to respond.

**VI.   CONCLUSION**

For all of these reasons, the *Jeanfort* Action should not be transferred and consolidated in the District of Minnesota, nor should any other case that does not exclusively name the MDL Defendants. Alternatively, if the Panel considers defendant-specific MDLs, it should centralize the TD Ameritrade, Inc. cases in the District Court of Nebraska.

Dated: September 15, 2023                              Respectfully submitted,

---

[51] [Doc. 1, p. 4].

/s/ William B. Federman
William B. Federman
**FEDERMAN & SHERWOOD**
10205 N. Pennsylvania Ave.
Oklahoma City, OK 73120
Telephone: (405) 235-1560
wbf@federmanlaw.com

*Counsel for Plaintiff Jeanfort*